UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
                              .
Carla Cain,                   .   Docket #CV-22-360 (CFK)
                              .
        Plaintiff,            .
                              .   United States Courthouse
           vs.                .   Philadelphia, PA
                              .   September 13, 2022
Cindy Bass,                   .   9:00 a.m.
City of Philadelphia,         .
                              .
        Defendants.           .
```
.............................................................

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE CHAD F. KENNY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:          John S. Carnes, Jr., Esq.
                            Law Offices of John
                            S. Carnes, Jr.
                            101 W. Main St.
                            Parkesburg, PA 19365

                            Aaron D. Martin, Esq.
                            Mette Evans & Woodside
                            3041 North Front St.
                            Harrisburg, PA 17110

For The Defendants:         Davis Smith, Esq.
                            Schnader Harrison Segal
(Cindy Bass)                & Lewis, LLP
                            1600 Market St.-Ste. 3600
                            Philadelphia, PA 19103

                            Layal A. Issa, Esq.
                            Schnader Harrison Segal
                            & Lewis, LLP
                            1600 Market St.-Ste. 3600
                            Philadelphia, PA 19103

2

|                          |                                                                                                                         |
| ------------------------ | ----------------------------------------------------------------------------------------------------------------------- |
| (City of Philadelphia)   | Benjamin H. Field, Esq.<br>Deputy City Solicitor<br>City of Philadelphia<br>Law Department<br>1515 Arch St.-17th Fl.<br>Philadelphia, PA 19102 |
|                          | Ryan B. Smith, Esq.<br>Affirmative & Special<br>Litigation<br>City of Philadelphia<br>Law Department<br>1515 Arch St.-17th Fl.<br>Philadelphia, PA 19102 |
| Audio Operator           | Christopher Kurek                                                                                                        |
| Transcribing Firm:       | Writer's Cramp, Inc.<br>1027 Betty Lane<br>Ewing, NJ 08628<br>609-588-8043                                               |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For The
 Plaintiffs:

| | Direct | Cross | Redirect |
|---|---|---|---|
| Ms. Bass | 23 | 60 | 73 |
| Ms. Cain | 76 | 88 | 99 |
| Mr. Goins | 103 | 129 | 140 |
| Ms. Sharpe | 148 | 152 | 159 |
| Ms. Foster | 160 | | |

Witnesses For The
 Defendants:

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| J-2 | Application | 67 | |
| J-3 | Application | 69 | |
| J-5 | Renewal Application | 84 | |
| J-6 | Stipulation Agreement | 53 | |
| J-12 | Correspondence | 66 | |
| P-3 | Anonymous User Application | 29 | 179 |
| P-6 | Letter Dated 10/13/21 | 32 | 179 |
| P-13 | RCO Notice | 120 | 179 |
| D-4 | Summary | 105 | |
| D-5 | E-mails | 54 | |
| D-10 | Regulation Amendments | 116 | |
| D-11 | Planning Commission Rules | 115 | |
| D-12 | City Discovery | 40 | |
| D-13 | E-mail | 33 | |
| D-14 | Richardson Communi. W/Goins | 51 | |
| D-15 | Not Identified | 51 | |
| D-16 | Not Identified | 51 | |
| D-16 | Not Identified | 51 | |
| D-17 | Not Identified | 51 | |
| D-18 | Change of Democratic Comm. Person | 51 | |
| D-19 | Application | 51 | |
| D-20 | Not Identified | 51 | |
| D-23 | E-mail | 80 | |

1          THE CLERK:  All rise please.  Court is now in

2    session, the Honorable Chad F. Kenney presiding.

3          THE COURT:  Okay, we're on the record in Cain vs.

4    Bass in the City of Philadelphia, and it's 360-22.  Counsel

5    for the record?

6          MR. CARNES:  John Carnes representing Carla Cain.

7          MR. MARTIN:  And Aaron Martin representing Carla

8    Cain.

9          MR. D. SMITH:  Good morning, Your Honor, David Smith

10   representing Cindy Bass.

11         MS. ISSA:  Layal Issa representing Cindy Bass.

12         MR. FIELD:  Good morning, Your Honor, Benjamin Field

13   for the City of Philadelphia.

14         THE COURT:  All right, good morning everybody.

15         MR. R. SMITH:  Good morning, Your Honor, Ryan Smith

16   for the City of Philadelphia.

17         THE COURT:  All right, everybody have a seat.  We're

18   on the record, and, Mr. Carnes, a brief opening?

19         MR. CARNES:  Yes, Your Honor.  My client, who is

20   here in the Courtroom, Carla Cain, she is a democrat in the

21   22nd Ward.  She was a competitor of Cindy Bass, who is the

22   ward leader.  In 2019, she applied to become the primary

23   contact and to open and register the 22nd Ward Democratic

24   Committee RCO, Registered Community Organization.  She made

25   that application on June 15th.  The paperwork was accepted by

1    the Planning Commission, and she was the registered party,
2    and she proceeded accordingly.  Then, in approximately a year
3    later in August of 2020, a new application was submitted
4    outside of the one-month period when applications are to be
5    submitted, and they're due the month of June.  So hers was
6    filed June 15th of 2019, and the renewal would be 2021.
7         So on August 13th of 2020, a year later almost, a new
8    application was filed.  This started a flurry of activity in
9    which Councilwoman Bass became involved to seek to remove
10   Carla Cain as the primary contact.  There were communications
11   back and forth between the Planning Commission and the
12   commissioner, and she had certified the application form on
13   August 13th, and there was indication that Carla Cain had
14   been removed, but then there was no indication or change in
15   the records to establish that she had been removed.  Carla
16   Cain remained in that position and renewed her application in
17   June 3rd of 2021.  Thereafter, in approximately September of
18   2021, an application came before the RCO of regarding a
19   property identified as 244 East Springer Street in the 22nd
20   Ward, which is co-extant with the 19119 zip code, Your Honor.
21   So these applications come as a little matter of history,
22   and, typically, when there's a zoning hearing board
23   application for a variance or a special exception, it's
24   supposed to be forwarded by a process to the RCOs.  There is
25   usually one RCO, which is the coordinating RCO and then

1     another or more RCOs that also become involved, depending

2     upon their proximity, and they gather community input to then

3     identify their position to the zoning hearing board.  The

4     councilwoman's office is also contacted if it's within her

5     ward regarding any of these zoning applications.

6          So, finally, after being there for quite some time and

7     having renewed in 2021, an application comes up, and, again,

8     the process springs forward.  Again, Councilwoman Bass seeks

9     to remove her and to place the same two people that she

10    previously identified as having been her proposed parties in

11    the August 13th, 2020, application, and then, at this point,

12    after, again, Councilwoman Bass becoming involved, she is

13    essentially told to put on her hat as a ward leader.  She is

14    the ward leader of the 22nd Ward and then to write a letter.

15    There is absolutely no thing in the zoning ordinance that

16    species that this procedure exists, and there was no

17    regulation in place that established that this is a procedure

18    that can be used.  The sum of it is that Carla Cain is then

19    removed after a letter is sent on October 13th, 2021, and,

20    again, Carla Cain does not get notified as to what happens,

21    but a review of the records establishes that about November

22    of 2021, her -- she is no longer listed as the primary

23    contact, and the two parties that have been identified by the

24    councilwoman become the new contacts.

25          It's our understanding, based upon the testimony

1    provided, that that RCO has never done anything, that the
2    only time it was called into action at 244 East Springer
3    Street, it was immediately shutdown.  And it is our
4    understanding that 244 East Springer Street did go before the
5    zoning hearing board ultimately, and there was no RCO
6    activity involved.  That's more of a side note.  But the main
7    point here is, Your Honor, that Cindy Bass, using her
8    authority, interfered with an ordinance of the city that
9    provided for an RCO, an RCO that is part of the zoning
10   ordinance.  It's meant to establish an appropriate procedure
11   for zoning applications, and she used the color of her
12   authority to do so and to attack, essentially, Carla Cain,
13   who was a political {quote} "enemy," I guess you would say or
14   a challenger.  That's our position, Your Honor.

15           MR. D. SMITH:  Good morning, Your Honor.  Again,
16   David Smith representing Cindy Bass.  Carla Cain did not form
17   an RCO.  She registered the 22nd Ward Democratic Committee as
18   a participant in the RCO process, and she made herself as the
19   spokesperson for the 22nd Ward Democratic Committee.  She
20   lacked the authority to do so.  She admits -- and Your
21   Honor's order requiring a stipulation, we provided her
22   admissions and the documents -- she admits that she lacked
23   the authority of the Democratic Committee to do so.  When the
24   ward leader, Cindy Bass, learned of it, she substituted as
25   the spokesperson for the 22nd Ward Democratic Committee, a

1    political position, people of her choosing, which she had a
2    right to do as the leader.  This is no different than a case
3    of identity theft.  Somebody without the authority assigned
4    herself to represent the 22nd Ward Democratic Committee.
5    When the leadership of the Democratic Committee learned of
6    that, it directed a change, which it had an absolute right to
7    do.
8         Your Honor, in your September 8 Order, defined a very
9    narrow scope of today's proceedings.  First, a stipulation to
10   avoid witness testimony of relevant agreed facts.  I think,
11   Your Honor, we'll find that the stipulation the parties
12   negotiated last week is comprehensive and is -- and resolves
13   all of the issues that are before Your Honor today.  It's --
14   I've been thinking of it more or less as a parol evidence
15   situation.  The documents, the applications submitted by
16   Carla Cain clearly identify that she is registering a
17   political committee to participate in the RCO process and
18   appointing herself.  She admits, and the -- her responses to
19   request for admission are part of the stipulation.  She
20   admits that she was not authorized by the committee, the
21   Democratic Committee, but rather took it upon herself.  The
22   Democratic Committee then has the right to choose its
23   representative, which it did.
24        Your Honor said in this order that you're most
25   interested in first looking at the ordinance.  The ordinance

1    is Joint Exhibit-8, and the ordinance provides that it's an
2    organization seeking recognition, so this is not something
3    that Carla Cain formed.  The organization is the preexisting
4    22nd Ward Democratic Committee.  The ordinance then provides
5    different paths for different types of organizations to
6    become recognized, registered, and to participate in the RCO
7    process.  There is one path for neighborhood organizations,
8    non-profits, unincorporated associations and so on, and that
9    requires a formal formalization with rules and bylaws and so
10   on.  That is not the process that Carla Cain followed here.
11   There is a separate process for ward organizations separately
12   stated in the ordinance, and that is how Carla Cain
13   registered the 22nd Ward Democratic Committee.
14        In the second of her registrations, she falsely stated
15   that she had the authority, the permission of the ward
16   leader, to register.  She didn't.  The ward leader runs the
17   22nd Ward Democratic Committee and gets to pick the
18   spokesperson for the committee.  Your Honor asked for brief
19   openings to demonstrate the awareness of the narrow issues
20   and why the facts favor in their side.  In this case, we are
21   here on a preliminarily -- a motion for a preliminary
22   injunction on likelihood of success.  There is an absolute
23   right of the ward leader to choose who will be the
24   spokesperson for the 22nd Ward Democratic Committee, and
25   there is an absence of state action.  We have cited

1    previously to the Court in our motion to dismiss, which I can

2    see was denied, but we cited the long string of cases in the

3    Third Circuit and in the Eastern District of Pennsylvania

4    holding that a ward leader -- that ward politics, and, as

5    counsel said, the competition for the leadership of the 22nd

6    Ward Democratic Committee is not state action.  That is

7    internal to the political process, and it is not state

8    action.

9         And so there's not a likelihood of success for those two

10   reasons, and the most prominent case, Your Honor, is the

11   Moore vs. Democratic Party.  But the cases that we cite

12   tended to be cases in which there was a contest for the

13   leadership.  Here, we've got a contest for the spokesperson

14   for the Democratic Committee.

15            THE COURT:  Yes, and I -- that's why those cases

16   don't apply unless determining the facts here because this is

17   about a city ordinance.  It is not about a fight.  It is

18   about a fight between ward politics, and ward politics are

19   involved.  And, of course, the Courts stay out of that, all

20   right?  This, though, is about this ordinance and the

21   allegation that a city councilperson used their authority

22   under the color of state law to have this ordinance -- to

23   have somebody removed without process, and I am not hearing

24   any process yet.  I am hearing that it was her absolute

25   right, not your absolute right to dictate to a bureaucrat

1   that they are to remove somebody.  There's processes involved

2   and motions to strike --

3           MR. D. SMITH:  Your --

4           THE COURT:  -- unless the ordinance tells me

5   otherwise.

6           MR. D. SMITH:  Your Honor --

7           THE COURT:  That is why we are here.

8           MR. D. SMITH:  Well, Your Honor, if I may disagree.

9   The ward has the right to designate who will be its

10  spokesperson, and that right is in the ward leader, and it

11  does not have to be a process.  On the City's side, the

12  organization gets to choose who will be its spokesperson.

13  That is purely a political decision in which this Court

14  should not be involved because it is not state action.

15          THE COURT:  I am not saying who should be the

16  spokesperson.  I am just saying, "All right, the ordinance is

17  in place."  Now, what is your response to -- because --

18          MR. CARNES:  Your --

19          THE COURT:  -- counsel is saying, "Look, Judge, we

20  are agreeing pretty much on all the facts here, and we really

21  don't need evidence because the stipulations of fact pretty

22  much set forth what both sides are saying.

23          MR. CARNES:  Your Honor, I think that the Court has

24  properly addressed the issue.  It is an ordinance.  It has no

25  authority for what has been done, and the history of it shows

```
 1    that the Planning Commission people were pushed to do this
 2    because, technically, as I had said in my opening, and I
 3    don't think it's disputed, Carla Cain, who the record will
 4    establish, was the first vice chair of the Democratic 22nd
 5    Ward, was also a committee person who was on the estate
 6    committee, took it upon herself, and there was nothing that
 7    prohibited her whatsoever to register, to get involved, and
 8    she did that under that zoning ordinance.  And then there was
 9    no action whatsoever as I indicated for a year, and then
10    attempts were made to remove her, and those attempts were
11    initially -- you couldn't tell what happened.  The record is
12    a little unclear, but it looks as though the Planning
13    Commission was besieged by her and sought to remove her and,
14    in fact, the -- her staff believed that they had removed
15    Carla Cain in 2020 when they filed a change application
16    outside of the period in which you are permitted to do so.
17         So all the rules have been -- have not been followed.
18    And, Your Honor, you know, here we are.  Carla Cain is here.
19    Cindy Bass is not here.  We're here at 9:00 o'clock, prepared
20    to move forward, and there's no witness.  She is our first
21    witness.  We subpoenaed her to be here, and we're prepared to
22    go forward.  So this is an attempt by the City.  I'd say
23    it's somewhat arrogant to just try to --
24              THE COURT:  All right, this is -- wait a minute.
25    Where is your client?  She's been subpoenaed.
```

1            MR. D. SMITH:  Yes, she has been subpoenaed, Your

2    Honor, and she will be here.  She had to drop off her child

3    at school.  She has no other way for her child -- and I told

4    her that we were having argument before testimony begins,

5    and --

6            THE COURT:  It wasn't argument.  It was openings.

7            MR. D. SMITH:  Openings, yes, Your Honor.

8            THE COURT:  All right, let's create a record.

9    Again, I'm just -- I'm hearing what you're saying is that she

10   had no authority in the first place to represent whatever she

11   was representing.  I just want to find out and then create a

12   record and make sure the record is complete.  I don't want to

13   go over anything that was stipulated, so you can call your

14   next witness --

15           MR. D. SMITH:  But, Your Honor --

16           THE COURT:  -- when we went --

17           MR. D. SMITH:  -- may I finish?

18           THE COURT:  Oh, I put you where?  Counsel, have a

19   seat.  Go ahead.

20           MR. CARNES:  Okay, thank you.

21           MR. D. SMITH:  Your Honor, there was no removal

22   here.  There was a designation of, first, the entity that is

23   registered is the 22nd Ward Democratic Committee.  The

24   committee chose its representative, and it assigned a

25   representative, which was not Carla Cain.  Now, also on the

1  issue of irreparable harm, assuming her claim, assuming her

2  facts as true, all she had to do, if she wanted to be an RCO,

3  is register a new organization, not the 22nd Ward Democratic

4  Committee, which she had no authority from the ward leader to

5  represent, and she admits, and it's in the stipulation, there

6  are other RCOs functioning in the 22nd Ward, and she is free

7  to participate in them if she wants.  So she is not in any

8  way being prevented from participating in the RCO process.

9  The only thing she is prevented from doing is assigning

10  herself as the spokesperson of the 22nd Ward Democratic

11  Committee against the wishes of the ward leader.  Thank you.

12           MR. R. SMITH:  Your Honor, may I be heard briefly?

13           MR. D. SMITH:  Thank you.

14           MR. R. SMITH:  From the City's perspective, Your

15  Honor, the ordinance speaks for itself and states that, "An

16  organization may be recognized as an RCO if it meets certain

17  factors."  Further, what that organization may do is

18  designate a primary contact person.  It doesn't  create an

19  individual right in any person.  It creates a right for an

20  organization that's a community group or a non-profit or a

21  political ward committee, as is the case here, to weigh in

22  officially on zoning matters via a community meeting.  After

23  that community meeting, they report back to the zoning board

24  what their position is, as counsel said.  In this case, the

25  City is simply allowing the organization itself to resolve

1    the internal dispute.  If this were a non-profit or a
2    neighborhood association, the City would do the same thing,
3    that is the City can't dictate to an organization who they
4    select as their primary contact person.  In fact, that could
5    implicate First Amendment problems.  Rather, the City said,
6    "We recognize this dispute here between these two parties.
7    We're going to the organization that's registered and its
8    leadership to resolve it, whether that was by committee vote,
9    by the ward leader's decision, by an executive director or a
10   board of directors if it's a non-profit.  In cases where
11   we've had disputes before, that is what we've done, and
12   that's what the City planned and commissioned to here.
13        So, just to be a little bit more precise on definitions
14   as I'm sure Your Honor is aware, a ward is a geographic
15   subdivision of the city.  It's not political in nature, but,
16   in each ward, the parties may form political committees,
17   which are then elected -- the committee persons, of which,
18   are elected by the people who are residing in that ward.  So
19   both Ms. Bass and Ms. Cain are elected committee persons for
20   the 22nd Ward Democratic Political Committee.  That's the
21   organization that the applications that we've stipulated to
22   be made clear that Ms. Cain registered as an RCO.  As far as
23   the likelihood of success on the merits and the irreparable
24   harms, Your Honor, I would like to speak to those at this
25   point starting with the irreparable harm first.

1          As counsel said, Ms. Cain could form her own

2     organization and register it as an RCO at anytime she wishes

3     within the application cycle.  The record is clear.  The

4     stipulated fact, no city employee prevented her from doing so

5     or implied that she couldn't.  No city employee prevented her

6     from attending any public meeting of the zoning board that

7     she wishes, any RCO meeting, which are open to the public, or

8     lobbying her local politician or being involved in local

9     politics that she is or, in fact, contacting applicants, that

10    is, developers directly about certain projects.  She may

11    continue to do those things.  And so, the primary contact

12    person here that the organization selects is literally just

13    the person who designates to receive e-mails and letters

14    regarding zoning applications in its geographic area.

15    There's no powers or duties other than to have an active e-

16    mail address or, if you prefer, a mailing address.

17         And, as far as the likelihood of success on the merit,

18    that's where those facts are relevant, Your Honor.  There's

19    no First Amendment retaliation here as Ms. Cain testified in

20    her deposition.  She couldn't identify any protected activity

21    for which the City actually retaliated against her.  She also

22    could not articulate a due process violation because, one,

23    there's no protected liberty or property interest at stake.

24    The organization is the right holder here under the ordinance

25    and the regulations, and, as far as whether there was process

1    due, it would be due to that organization and not any

2    individual.  I think the confusion or the conflation here is

3    between a public elected official position of some kind and

4    this primary contact person, and when it's a political ward

5    committee, those lines become muddy.  But, in this case, the

6    City, I'll reiterate, did what it always does and when

7    there's a dispute, which, thankfully, isn't very often over

8    who the primary contact person should be and that's allow the

9    organization to resolve it whatever form that takes.

10            THE COURT:  All right.  Does that say that in the

11    ordinance?

12            MR. R. SMITH:  Your Honor, the specific circumstance

13    of the disputed primary contact person is not covered in the

14    ordinance.  To be frank, the newest addition of the

15    regulations make a bit more clear how the City will handle

16    this stipulation in part because of these events.  But the

17    prior version allows --

18            THE COURT:  So this -- the new version --

19            MR. R. SMITH:  Yes, Sir.

20            THE COURT:  -- what does that -- what process does

21    that require?

22            MR. R. SMITH:  Your Honor, the newest version simply

23    specifies that the executive director may request more

24    information -- state planning may request more information.

25    And in the case of -- I'll read it to you, if you permit me

1    just a minute to find it.

2         (Pause in proceedings)

3         MR. R. SMITH:  "An RCO may submit" -- this is

4    regulation section 12.3.4, Updates and Corrections.  "An RCO

5    may submit a written request to the Executive Director to

6    correct or update its registration information at anytime.

7    This request shall be submitted or verified by the primary

8    contact person as listed on the RCO's current registration

9    unless the primary contact is unavailable due to death,

10   medical condition, or other exceptional circumstances.  The

11   Executive Director may request additional documentation to

12   verify any modification to an RCO's registration information.

13        THE COURT:  So it still contemplates going through

14   the RCO?

15        MR. R. SMITH:  Through the primary contact, Your

16   Honor?

17        THE COURT:  Yes.

18        MR. R. SMITH:  Yes, that's right.  So the situation

19   is anybody can fill out the online form.  I can fill it out

20   today, the online form, for the 22nd Ward Democratic Ward

21   Committee and say, "I'd like to be the primary contact

22   person."

23        THE COURT:  Right.

24        MR. R. SMITH:  So the idea is to check with the

25   existing person that we know the e-mail of --

1              THE COURT:  Right.

2              MR. R. SMITH:  -- what's going on?

3              THE COURT:  Right.

4              MR. R. SMITH:  So the question --

5              THE COURT:  But the ordinance is the ordinance.

6    Anybody can do it, and you've done it, and it's done, and I'm

7    it.  And the question is, "Okay, where's the process to

8    remove me?"  On file and I turn around, I'm not the primary

9    person.

10             MR. R. SMITH:  Exactly, Your Honor, but --

11             THE COURT:  And that's what we're going to see, what

12   was filed here, and how was it done?  Did somebody in city

13   council had to walk in and say, hey, remove it based on my

14   word?

15             MR. R. SMITH:  Your Honor, again, the organization

16   is the right holder here, not the individual.

17             THE COURT:  Where does it say that in the ordinance?

18             MR. R. SMITH:  The ordinance begins, "An

19   organization that seeks recognition as a registered community

20   organization," and it goes on.  And then 11 -- this 14-303

21   (11A) part B, "An organization shall file a registration

22   request with the Commission on a form provided by the

23   Commission, which shall include the following: the name of a

24   contact person.

25             THE COURT:  Right.  That's what I think we have

1    here.  I mean, look, the ordinance is the ordinance, and how

2    it gets challenged in terms of who filed, and they were filed

3    wrong, and it was fraud, and it was this and that, does

4    somebody walk in and say to a bureaucrat, "Hey, this was

5    fraud.  This is all wrong.  Take that off.  Put me in."

6              MR. R. SMITH:  Yes, Your Honor, the way --

7              THE COURT:  They get to do that?

8              MR. R. SMITH:  If they are the leader of the

9    organization, absolutely.

10             THE COURT:  Yes, I just -- I'm just questioning

11   whether that is due process, even if it doesn't say what the

12   process is on file.  I get filed.  Here I am.  I'm the

13   person, and I don't get notice.  What happened?  Oh, somebody

14   walked in and said, "You're not the guy."  I don't know that

15   that's -- that has something, then, to do with the bureaucrat

16   being told by somebody without any process to say, "Hey,

17   you're removed."  This second regulation goes a little bit

18   further, but look at your own regulation.  It says, "Identify

19   that person."  Identify, in other words, who's the contact

20   person.  The contact person would be that primary person,

21   except if somebody walked in and said, "No, make me the

22   contact person."  Who are you to tell me that?  Well, I'm so

23   and so.  Let me give you my ID.

24             MR. R. SMITH:  Your Honor, if you were the leader of

25   the organization that you registered or represented as a

1    board or powered by a board to do that, I would agree with
2    you one hundred percent threat you are the only one who can
3    change it.  In this case, we verified with the primary
4    contact, who was Ms. Cain, that the request was legitimate.
5    She disputed the request, but she didn't say, "I don't know
6    who that is."  She didn't say, "That's the mistake in
7    request."  She said -- she, essentially, articulated that she
8    disputed that Ms. Bass could make a statement.
9            THE COURT:  All right.  Well, so your defense is
10   inequity?  You must do equity?
11           MR. R. SMITH:  No, Your Honor, it is --
12           THE COURT:  In a declaratory judgment, she makes a
13   statement that's a lie?  So equity -- you have to do equity.
14   So she lied, so, therefore -- on her form?
15           MR. R. SMITH:  Not at all, Your Honor.  The initial
16   application is, frankly, to the City, irrelevant.  The issue
17   is that whenever the organization would like to make a
18   change, it can do so.  It can designate on a renewal form a
19   new person.  It can designate, as the regulation says, at
20   anytime, request to make a change.
21           THE COURT:  And who do they notify?  Who is
22   notified?  All the notifications are supposed to go through
23   the primary person, right?
24           MR. R. SMITH:  Because that's the person the
25   organization provided, Your Honor.  That's who we have the

 1    contact information for.  So let's imagine --

 2          THE COURT:  And the organization came in and said,

 3    "Remove that person."

 4          MR. R. SMITH:  Your Honor, let's imagine a situation

 5    where --

 6          THE COURT:  No, I think I understand it now.  You're

 7    going to call your first witness?

 8          MR. CARNES:  Yes, we're going to call -- Cindy Bass

 9    is here now --

10          THE COURT:  All right.

11          MR. CARNES:  -- so we're going to call her as a

12    witness.

13          THE COURT:  Did anybody else have anything to add

14    before we make a record?

15          ALL:  (No verbal response).

16          THE COURT:  Go ahead, counsel.

17          MR. CARNES:  Your Honor, there's a bench copy of the

18    joint exhibits in front of you as well as some additional

19    exhibits that may be -- Ms. Bass?

20          MS. BASS:  Yes.

21          MR. CARNES:  Would you --

22          MS. BASS:  Sure.

23       (Pause in proceedings)

24          THE CLERK:  Please remain standing.  Please remain

25    standing.

1                    CINDY BASS, DEFENDANT, SWORN

2              THE CLERK:  Thank you, you can be seated.

3              MS. BASS:  Thank you.

4              THE CLERK:  And can you please state your full name?

5              MS. BASS:  Cindy Bass.

6              THE CLERK:  Thank you.

7              MR. CARNES:  Your Honor, may I approach with the --

8    it is an exhibit.  It's the same as Your Honors'.  This is

9    the witness joint exhibit index and exhibits.

10       (Pause in proceedings)

11             MR. CARNES:  Your Honor, I'm calling Ms. Bass as on

12   cross.

13                    DIRECT EXAMINATION (AS ON CROSS)

14   BY MR. CARNES:

15   Q.  Ms. Bass, could you just state your name for the record,

16   please?

17   A.  Cindy Bass.

18   Q.  And B-A-S-S is how --

19   A.  Yes.

20   Q.  -- the last name is spelled?  Okay.  And, Ms. Bass, you

21   know Carla Cain seated at my right behind me?

22   A.  Yes.

23   Q.  Okay, and Carla was a supporter of yours back in 2011

24   when you ran for council?

25   A.  Yes.

1   Q.  And you are now opposed to one another in terms of your

2   viewpoints, correct?

3   A.  It depends on what the viewpoint is.

4   Q.  But she has spoken up and criticized you in public, and

5   you'VE heard her say that?

6   A.  Well, that's true, yes.

7   Q.  Yes, and she's questioned your transparency and your

8   finances and other things of that nature as well, correct?

9   A.  She has questioned transparency.  I'm not aware of any

10  question about my finances.

11  Q.  Okay, and you were elected to council when the -- I guess

12  you would call it the new zoning ordinance of the City of

13  Philadelphia was enacted in approximately 2012, is --

14  A.  Yes, correct.

15  Q.  -- that correct?  And you were also a sponsor of the

16  section of the zoning ordinance that deals with Registered

17  Community Organizations in chapter 12 thereof, is that

18  correct?

19  A.  That's correct.

20  Q.  Okay.  And as of June of 2019, Carla Cain was the vice

21  chair -- first vice chair of the 22nd Ward Democratic

22  Committee, is that correct?

23  A.  That is correct.

24  Q.  And she was also on state committee?

25  A.  At that time, yes.

1    Q.  Okay, and she had run against you for ward leadership in

2    2018?

3    A.  Well, the seat was vacant, and there were several people

4    who were running, including myself, Carla Cain, Derek Green,

5    and Alex Talmadge.  There were four people who were vying for

6    the seat.

7    Q.  So she was one of four candidates?

8    A.  Correct.

9    Q.  Okay.  And between, say, 2013 and 2019, the -- there was

10   no 22nd Ward Democratic Committee RCO, correct?

11   A.  That is correct.

12   Q.  Okay.  And --

13   A.  To the best of my knowledge, yeah.

14   Q.  You were aware, are you not, it's part of the listed

15   exhibits, and you've seen it before that Carla Cain made an

16   application on forms available from the City and supplied

17   information necessary to register the 22nd Ward Democratic

18   Committee June 15th of 2019?

19   A.  I was made aware after the fact, after the fact of the

20   registration.

21   Q.  Okay.  When did you first become aware?

22   A.  I can't tell you the exact date, but it was sometime

23   after the application was made.

24   Q.  Okay, and just as a background fact, as a councilwoman,

25   do you receive information at your office regarding any

1   applications for a variance or a special exception that would

2   be within the district that you represent, the 8th

3   Councilmanic District?

4   A.  Correct.

5   Q.  And that would include the 22nd Ward, is that correct?

6   A.  Correct.

7   Q.  Okay.  And, in terms of the RCO and its operation under

8   the zoning ordinance, there's a procedure when there is a

9   variance or special exception that requires that the RCOs be

10  contacted, is that correct?

11  A.  I'm sorry.  I don't understand your question.

12  Q.  When a person comes within the 8th Councilmanic District

13  or within the 22nd Ward to seek a variance or special

14  exception that's going to go before the zoning hearing board,

15  would they not have to seek some input from the RCOs?

16  A.  Correct.

17  Q.  Okay, and the Planning Commission is the gatekeeper of

18  that information, is that right?

19  A.  Correct.

20  Q.  Now, does that application for an RCO also go to your

21  council offices?

22  A.  It does.

23  Q.  Okay, and when there's a coordinating RCO, is that a

24  determination that's made by you as a city councilwoman?

25  A.  That -- currently, it is.  That's something that has

1   changed, though, over the years.  Originally, at that time,

2   it was something that was worked out among neighboring or

3   overlapping RCOs, so it wasn't at that time when it was

4   registered a decision that would've come from my office.  It

5   would've been a decision between the other RCOs that overlap

6   the area.

7   Q.  Now, it was in 2019 when the 22nd Ward Democratic

8   Committee RCO was registered.  Had the process been changed

9   that you're councilmanic officer would make that

10  determination?

11  A.  No.

12  Q.  When did that change take place?

13  A.  That probably happened sometime during the pandemic, so

14  that was in 2020.

15  Q.  Okay.  Now, let me just go back.  When we bring up the

16  pandemic, as the ward leader of the 22nd Ward in 2020 during

17  the pandemic, did you not exclude Carla Cain from

18  participating in ward meetings beginning with the pandemic?

19          MR. D. SMITH:  Objection, Your Honor, outside the

20  scope of this hearing.

21          MR. CARNES:  Your Honor, just some background, I --

22  part of this is stipulated that there were differences, but

23  this is a First Amendment issue.  The communications in the

24  ward, you know, were the testimony has already been provided

25  in deposition that Ms. Bass, as an offer of proof, did

1    exclude Carla Cain and certain people who criticized her from

2    participating in their ward meetings, and that resulted,

3    ultimately, in an injunction order issued by Judge Coyle in

4    the Court of Common Pleas in Chester County prohibiting her.

5              THE COURT:  I'll sustain the objection.

6              MR. CARNES:  Okay, thank you.

7    BY MR. CARNES:

8    Q.  So that changed in 2020, is that correct?

9    A.  Uhm-hum.

10   Q.  And would you say that, after Carla Cain registered in

11   June of 2019, you became aware that she had registered,

12   excuse me, in 2020?  Would the pandemic help give you an idea

13   as to the timing?

14   A.  I believe it was in 2019 that I was aware, but I was not

15   aware at the time when she actually registered.

16   Q.  Okay.

17   A.  Yeah.

18   Q.  And what did you do when you found out, Councilwoman,

19   that she had registered the 22nd Ward RCO?

20   A.  We -- well, I made a determination that we would, you

21   know, need a partner that we could work with within the RCO.

22   And, as the ward leader, I asked Christine Foster if she

23   would be willing to take on the task.

24   Q.  Okay, and who all -- did you ask anybody else?

25   A.  I believe we asked Dominic Mathis (phonetic), who was Ms.

1  Cain's partner, if he would be willing to serve as a second.

2  Q.  Okay.  And you say that took place in 2019, you think?

3  A.  I believe so.

4  Q.  Okay.

5  A.  Yeah.

6  Q.  Now, did they agree to serve --

7  A.  Yes.

8  Q.  -- for the ward?

9  A.  Yes.

10 Q.  Okay.  And what did you do next?

11 A.  In terms of?

12 Q.  Now that you had their consent to acting as, you know,

13 who you wanted to be the RCO on the RCO.  What happened next?

14 What did you do next?

15 A.  Inform the Planning Commission of the change that we

16 would like to make.

17 Q.  Now, if we have an exhibit that constitutes an August 13,

18 2020, application -- I believe that's correct -- would that

19 change your recollection of the dates?  Exhibit-3.  Look at

20 Exhibit-3, please.

21     (Plaintiff's Exhibit-3 previously marked for

22 identification)

23 A.  So your question is, you're asking me do I remember this

24 application?

25 Q.  Well, it's an application submitted by Anonymous User

1    August 13, 2020, to organize type ward committee 22nd Ward

2    RCO.

3            MR. D. SMITH:  Your Honor, I'm going to object to

4    the form of that question.  Anonymous User, it's been

5    established in discovery that all print outs start with

6    Anonymous User, and then this party submitting is identified

7    later in the document.

8            MR. CARNES:  Your Honor, I'm just reading from the

9    first page of it.  I don't disagree with --

10            THE COURT:  Thanks for --

11            MR. CARNES:  -- what was stated.

12            THE COURT:  -- the clarification.  Thank you for the

13    clarification.

14            MR. CARNES:  Thank you, Your Honor.  Yeah, I don't

15    disagree with what was stated.

16    BY MR. CARNES:

17    Q.  But turning to that Exhibit-3 --

18    A.  Yes.

19    Q.  -- the last page of that exhibit has political ward RCO

20    registration certification Cindy Bass --

21    A.  Uhm-hum.

22    Q.  -- okay?  And that's -- that was prepared, I assume, with

23    the rest of that application?

24    A.  I'm assuming.

25    Q.  Did you review this application with Christine Foster?

1   A.  Likely, but I can't say for sure.  You're talking about

2   over two years ago.

3   Q.  Well, does this date now ring a bell in terms of when you

4   met with Christine Foster and Mr. Mathis?

5   A.  It does not.

6   Q.  No?

7   A.  I'm sorry, it does not.

8   Q.  Okay.  Now, what happened after -- were you aware that

9   under -- I'm not sure whether it's the ordinance or the

10  regulation, but the paperwork that you obtained from the

11  City, if you go on the website for an RCO, indicates that

12  June is the application period and renewal period, are you --

13  A.  Okay.

14  Q.  -- aware of that?

15  A.  No.

16  Q.  Okay, so your August 13, 2020, application, wasn't that

17  not treated as a duplicate application out of time?

18  A.  I cannot tell you.

19  Q.  Okay, did you find out after this submission was made on

20  August 13, 2020, whether it was effectuated to remove Carla

21  Cain as the primary contact from the 22nd Ward Democratic

22  Committee RCO?

23  A.  I'm sorry, I can't recall exactly if that's, you know --

24  I don't know.

25  Q.  Did you address this later in 2021 a year later?

1   A.   It's possible.

2   Q.   Did you write a letter on October 13, 2021, addressed to

3   Eleanor Sharpe, Deputy Director, expressing that Christine

4   Foster should be listed as the primary contact for the 22nd

5   Ward Democratic RCO?  I'm talking about Exhibit-6 on the

6   exhibit list.

7        (Plaintiff's Exhibit-6 previously marked for

8   identification)

9   A.   Yes.

10  Q.   So you did deal with this again in 2021?

11  A.   Correct.

12  Q.   And did you find out whether this was effective or not?

13  A.   I'm sorry, I don't recall.

14  Q.   Do you know who the ward -- who is the primary contact

15  for the 22nd Ward Democratic Committee RCO as we sit here

16  today?

17  A.   I believe it's Christine Foster.

18  Q.   And who would be the second?

19  A.   It should be Dominic Mathis.

20  Q.   And do these parties both have to be committee people in

21  the 22nd Ward?

22  A.   They should be, but it's not a requirement.

23  Q.   Are they both committee people in the 22nd Ward?

24  A.   Yes.

25  Q.   Dominic Mathis is currently a committee person in the

1    22nd Ward?

2    A.   Yes, he's an appointed committee person.

3    Q.   He was appointed?

4    A.   Yes, correct.

5    Q.   After he lost the election?

6    A.   That is correct.

7    Q.   After he was stricken from the ballot?

8    A.   I'm not sure why he was, you know -- why he didn't win,

9    but --

10   Q.   Okay.

11   A.   Yeah, I don't know.

12   Q.   Now, I want to ask you to please turn to some e-mails

13   that are -- we'll start with your exhibits, which are in 13,

14   Ms. Bass.   It's Exhibit-13 there, and we're looking at Bass

15   one through eight.

16        (Defendant's Exhibit-13 previously marked for

17   identification)

18   Q.   Do you see those e-mails?

19   A.   Uhm-hum.

20   Q.   Okay.   Now, this is dealing with 2020.   First of all, is

21   Christian Matozzo, last name spelled M-A-T-O-Z-Z-O, is he on

22   your staff?   Was he on your staff in 2019?

23   A.   He was at that time.

24   Q.   Okay.   And how about Tyrone Barge and Rodney Jamison

25   (phonetic)?

1   A.   They were at that time.

2   Q.   Okay.  Now, I believe we have to look backwards to get

3   the sequence here.  So, if you look at -- no.  If we look at

4   the -- excuse me, on Bass-1, this is dated September 16,

5   2019, and it's an e-mail addressed to yourself.  Is that your

6   e-mail address, Ms. Bass, cindy.bass@phila.gov?

7   A.   Correct.

8   Q.   And your personal e-mail, bass -- behind that --

9   cindy.bass@gmail.com?

10  A.   Correct.

11  Q.   And copied are Tyrone Barge and Rodney Jamison?

12  A.   Yes.

13  Q.   It says, and it -- so this is a 2019 notice sent to you

14  saying that Carla Cain is registered in the 22nd Ward as an

15  RCO?

16  A.   Uhm-hum.

17  Q.   Is this the first you knew of it?

18  A.   Yes.

19  Q.   Okay.  And we have not received any other discovery from

20  you that relates to 2019.  We now turn to 2020.  Okay.  Now

21  go, if you would, to page eight, Bass-8 and 7.  This e-mail

22  is dated September 5, 2020, is that correct?A.  Yes.

23  Q.   And this is from Christine Foster?

24  A.   Uhm-hum.

25  Q.   So this would be after the August 13th, 2020, application

1    had been filed?

2    A.  Uhm-hum.

3    Q.  And you had already spoken to her about that matter,

4    correct?

5    A.  Correct.

6    Q.  And what she is sending is a forwarded message dated the

7    day before on September 4th from rco@phila.gov, and is that

8    the RCO coordinator that would be either Justin -- Jonathan

9    Goins or Ms. Bowers?

10   A.  I believe so.

11   Q.  Okay, so on September 4, a response comes back regarding

12   the August 13th application, and what does that say?

13   A.  What -- you want me to read the response?

14   Q.  The "good afternoon" from --

15   A.  Good afternoon --

16   Q.  -- RCO to Foster.

17   A.  Right.  "Good afternoon.  I am writing to follow up

18   regarding your recent RCO registration application.  As I

19   presume, you are aware there is already an active registered

20   2022 Democratic Ward RCO since June of 2019.  The existing

21   22nd Ward -- Democratic Ward RCO status does not expire until

22   summer of 2021, as we are not able to register two RCOs under

23   the umbrella of a single political ward, and the 22nd is not

24   up for renewal.  We would need to treat your registration as

25   a request to change contact information, primary and

1   secondary, for the existing RCO -- for the existing

2   registered RCO.  22nd would still need to renew next summer.

3       Our typical procedure for RCO contact info request is to

4   confirm the change with the existing primary contact, Carla

5   Cain, in this case.  If we can't get that confirmation or the

6   change is contested, we would turn to organizational

7   leadership, in this case, the ward leader, to confirm the

8   change.  The ward leader certification submitted with your

9   registration should be sufficient, but I am writing to

10  confirm that you understand what we we're proposing that

11  renewal wouldn't be needed next summer and that you wish to

12  proceed with the contact changes I've described to you.

13  Please feel free to follow up with any questions or concerns,

14  and please respond when you are able."

15  Q.  And that's signed by -- that has the name, Jonathan

16  Goins?

17  A.  Jonathan Goins.  Sorry, I don't have reading glasses,

18  so --

19  Q.  Okay.

20  A.  -- it's a little challenge.

21  Q.  Now, and, again, Mr. Goins was the person, as you

22  understand it, who was in charge of the RCO registration

23  process?

24  A.  Correct.

25  Q.  Okay.  And did the -- did Christine Foster make

1   applications subsequently in 2021 in June to renew the RCO?

2   A.  I believe so.

3   Q.  Do we have a copy of that renewal application?

4   A.  Do I have a copy of it?  No.

5   Q.  Okay.  Were you aware that Cindy -- Carla Cain, excuse

6   me, did apply on June 3rd of 2021 to renew the RCO?

7   A.  No.

8   Q.  And by the way, this e-mail that we're looking at at the

9   top of page Bass-7, it has a big black spot, and it says

10  redacted.  Do you know what would have been there?

11  A.  No.

12  Q.  And your initial e-mail carrying the e-mail from Jonathan

13  Goins to Cindy Foster -- I mean, Christine Foster -- was

14  forwarded to Charles Richardson, and who is he?

15  A.  He's a staffer (indiscern.) --

16  Q.  Okay, so this was being run --

17  A.  -- district director.

18  Q.  -- by staff, right?

19  A.  Yes.

20  Q.  Okay.  And now, we turn to Bass-3 and 4.  Again, there's

21  a -- now, an e-mail dated from RCO on the bottom of Bass-3 to

22  Carla Cain informing Carla Cain of the request to change and

23  requesting her response, is that correct?

24  A.  (No verbal response).

25  Q.  That's on September 21st, so --

1   A.   Uhm-hum.

2   Q.   And, above that, you see an e-mail, and that comes from

3   cindybass@phila.gov, and it says -- can you read that?

4   A.   Uhm-hum.

5   Q.   What does that say?

6   A.   "Hi, Jonathan.  Can you call me on this?  215-820-4991.

7   Thank you."

8   Q.   And, again, above that on page three, there's a big black

9   mark that says redacted

10   A.   Uhm-hum.

11   Q.   Okay.

12        MR. D. SMITH:  Your Honor, if I may address that,

13   these redactions at the top are the forwards to my law firm.

14        THE COURT:  You don't have to address it.  You don't

15   have to address it.

16   BY MR. CARNES:

17   Q.   I'm turning to Bass-5 and 6.  In -- and now, we have an

18   e-mail from Jonathan Goins addressed to you at phila.gov

19   again, and below that is an e-mail from you dated September

20   23rd where you say -- that's your e-mail to Mr. Goins,

21   correct?

22   A.   Where are you looking at?

23   Q.   Bottom of page six or of Bass-6.

24   A.   Oh, page six.  I'm sorry.  Okay.

25   Q.   And you asked Mr. Goins to call you, and you gave him

1   your phone number?

2   A.  Uhm-hum.

3   Q.  And he then says he's going to call you?

4   A.  Uhm-hum.

5   Q.  And, above that, that same day, the 23rd, you say you're

6   free most of the day?

7   A.  Uhm-hum.

8   Q.  And, again, there's another -- okay.  Now, on October

9   20th, 2020, you say, "I would like the" -- what -- it's from

10  Cindy Bass to Jonathan Goins.  What does that mean?  What is

11  that -- what's happening there?

12  A.  Where are you?  What page?

13  Q.  Page five.

14  A.  Okay.

15  Q.  It's October 20, 2020.

16  A.  Uhm-hum.

17  Q.  What's this referred to?

18  A.  I can't -- I cannot tell you.  "I would like the 22nd

19  Ward RCO to be included on the list."  I'm really not sure.

20  Q.  Well, below, it says from Jonathan Goins that same day

21  earlier in the morning at 9:57 --

22  A.  Yes.

23  Q.  -- 10:00.  To Cindy Bass.  Subject RE: 22nd Ward, and,

24  below that, it says redacted.

25  A.  Correct.  I don't have the --

1  Q.  So you don't -- we don't know what --

2  A.  I don't have the information in terms of what was

3  redacted, so I don't know what, you know, this particular

4  statement was actually referring to.  I can't speak to it.

5  Q.  But was it your understanding that you had effectuated

6  the change of the primary RCO at about this date, October

7  20th, when you were talking about the 22nd Ward RCO to be

8  included on the list?

9  A.  I cannot tell you if that was what we were discussing at

10  that point.  I know that we were working towards making sure

11  that we have the contact change to Ms. Foster, but I can't

12  tell you if it was done at that point.  This was over two

13  years ago, so I really can't speak specifically as to, you

14  know, what this is referring to.

15  Q.  Okay.  I'd ask you now turn to the next exhibit, which is

16  Exhibit-12, City 95.

17       (Pause in proceedings)

18  Q.  Bass -- I mean, no, I'm talking City-12.  City Exhibit-

19  12, which is the city discovery.

20       (Defendant's Exhibit-12 previously marked for

21  identification)

22  A.  Oh, sorry.

23  Q.  Do you see on City 95, the very -- pretty much to the

24  end?

25  A.  Okay.

1   Q.  There's an e-mail from Jonathan Goins to Christian

2   Matozzo.  Let me -- regarding 22nd Ward apt.  Do you see

3   that?

4   A.  Uhm-hum.

5   Q.  And Christian Matozzo then responds how?

6   A.  He asked Jonathan to call him.

7   Q.  To call him?

8   A.  Uhm-hum.

9   Q.  And that's September 27 -- September 16th and a September

10  27th response by Christian Matozzo, is that correct?

11  A.  Uhm-hum, correct.

12  Q.  Backing up again on City page six, on page six and page

13  seven, there's an e-mail from the bottom of page six on this

14  page seven dated September 4th addressed to Ms. Foster, and

15  that's the e-mail you read before.  The next e-mail up on

16  September 11th, again, there's an e-mail asking to confirm

17  that she wants to be the ward leader, correct?

18  A.  That she wants to be the RCO.

19  Q.  I mean RCO.

20  A.  Yes.

21  Q.  And above that, on September 14th, Jonathan Goins is

22  writing to Mr. Mathis, and then, on September 17th, another

23  e-mail requesting confirmation from Ms. Foster.  Now, did --

24  do we -- did Mr. Mathis ever agree to be the second person?

25  A.  Yes.

1   Q.  He did?

2   A.  Yes.

3   Q.  And yet, in 2021, we came back to this issue, correct?

4   A.  We came back to this --

5   Q.  The issue of who was the RCO --

6   A.  Yes.

7   Q.  -- the RCO --

8   A.  Uhm-hum.

9   Q.  -- primary contact and secondary contact.  I would like

10  you to take a look at Exhibit-12, the beginning of that, the

11  RCO application, do you see that?  It would be pages one

12  through three.

13  A.  Okay.

14  Q.  And that's the application for renewal by Carla Cain.

15  And isn't it true that there is no application made by

16  Christine Foster to renew in 2021?

17  A.  I don't know.  I'm not sure.

18  Q.  In 2021, there was an application made regarding a

19  property on Springer Street at 244 East Springer, do you

20  remember that happening?

21  A.  No.

22  Q.  Do you remember a person that -- from South Philadelphia

23  that had run for council having a property on 244 East

24  Springer Street?

25  A.  A person from South Philadelphia?

1   Q.   I believe so.  Mr. Anastasio?

2   A.   Vernon Anastasio?  I --

3   Q.   Yes, Vernon Anastasio.

4   A.   I don't know that he owns the property.  I think he was

5   the attorney on the case.

6   Q.   So he was presenting somebody with an application at 244

7   East Springer Street in 2021.

8   A.   Okay.

9   Q.   And what happened after that application was submitted?

10  A.   I cannot tell you.

11  Q.   Would that have been -- would that information have been

12  supplied to the primary contact for the RCO?

13  A.   It could have been.  You know, it could've been worked

14  out among the RCOs.  There was -- in that neighborhood, it

15  would be either East Mount Airy Neighbors or Cliveden Hills.

16  Those were the two active RCOs in the community, and so those

17  were the two that it most likely would have either been

18  assigned to or would have been directed to.

19  Q.   Okay.  So I'm asking you to turn to Exhibit-13, which is

20  the Bass exhibits that were supplied.

21  A.   What section is that?

22  Q.   It would pages nine --

23  A.   Is that on section 12?

24  Q.   Yeah -- no, it's on 13.

25  A.   Thirteen, I'm sorry.  And pages?

1   Q.  Nine through seventeen.

2   A.  Okay.

3   Q.  So, if we start at pages 13 and 14, in the middle of 13

4   on September 20, 2021, do you see an RCO notification sent to

5   vern@alawphilly.com?

6   A.  Uhm-hum.

7   Q.  Would that have been -- be Vernon Anastasio?

8   A.  I'm assuming so.  I don't have his e-mail address, but

9   I --

10  Q.  Okay.

11  A.  -- probably assume, yeah.

12  Q.  And that September 20 at 3:17 p.m., and its Ccs are

13  RCOZBA, RCO notification, and then we see

14  rconotification@phila.gov and C. Cain with an e-mail address

15  of ccain225@gmail.com, and then info@eastmountairy.org, and

16  then we also have a copy, Charles L. Richardson and Tyrone

17  Barge.  So this e-mail was sent to an RCO notification

18  address and as well as the 22nd Ward Democratic Committee

19  with Carla Cain as the primary RCO, primary contact, and all

20  sent to the East Mount Airy group with their primary contact,

21  correct?

22  A.  Uhm-hum.

23  Q.  And it was also copied to your council -- to your staff

24  at council?

25  A.  Correct.

1   Q.  So after the September 20, '21, notification on --

2   turning back a page on September 24, 2021, there's an e-mail

3   in the middle of the page.

4             MR. D. SMITH:  What page are you looking at, please?

5             MR. CARNES:  Page 12.  Bass-12, page 4.

6   BY MR. CARNES:

7   Q.  And it's -- it starts on Friday, September 24.  That's

8   three days later at 10:38 a.m.  RCO notification wrote, "Good

9   morning.  The contact for the 22nd Ward Democratic Committee

10  is NO," in big bold, "longer C. Cain."  And what -- it then

11  identifies Christine Foster, correct?

12  A.  Uhm-hum.

13  Q.  And above that is an e-mail from Carla Cain at 1:07 later

14  that day addressed to Vern at Philly Law, RCOZBA,

15  info@mountairy, Charles Richardson, Tyrone Barge, and others

16  saying, "I'm appealing this notice and would like to inform

17  you that Christine Foster is not RCO lead for the district.

18  I would like a full investigation into this since this is an

19  outcome of ongoing harassment," do you see that?

20  A.  I see that.

21  Q.  That's at 1:07, and backing on to page 11 at 1:30 p.m.,

22  Mr. Richardson, your staff member, gets involved and says,

23  "Importance high," and he sent an e-mail to RCO, and that

24  would be Jonathan Goins?

25  A.  Uhm-hum.

1   Q.  Is that yes?

2   A.  I'm assuming.

3   Q.  And she says, "Please.  Please, the below e-mail from

4   Carla Cain, and her e-mail address is supplied, she

5   represents the 22nd Ward Democratic Committee.  How can this

6   issue be resolved?"  So your staff was, at that point in

7   time, recognizing, in 2021, after -- in September after the

8   June registration that the RCO was still -- had as primary

9   contact Carla Cain, correct?

10  A.  Correct.

11  Q.  Okay.  And now, we have Jonathan Goins' response a few

12  days later on September 27th on the same e-mail stream

13  addressed to Nicole Odizemere (phonetic) and Jeanine Allen-

14  Bowens, and it also says RCO notification; Eleanor Sharpe.

15  So that now appears in the caption.  Who is Eleanor Sharpe?

16  A.  She works for the Planning Commission.

17  Q.  Okay.  And what does he tell Jeanine Bowing -- Allen-

18  Bowens?

19  A.  "My apologies.  I should have replied to you directly

20  when this question first came up.  The council office does

21  not have the authority to change contact information for an

22  RCO.  This will need to go through a process with us, PC

23  staff, to sort it out, and Ms. Cain will need to remain the

24  primary contact while we do so.  There is a history here that

25  I can fill you in on.  Let me know if you have time for a

1    Teams chat later today.

2    Q.   Okay.  And then, previously, going -- or moving forward

3    in time, we have a -- an e-mail from Jeanine Allen-Bowens,

4    this time addressed to Charles L. Richardson with a Cc to you

5    and Jonathan Goins, "Please" -- forwarding everything and

6    saying, "Please see the e-mail below and contact Jonathan

7    Goins," is that correct?

8    A.   Yes.

9    Q.   Now, we move into September 28th, and Jonathan Goins is

10   now writing to Jeanine Allen-Bowens, Charles L. Richardson,

11   with a Cc to you, and he's saying what?

12   A.   "Councilmember Bass and Mr. Richardson, we don't have any

13   set procedure in place for when there's a disagreement about

14   primary contacts for RCOs or, in this case, where we have

15   separate RCO applications under the same ward umbrella.

16   Thankfully, neither happens very often.  When we spoke on

17   this last year, I believe we requested something in writing.

18   A word doc is fine from Ward Leader Bass representing the

19   22nd Ward making a specific request to change the primary

20   contact info, name, and e-mail for the 22nd Ward RCO.  I

21   haven't spoken yet with Eleanor, but I think that would still

22   be sufficient to make the change.  My apologies for the

23   confusion on this.  We're just trying to be consistent in how

24   we handle things across all RCOs.  Thank you for being

25   responsive and trying to clear things up.  Jonathan."

1  Q.  And Eleanor that's referenced is the same Eleanor Sharpe

2  that was identified previously, that's --

3  A.  I believe so.

4  Q.  Okay.

5  A.  Yes.

6  Q.  And then --

7  A.  If I have to do more reading, can I get my reading

8  glasses, please?

9  Q.  Absolutely.

10  A.  Okay, thank you.

11  Q.  I mean, that's --

12  A.  Okay, all right.

13  Q.  Court's --

14  A.  Thank you.

15  Q.  -- indulgence.

16      (Pause in proceedings - witness retrieving glasses)

17  A.  Okay.

18  BY MR. CARNES:

19  Q.  So do you have your glasses?

20  A.  I do.

21  Q.  Okay.  So turning now to the bottom of nine, the

22  beginning of ten --

23  A.  Okay.

24  Q.  -- we have an e-mail that followed from your staff,

25  Charles Richardson, saying that -- essentially, what does it

1   say?  "I have to look for the paperwork, but a letter from

2   the councilwoman" -- and then he puts {paren.} (ward leader)

3   {paren.} was included with the application naming Ms. Foster

4   as her designee for the chair and contract for the 22nd Ward

5   RCO, is that correct?

6   A.   That's correct.

7   Q.   So he's trying to say this was done before.  And then we

8   go back later in -- on page nine a little later in the day,

9   Mr. Richardson sends you an e-mail about the RCO.  And, in

10  the second paragraph, he says what?

11  A.   "Jonathan asked that we now supply a letter from you with

12  your ward leader hat on on behalf of the ward asking for

13  Christine to be listed as primary contact and as committee

14  chair.  According to him, this will finally solve the issue."

15  Q.   And then what's the next paragraph say?

16  A.   "They want to avoid appearances of council choosing

17  contacts for RCOs even though it makes sense in this

18  particular case."

19  Q.   And are their quotations around the words "ward leader

20  hat on" --

21  A.   Uhm-hum.

22  Q.   -- in the paragraph that you read before?

23  A.   Yes.

24  Q.   Okay.  Now, I want you to look at just -- to just switch

25  for a second back to city.  That's Exhibit-12, 96 and 97.

1   You had previously testified about Mr. Mathis accepting his

2   position of ward -- of -- as being a secondary contact under

3   -- for the RCO, is that correct?

4   A.   Correct.

5   Q.   Now, on page 97, there's an e-mail sent to him from

6   rco@phila.gov.  That would be Jonathan Goins?

7   A.   Uhm-hum.

8   Q.   And that's stated at the bottom of page, 11:29, and it

9   says, "This message serves as notice to the 22nd Ward

10  Democratic Ward RCO that we have received a request to change

11  the contact information on file for the RCO.  This change

12  would replace the currently listed contact information found

13  here, and there's a connection with a primary and secondary

14  contract listed in the attached registration application, and

15  the attached registration was supplied.  Please respond to

16  confirm you received this message."  And Mr. Mathis responds

17  at 8:03 p.m. as how?

18  A.   "Good evening.  I did not know that this would be

19  affecting my partner, Carla Cain.  I would like to be removed

20  from the RCO."

21  Q.   And turning the next page, on September 21 at 8:09, six

22  minutes later, what does he now say to the RCO?

23  A.   "I'm sorry, that was not a valid e-mail.  I gladly accept

24  the position in the RCO.  Thank you very much, and it would

25  be a pleasure to serve my community.  Dominic Mathis."

1   Q.  Now, did you speak with Mr. Mathis regarding this matter?

2   A.  I don't recall speaking to him.

3   Q.  Okay.  I want to turn your attention now to City Exhibits

4   14 to 19 and 20.

5        (Defendant's Exhibit 14 previously marked for

6   identification)

7        (Defendant's Exhibit 15 previously marked for

8   identification)

9        (Defendant's Exhibit 16 previously marked for

10  identification)

11       (Defendant's Exhibit 17 previously marked for

12  identification)

13       (Defendant's Exhibit 18 previously marked for

14  identification)

15       (Defendant's Exhibit 19 previously marked for

16  identification)

17       (Defendant's Exhibit 20 previously marked for

18  identification)

19  Q.  Again, on page 19, we have the application referenced

20  regarding 244 East Springer Street, do you see that?

21  A.  Yes.

22  Q.  At 18, we have what we saw before was the change of the

23  democratic committee person by Ms. Bowens with Carla Cain's

24  statement that she's appealing?

25  A.  Uhm-hum.

1  Q.  And back on 14, we have communication from Mr. Richardson

2  back and forth with Mr. Goins regarding the letter, is that

3  correct?

4  A.  Uhm-hum.

5  Q.  And on October 7, Mr. Richardson says what?

6  A.  "Who is the letter to be addressed to?"

7  Q.  It's from Charles Richardson to Jonathan Goins, CC to

8  Jeanine Allen-Bowens.  What does he say on October 7th?

9  A.  "Charles, just looping back to this request.  Let me know

10  if you -- let me know any additional questions."

11  Q.  And above that, he says?

12  A.  "Sorry, I'll send it."

13  Q.  And what's that?  Is that the letter?

14  A.  I assume so.

15  Q.  And Jonathan Goins is giving directions to Mr. Richardson

16  as to how to prepare the letter?

17          MR. D. SMITH:  Objection.

18          THE COURT:  Sustained.  Rephrase it.

19          MR. CARNES:  Okay.

20  BY MR. CARNES:

21  Q.  What does the -- on the middle of 14, Charles Richardson

22  communicates with Jonathan Goins, and he has a question, do

23  you see that?

24  A.  On the -- on September 30th, is that where you are?

25  Q.  At 2:57:22, what does he say?

 1  A.  "Jonathan, who is the letter to be addressed to?"

 2  Q.  And then Jonathan Goins responds, at 3:12?

 3  A.  Ideally, Eleanor, but anything to PCPC would work -- will

 4  work.

 5  Q.  Okay.  And then Jonathan Goins follows up again later

 6  that day?

 7  A.  Uhm-hum.

 8  Q.  Okay.  And the letter that was prepared, was that a

 9  letter that you signed?

10  A.  Where's the letter?

11  Q.  It's -- I believe it's City #5 at the back of -- yeah,

12  City #6, excuse me.  There's an October --

13          MR. D. SMITH:  No, no, it's Joint Exhibit #6.

14  Q.  Yeah, Joint Exhibit #6, my error.

15      (Joint Exhibit-6 previously marked for identification)

16      (Pause in proceedings - attorneys confer)

17          MR. D. SMITH:  That binder has the stipulation in

18  the front and then the joint exhibits in the back.

19          MR. MARTIN:  If I might inquire, Your Honor, that

20  appears to be much thinner than what the witness has.

21          MR. D. SMITH:  Two-sided copy.

22          MR. MARTIN:  Double sided, but it's identical.

23          MR. D. SMITH:  Yes, killing less trees.

24          MR. MARTIN:  Thank you.

25  BY MR. CARNES:

1    Q.  So on City-5, we have previously reviewed the e-mails,

2    the directions that were supplied in the correspondence

3    between Mr. Richardson and Mr. Goins, and then there's this

4    October 13th, 2021, letter, and it has a signature, Cindy

5    Bass.  Did you sign it, or is that stamped?  Do you know?

6           (Defendant's Exhibit-5 previously marked for

7    identification)

8    A.  I don't know.  It looks like it might be stamped, but

9    that is my signature.

10   Q.  Okay.  And is this something that was prepared for you by

11   Mr. Richardson?

12   A.  I cannot say.

13   Q.  And is it your understanding that sometime in

14   approximately November of 2021, the registration at the --

15   that is printed out by the City identifying the primary

16   contracts for RCOs has been changed to identify Christine

17   Foster as the primary contact?

18   A.  I'm not aware.

19   Q.  What has Christine Foster done since you wrote a letter

20   in her support on October 13, 2021?

21   A.  You would have to --

22           MR. D. SMITH:  Objection to form.

23   A.  -- ask Ms. Foster.

24           THE COURT:  Sustained.  Anyways, what has she done?

25           MR. CARNES:  Yeah, I -- okay.

1           THE COURT:  I mean, she went to the shore for two

2    weeks.

3           MR. CARNES:  Yeah, that was -- you're right, Your

4    Honor.

5    BY MR. CARNES:

6    Q.  In terms of activities as the primary contact of the RCO,

7    has the 22nd Ward RCO -- Democratic Ward RCO been involved in

8    any activities since she was appointed in 2021?

9    A.  I think you would have to ask Ms. Foster.

10   Q.  Do you remember when I asked you this question in your

11   deposition previously?

12   A.  No.

13          (Pause in proceedings)

14   Q.  I'm sorry, I can't find the spot right now.  So do you

15   know what happened to 244 East Springer Street that was --

16   A.  I do not.

17   Q.  Okay, did that go before the RCO?

18   A.  I cannot say.  We hear hundreds of zoning cases.

19   Q.  What's that?

20   A.  We hear a lot of zoning cases, a whole lot.

21   Q.  And do you hear a lot of it -- them in the 22nd Ward?

22   A.  They're -- I would say they're equally distributed.

23   Q.  Okay, how many would you say go through there a year?

24   A.  A lot.  I can't say -- give you a number, but it's a lot.

25   Q.  And when they go before the zoning hearing board, do they

1   go before the RCO?

2   A.  Yes.

3   Q.  Okay.  So that means that Christine Foster would have had

4   some activities as the primary contact for the RCO since

5   September -- since October of 2021?

6               MR. D. SMITH:  Objection.

7               THE COURT:  Sustained.

8               MR. CARNES:  One second.

9       (Pause in proceedings - attorneys confer)

10  BY MR. CARNES:

11  Q.  Ms. Bass, are you aware whether or not there's a

12  procedure under the zoning ordinance or the regulations to

13  address circumstances when somebody makes an application for

14  an RCO and is denied?

15  A.  I'm not aware what the procedure is.

16  Q.  And what did you do to address Carla Cain's complaints

17  regarding the fact that she said there was no due process and

18  that she was being removed without any process?

19              MR. D. SMITH:  Objection.

20              THE COURT:  Overruled.

21  A.  What did I do to --

22  BY MR. CARNES:

23  Q.  Yes.

24  A.  -- to address it?  Well, Ms. Cain was not authorized to

25  set up a ward -- you know, the RCO on behalf of the ward, so

1   this never should have happened in the first place.

2   Q.  So you had no meeting with her or discussion with her at

3   all?

4   A.  No, no.

5   Q.  Okay, and just explain to me how this ward committee

6   works.

7   A.  Sure.

8   Q.  Okay?  Once you're elected ward leader, you have a --

9   what's your designation at that point?

10  A.  Ward leader.

11  Q.  Okay --

12  A.  Yeah.

13  Q.  -- and what -- who's below you?

14  A.  Ward chair.

15  Q.  And who's below the ward chair?

16  A.  I believe it's the first chair.  There's a first chair,

17  second chair, third chair.

18  Q.  And you can also bring your staff in to handle matters as

19  well, can you not?

20          MR. D. SMITH:  Objection.

21          THE COURT:  Sustained.

22          MR. CARNES:  Okay.

23  BY MR. CARNES:

24  Q.  What -- have you ever used -- do these people -- what do

25  they do?  They work for you?

                          Bass - Direct                    58

1               MR. D. SMITH:  Objection.

2               THE COURT:  Sustained.

3               MR. CARNES:  Okay.

4    BY MR. CARNES:

5    Q.  And at the time that we're talking about, Carla Cain was

6    the first vice chair, correct?

7    A.  Correct.

8    Q.  You -- did you speak with Jonathan Goins about this

9    matter personally?

10   A.  About which matter?

11   Q.  About your determination that Cindy -- that Carla Cain,

12   excuse me, should be removed as the RCO primary contact.

13   A.  Did I speak directly to him?  No.

14   Q.  You never spoke to him?

15   A.  No, not to my recollection, no.

16   Q.  So when you say "call me" in an e-mail, he never called

17   you back?

18   A.  I don't believe so.  I don't recall ever speaking with

19   him.

20   Q.  Did you ever talk to Eleanor Sharpe about the matter?

21   A.  I don't believe I did, no.

22   Q.  Did you have your staff speak with -- like, for instance,

23   Mr. Matozzo, did you have him speak with Mr. Goins?

24   A.  Very likely.

25   Q.  How about Mr. Richardson?

1   A.  Very possible.

2   Q.  So they spoke for you with Mr. Goins?

3   A.  Correct.

4   Q.  Now, did you recruit Christine Foster for this position?

5   A.  I asked her.  Yes, I did ask her.

6   Q.  And have you spoken to her since about the position?

7   A.  Yes.

8   Q.  How often do you speak with her?

9   A.  About this position?

10  Q.  Yeah.

11  A.  Very rarely.  More in the context of, you know, just

12  unifying the ward because there's been some division around

13  this particular matter.

14  Q.  Have you discussed with her whether to renew in June of

15  2023?

16  A.  I don't recall ever speaking with her about that, no.

17  Q.  Is there any reason why the 22nd Ward RCO had not been

18  established prior to June of 2019?

19  A.  There were a number of other RCOs, as I mentioned

20  earlier, that were already operating in the community.  They

21  were doing a great job.  There was no need to duplicate

22  efforts.  You know, it was something that was on the table to

23  be done further down the road in the future when, you know,

24  when you have free time, but there was no need or need --

25  immediate need to bring forth another RCO when we already had

1    some really good ones.

2    Q.  And the two good ones you had are the East Mount Airy and

3    the Cliveden Hills, you say?

4    A.  Correct.

5    Q.  And is the --

6    A.  And, actually, I should add in West Mount Airy as well.

7    Q.  Okay.

8    A.  They were also an RCO.

9    Q.  And is Cliveden Hills in the 19119 zip code?

10   A.  Correct.

11   Q.  It is?  Okay.

12   A.  All three are.

13   Q.  Okay, and you were on the board of East Mount Airy, is

14   that right?

15   A.  That's correct.

16           MR. CARNES:  I have no further questions, Your

17   Honor.  Thank you.

18           THE COURT:  Questions?

19           MR. D. SMITH:  Yes, Your Honor.

20                    CROSS EXAMINATION

21   BY MR. D. SMITH:

22   Q.  When were you elected ward leader?

23   A.  June 2018.

24           THE COURT:  How long are you going to be with the

25   witness?

1            MR. D. SMITH:  Maybe 15 minutes, Your Honor.

2            THE COURT:  All right, let's take a -- literally, a

3    five minute break, okay?

4            MR. D. SMITH:  Sure.

5            THE COURT:  So when I say five minutes, I mean five

6    minutes, okay?

7            MR. D. SMITH:  I'm not going to leave this table,

8    Your Honor.

9            THE COURT:  Well, you can take a break, all right?

10   You can leave the table.  You can sit down for a minute if

11   you like --

12   A.  Okay.

13           THE COURT:  -- but don't talk to anybody about your

14   testimony --

15   A.  Okay.

16           THE COURT:  -- all right?

17           THE CLERK:  All rise, please.

18       (Recess)

19           THE COURT:  We're set.

20           MR. D. SMITH:  Thank you, Your Honor.

21                   CROSS EXAMINATION (CONT'D)

22   BY MR. D. SMITH:

23   Q.  You testified that you are both a councilperson and a

24   ward leader, is that right?

25   A.  Correct.

1   Q.  As a councilperson, what are your responsibilities with

2   respect to real estate development and zoning issues within

3   your council district?

4   A.  We -- generally, we provide letters of support to the

5   RCO.  We'll make a decision.  Generally, if the community

6   supports a project, we support it.  If the community does not

7   support it, we do not support it, so we generally have a very

8   community-driven process around land and development.

9   Q.  And what are the RCOs with which you work to determine

10  what your positions will be for real estate development

11  within your district?

12  A.  Well, there's quite a few.  There's in the northwest.

13  Again, there's the Chestnut Hill Community Association, which

14  is an RCO.  There is East Mount Airy Neighbors, the West

15  Mount Airy Neighbors.  There's a 13th Democratic Ward RCO.

16  There's Tioga United RCO (indiscern.), Upper North Neighbors

17  Association RCO.  There's quite a few.

18  Q.  Yeah.  In your opinion, have those RCOs served the

19  neighborhoods well during your time as council -- as a

20  councilmember?

21  A.  Overall, yes.

22  Q.  Okay.  Now, you have a history with RCOs yourself, is

23  that right?

24  A.  As far as?

25  Q.  As far as participation in RCOs.

1    A.  Yes.

2    Q.  And what is your background in participation in RCOs?

3    A.  Well, you know, working with them as necessary to help,

4    you know, encourage development, you know, or the opposite of

5    that in terms of, if we have a project that's problematic for

6    the community, but just really having a very strong, working

7    relationship.  And also, we do sometimes monthly, sometimes

8    bimonthly calls with all of the RCOs in the district to talk

9    about development issues, concerns they have, things of that

10   nature.

11   Q.  Were you at one time an officer of an RCO?

12   A.  Not that I can recall.

13   Q.  Okay.

14   A.  Not that I can recall.

15   Q.  With respect to your ward leader position, what are your

16   responsibilities with respect to real estate development

17   within the ward?

18   A.  Well it's -- again, it's a community-driven process, so

19   we go by what the community wants.  So as the ward leader,

20   you know, we work to make sure, #1) that the immediate

21   neighbors have been notified of a project that's pending.

22   You know, the city planning commission requires it up to 250

23   feet of said project that those neighbors need to be notified

24   and have the opportunity to vote on whether they want that

25   because they're the most impacted in the neighborhood.  So we

1   generally work with the neighbors and work with the RCOs to

2   make sure that those neighbors have a say, and attend the

3   meetings and vote.

4   Q.  Now as councilperson, does your staff become involved in

5   real estate development and zoning issues?

6   A.  Yes.

7   Q.  And what is that involvement?

8   A.  It varies, depending on what the need is.  We may have

9   staff involved if someone is bringing forth a project

10  particularly that's controversial.  There are some projects

11  that are, you know, pretty easy, you know.  They go through,

12  they're voted up and down, they stay or they go based on

13  that.  On occasion you have projects that are a little more

14  controversial, you know, where neighbors are, you know,

15  adamant, the planning commission, you know, may follow the

16  lead of the community and our lead -- or excuse me, the

17  zoning board, ZBA, may follow our lead or they may do their

18  own thing.  And so, you know, those are the cases generally

19  that we are very intimately involved with.

20  Q.  Do you make an effort to keep your councilperson and ward

21  leader roles separate?

22  A.  Absolutely.

23  Q.  Can you tell us how you do that, please?

24  A.  Well, I generally don't involve myself as the ward leader

25  in things in the 22nd.  So as an example, you know, having a

1    22nd ward RCO, again, wasn't necessary, wasn't something that

2    I thought would be productive.  I thought it could be a bit

3    messy in terms of just not being a good look for the 22nd

4    ward of having the ward leader, you know, weigh in on a

5    decision that also is supported or not supported by the 8th

6    District councilperson and that's -- you know, both of those

7    positions I hold.  So I think that we have other RCOs that

8    are doing a great job and there was no need to bring forth

9    another one.

10   Q.  Now you learned in 2019 that Ms. Cain had submitted an

11   application --

12   A.  Yes.

13   Q.  -- for the 22nd democrat ward, democratic committee, is

14   that right?

15   A.  Yes.

16   Q.  And did you at the time, as ward leader, regard her as

17   having had authority to register the 22nd --

18   A.  She --

19   Q.  -- ward democratic committee?

20   A.  She did not.

21   Q.  Did you object at that time?

22   A.  When I found out, yes.

23   Q.  Now we have seen -- and if you would turn, please, to

24   that page city-7 in exhibit, I believe, 12, Joint Exhibit-12.

25   We've seen September 2020 correspondence regarding the

1   typical procedure by which the city resolves contests with

2   respect to who should be the contact person, is that right?

3           (Joint Exhibit-12 previously marked for identification)

4   A.  Yes.

5   Q.  Okay.  And if I may read that into the record.  "Our

6   typical procedure for RCO contact" --

7               THE COURT:  Where are you, exhibit what?  What

8   exhibit?

9               MR. D. SMITH:  Oh, I'm sorry, Exhibit-12, Your

10  Honor.  It's City-00007.

11              THE COURT:  All right, go ahead.

12  BY MR. D. SMITH:

13  Q.  And in that email the city says, "Our typical procedure

14  for RCO contact info requests is to confirm the change with

15  the existing primary contact, Carla Cain in this case.  If we

16  can't get that confirmation or the change is contested, we

17  would turn to organizational leadership, in this case the

18  ward leader, to confirm the change."  Do you see that?

19  A.  Yes.

20  Q.  And it goes on to say, "The ward leader certification

21  submitted with your registration should be sufficient, but I

22  am writing to confirm that you understand that what we are

23  proposing, that renewal would be needed next summer and that

24  you wish to proceed with the contact change as I've described

25  it."  Do you see that?

1  A.  Yes.

2  Q.  So when you objected in 2019, nothing had happened to

3  change the contact person through September of 2020, is that

4  right?

5  A.  That's correct.

6  Q.  And in September of 2020 the RCO staff advised that they

7  were going to follow their normal procedure, which is to

8  check with organizational leadership, is that right?

9  A.  Yes.

10 Q.  Now if we look at joint Exhibit-1 -- excuse me, joint

11 Exhibit-2.

12    (Joint Exhibit-2 previously marked for identification)

13 A.  Which page is that?

14 Q.  Joint Exhibit-2 is -- and that's -- in that large binder

15 you have, it's tab 2.

16 A.  Oh.  Okay.

17 Q.  Have you been able to find that?

18 A.  Yes.

19 Q.  This is an application -- again, it says anonymous user,

20 but we know that that's just the software.  It shows a

21 submission on June 15th, 2019, do you see that?

22 A.  Yes, I do.

23 Q.  Under organization name, can you tell us what was

24 registered at that point?

25 A.  22nd Ward Democratic Committee.

1  Q.  And who was the leader of the 22nd Ward Democratic

2  Committee?

3  A.  Me, Cindy Bass.

4  Q.  It then goes on, on the second page, that's city-00009,

5  under contact information for people, it says organization

6  type, do you see that?

7  A.  Yes, I do.

8  Q.  And what is the type of organization being registered?

9  A.  A ward committee.

10 Q.  And then underneath that it has the name of Ms. Cain, is

11 that right?

12 A.  Correct.

13 Q.  Did you authorize Ms. Cain to designate herself the

14 contact person or spokesperson for the 22nd Ward Democratic

15 Committee in real estate matters?

16 A.  No.

17 Q.  Did you in fact have an objection to her nomination of

18 herself?

19 A.  Yes.

20 Q.  And can you explain what your objection was?

21 A.  My objection is that, #1) it was done without any sort of

22 contact, communication, you know, request, interest, you

23 know.  We weren't notified until the registration was already

24 done.  But beyond that, I had some concerns about the

25 representation that she will be providing to the community.

1   You know, we had had a little bit of history of just sort of

2   a disruptiveness and being contrary in a lot of matters.

3           THE COURT:  So I thought we were going to stay away

4   from this, right?

5           MR. D. SMITH:  Okay, yes.

6   A.  Okay.

7           MR. D. SMITH:  I'm sorry, Your Honor.

8           THE COURT:  I mean --

9           MR. D. SMITH:  My question wasn't intended to be

10  that broad.  I apologize.

11  A.  Sorry.

12  BY MR. D. SMITH:

13  Q.  Then if you would turn, please, to joint exhibit #4 --

14  oh, I'm sorry, it's joint exhibit #3, I'm sorry.  This is an

15  application submitted on May -- excuse me, on August 13,

16  2020, is that right?

17      (Joint Exhibit-3 previously marked for identification)

18  A.  Correct.

19  Q.  And the organization type is what?

20  A.  Award committee.

21  Q.  And the organization name is?

22  A.  22nd Democratic Ward RCO.

23          THE COURT:  Well, I've been through the document on

24  direct.  I know what it's filed and filed for, and I know the

25  file up letter saying hey, we have two committees now

1   organized, we're going to change -- we'll consider this as a

2   change of name request.

3   BY MR. D. SMITH:

4   Q.  Okay, well, if you would turn then just to the last page

5   of that document, there is a political ward RCO registration

6   certification, do you see that?

7   A.  Yes.

8   Q.  And is that your signature?

9   A.  Yes, it is.

10  Q.  And these are the representatives that you as ward leader

11  chose to represent the 22nd ward in real estate matters, is

12  that right?

13  A.  That is correct.

14  Q.  Now was it your intention that this group would override

15  or interfere with the existing neighborhood RCOs?

16  A.  Not at all.

17  Q.  What was the role that you anticipated?

18  A.  I anticipated that this would be an RCO that would be

19  available if for some reason the other two or three were

20  unable to perform, but other than that, you know, that we

21  would continue on with the RCOs that have been performing and

22  doing a good job and were very familiar.

23  Q.  All right.  Now referring back to city-0007, which was

24  that email discussing the -- that the city would investigate

25  with ward leadership, did the city in fact contact you as

1   ward leader to find out what the organization, the 22nd Ward
2   Democratic Committee, wanted as its representative in the RCO
3   process?
4   A.  They did ask.
5   Q.  Okay.  And now if you would turn to Joint exhibit #6,
6   please.
7   A.  Uhm-hum.
8   Q.  Exhibit-6 is the letter that you provided in response to
9   that investigation by the city, is that right?
10  A.  Correct.
11  Q.  And it is on ward leader letterhead, is that right?
12  A.  That is correct.
13  Q.  Why is it on ward leader letterhead rather than
14  councilperson letterhead?
15  A.  I was acting as the ward leader, and it was the ward to
16  RCO.
17  Q.  Now you are aware that there is no limit under the city
18  ordinance to how many RCOs there are functioning within a
19  geographic area, is that right?
20  A.  That is correct.
21          THE COURT:  I am aware of that.  Go ahead.
22  BY MR. D. SMITH:
23  Q.  So would you have any objection to Ms. Cain forming her
24  own RCO and appointing herself as the spokesperson or contact
25  person for that RCO?

1    A.  Not at all.

2              MR. D. SMITH:  I have no further questions.

3              MR. R. SMITH:  Just briefly, Your Honor, one or two.

4    May I come around so I can see the witness maybe from the

5    podium?  Thanks.

6                        CROSS EXAMINATION

7    BY MR. R. SMITH:

8    Q.  Good morning, council member Bass.

9    A.  Good morning.

10   Q.  I'm Ryan Smith, I represent the city defendant in this

11   case.

12   A.  Thank you.

13   Q.  Is the 22nd Ward Democratic Political Committee a city

14   entity?

15   A.  The 22nd ward RCO?

16   Q.  No, the political committee.

17   A.  Is it a city entity?  No.

18   Q.  Okay.  Is it affiliated with the government --

19   A.  No.

20   Q.  -- that is?

21   A.  No.

22   Q.  It's a private organization?

23   A.  Correct.

24   Q.  It's a component of the city democratic party, right?

25   A.  That is correct.

1   Q. Do other parties have ward committees as well?

2   A.  Yes, I believe so.

3   Q.  In -- across the city in various wards?

4   A.  Yes, oh, yes.

5           MR. R. SMITH:  Nothing further.  Thank you.

6   A.  Okay, thank you.

7                    REDIRECT EXAMINATION

8   BY MR. CARNES:

9   Q.  Ms. Bass, this is -- I just have a question about your

10  prior testimony.

11  A.  Okay.

12  Q.  And I'm going to just approach if I may.

13  A.  Sure.

14  Q.  Because you had made a statement about the activities of

15  the RCO.  And I'm showing you --

16          MR. CARNES:  -- if I may approach, Your Honor?

17          MR. R. SMITH:  Your Honor, I think this is -- I

18  think what he's trying to do is go back to his own direct to

19  confront the witness with deposition testimony, and it has

20  nothing to do with my cross.

21          THE COURT:  Well, you talked about activities.  Just

22  let me hear this section you're going to talk about.

23          MR. CARNES:  It would only be one section, or one

24  thing that I would ask about.

25          THE COURT:  He probably is, he just found it.

1              MR. CARNES:  That's correct, Your Honor.  That's why

2     I started --

3              THE COURT:  He's got a paralegal, it's not --

4              MR. CARNES:  No -- my attorney -- my co-counsel

5     could not find it at the time, and I apologize.  This will

6     only take a second, Your Honor.

7              THE COURT:  I've been there.

8              MR. CARNES:  Okay.

9              THE COURT:  Go ahead.

10    BY MR. CARNES:

11    Q.  I'm approaching you.  Do you see this notice of

12    deposition that took place on July 28th, 2022?

13    A.  I do.

14    Q.  Okay, and I'll just ask you, when I was asking you some

15    questions on page 34, we had gone back and forth about East

16    Mount Airy, West Mount Airy, the 22nd ward --

17    A.  Okay.

18    Q.  -- would never be the coordinating, it would be one of

19    the two, and it would also be involved.

20    A.  Correct.

21    Q.  And I asked you about the RCO, and I said where does the

22    22nd ward committee RCO have its meetings, and you said --

23    A.  My understanding, there has not been a meeting.

24    Q.  So there had never been a meeting up until -- that you

25    were aware of, up until July 28th, involving the RCO, the

1   22nd ward RCO?

2   A.  Well, that was my understanding, but that's why I said

3   that I think that you should speak directly to Ms. Foster

4   because she could give you better information as to what her

5   activities were.

6   Q.  Okay, but that's what you testified, that there hadn't

7   been a meeting that you're aware of.

8   A.  To the best of my knowledge.

9   Q.  Okay.

10  A.  But that's why I said that you should really speak with

11  Ms. Foster about the activities of the RCO as a leader.

12  Q.  Thank you.  Thank you.

13          MR. R. SMITH:  I have no further questions.

14          THE COURT:  All right, you may step down.

15          MS. BASS:  Thank you.

16          THE COURT:  Thank you.

17          MR. MARTIN:  Your Honor, at this time we'd like to

18  call Carla Cain.

19                  CARLA CAIN, PLAINTIFF, SWORN

20          THE CLERK:  Thank you very much.  You can be seated,

21  please.  And if you could, please state your full name for

22  the Court.

23          MS. CAIN:  Carla Cain.

24          THE CLERK:  And can you spell your last name?

25          MS. CAIN:  C-A-I-N.

1           THE CLERK:  Thank you.

2                          DIRECT EXAMINATION

3    BY MR. MARTIN:

4    Q.  Ms. Cain, given the testimony we've already had from

5    council member Bass, I'll try to streamline my questions for

6    you.  Where do you live?

7    A.  8 -- Philadelphia, Pennsylvania, 823 East Dorset Street.

8    Q.  And how are you employed?

9    A.  I am -- I have my own company.

10   Q.  And what does your company do?

11   A.  Home care.

12   Q.  And how long have you been active in democratic city

13   politics?

14   A.  Oh, well over 30 years.

15   Q.  All right, and what positions do you currently hold?

16   A.  Currently I'm a committee person in the 22nd ward, 25th

17   division.

18   Q.  And have you previously held other positions in the

19   democratic party?

20   A.  I was previously a committee -- a past cycle I was a

21   committee person first vice chair, and I was also on a state

22   committee.

23   Q.  Okay.  This has already been alluded to in testimony,

24   just a little bit by way of background.  Can you tell us when

25   it was that you first became interested in submitting an

1    application for the RCO?

2    A.   2019.

3    Q.   Okay, and was there something in particular that provoked

4    you that you would be interested in doing that?

5    A.   The development that was going on in the community.

6           THE COURT:  Can you please keep your voice up, and

7    you can move the mic closer to your --

8    A.   The development that was going on in the community.

9    BY MR. MARTIN:

10   Q.   Now is development in the community something that you

11   had been keeping track of at that point?

12   A.   To the best of my knowledge, yes.

13   Q.   Okay.  And were there other people who were like-minded

14   with you as to approaching development issues?

15   A.   Correct, yes.

16   Q.   And were there other people with you who were interested

17   in forming this RCO?

18   A.   Yes.

19   Q.   And as the primary contact person for the RCO, what kinds

20   of special privileges do you have in that role?

21   A.   You get the opportunity to receive upcoming developments

22   that's going in the area.

23   Q.   That's a -- you're referring to the notifications from

24   the city?

25   A.   Correct, and notification from a developer.

1  Q.  When was the first time you became aware as to there

2  being any issue with you being recognized as the primary

3  contact person?

4  A.  In 2020.

5  Q.  Now was that around the same time as what's already been

6  testified to, the application submitted in August of 2020?

7  A.  Yes, correct.

8  Q.  And at that time, what's your understanding as to whether

9  you continued to hold the position or as to whether you were

10  removed?

11  A.  My understanding is that it was supposed to be a process

12  of removing me, and I wasn't in any violation to be removed.

13  Q.  Let me ask you to turn in that binder in front of you,

14  please, to tab 12.  These are city documents.

15          UNIDENTIFIED SPEAKER:  Look out, watch the water

16  pitcher, ma'am.

17  A.  Oh, okay.

18  BY MR. MARTIN:

19  Q.  And if you would, we're going to look at an email chain

20  between pages city-23 and city-26.

21  A.  Okay, I -- okay, 22.  Go to 23.

22  Q.  Well, let's start at 25.  It's in reverse chronological

23  order.  Let's start on page 25.

24  A.  Okay, I'm at 25.

25  Q.  All right.  Do you see the email there at the top of the

1   page?

2   A.  Yes.

3   Q.  And am I right, that email is dated August 20th, 2020,

4   and it says from RCO.  Do you know who actually authored

5   that?

6   A.  You said the subject -- you said who offered that, who

7   was offering it?

8   Q.  Yeah, who sent it to you?

9   A.  Mr. Goins.

10  Q.  Jonathan Goins, correct?

11  A.  Correct, uhm-hum.

12  Q.  And would you read that email, please?

13  A.  "I am writing to make you aware that if you are already

14  or recently submitted an RCO registration application for the

15  22nd ward, the application referred to RCO meeting the first

16  Wednesday of each month as of August the 6th meeting to

17  discuss and create a new 22nd ward RCO.  The application

18  lists primary, secondary contact, certification authorization

19  of the application by ward leader.  As the applicant for the

20  22nd ward last June, the current list and primary contact of

21  the RCO, I am reaching out to you to confirm if you are aware

22  of the recent submission of application."

23  Q.  And I think you may have skipped over a word.  The last

24  sentence in the first paragraph, am I correct it says, "the

25  application lists new primary and secondary contacts"?

1    A.   Yes.

2    Q.   All right.  Let's move forward now here on page 24, am I

3    correct that that's an email from Jonathan Goins also to you,

4    and he says that he is "writing to follow up with my message

5    of August 20th regarding the 22nd ward RCO.  Because I

6    haven't received a response from you, I am now writing to

7    inform you that we will be moving forward with the changes to

8    organization name and primary contacts as requested in the

9    newly submitted registration.  Please reach out with any

10   questions or concerns.  I hope that you are doing well at

11   this time."  Is that right?

12   A.   Yes.

13   Q.   And then let's turn back to city-23, please.  Oh, am I

14   correct, there was an e-mail that you sent in response on

15   September 3rd, 2020?

16        (Defendant's Exhibit-23 previously marked for

17   identification)

18   A.   Yes.

19   Q.   And would you just read that at the bottom of the page?

20   A.   Are we on Exhibit-23?

21   Q.   Page 23 at the very bottom of the page, the email you

22   sent.

23   A.   Not -- okay.  "Please give me a call because I do not

24   understand.  Carla Cain."

25   Q.   And then you gave your phone number, correct?

1   A.   Yes.

2   Q.   And then, am I right, as we go up the page that there was

3   an email also on that date at 10:33 a.m. where Mr. Goins

4   wrote to you, "I will call later this morning if that works

5   for you from my Google voice number," then he gives the

6   number.   "Committee members from the 22nd democratic ward

7   submitted an RCO registration in August with two new contacts

8   and the ward leader's signature," {in parentheses} (both

9   attached).   "As the 22nd ward RCO was already active with you

10  as primary contact, we are treating the new registration as a

11  request to change contact information for the RCO.   When we

12  receive requests to change RCO information from someone other

13  than the primary contact, we reach out to the primary contact

14  to confirm.   If the primary contact doesn't respond or

15  contests the request for changes, we'll reach out for

16  organizational leadership, in this case the ward leader for

17  confirmation.   We're taking the ward leader's signature on

18  the recently submitted registration as confirmation of the

19  request to change information in this case.   Happy to answer

20  any questions as best I can by phone, Jonathan."   And then am

21  I right that you responded to that email at 10:53 a.m.

22  saying, "Anytime will work for me.   I look forward to hearing

23  from you."   Correct?

24  A.   Uhm-hum.

25  Q.   So at that time in September of 2020, did you have a

1    conversation with Mr. Goins about what was going on with this
2    new application?
3    A.   Correct.
4    Q.   And what was the nature of that conversation?
5    A.   Basically at the request of the ward leader -- I mean,
6    the councilwoman, Ms. Bass, she would like to remove me from
7    the RCO.
8    Q.   And did he indicate whether that would in fact happen
9    then in 2020, you would be removed?
10   A.   He -- oh, what basically what he said, he said that she's
11   pressuring, you know, for my removal.
12   Q.   Okay.  Now to the best of your understanding, were you
13   removed from that role in 2020?
14   A.   I was removed in 2020, yes.
15   Q.   Okay, and was there a point when you were reinstated?
16   A.   Then I was reinstated back again.
17   Q.   Okay.  And how did you become aware of that?
18   A.   Through emails.  Through a email.
19   Q.   Let me ask you now to turn back to city documents 22 and
20   21.
21   A.   22 --
22   Q.   And do you see there is an email from you dated September
23   23rd, 2020 -- I'm on page city-21.
24   A.   You're on 21 now, okay.
25   Q.   Yes.

1   A.   Okay, I see.

2   Q.   And did you write, "Hi, Jonathan.  I will not accept or

3   acknowledge this change until the below is addressed.  1)

4   What is the policy and/or legal jurisdiction that allows for

5   the removal of the head of an RCO?  Please advise and share

6   the documentation that supports this.  2) What is the

7   procedure to file an appeal on being removed as an RCO head?

8   Please respond at your earliest convenience."  You sent that

9   to Mr. Goins, correct?

10  A.   Yes.

11  Q.   And there are numerous people listed as also receiving

12  that, correct?

13  A.   Correct.

14  Q.   And let me ask you about that bullet point 2 first.  Did

15  Mr. Goins ever explain to you any procedure to file an appeal

16  on being removed as the RCO head?

17  A.   No.

18  Q.   Okay, and then point #1, you had asked about {quote}

19  "policy and/or legal jurisdiction" {unquote}, allowing for

20  the removal of the head of an RCO.  Did he ever give you an

21  answer to that?

22  A.   No.

23  Q.   So to the best of your knowledge, at this point you were

24  then taken out of the position?

25  A.   Correct.

 1  Q.  And then it's been alluded to in prior testimony, but am
 2  I correct -- Joint Exhibit-5, if you would turn to that just
 3  for a minute.
 4      (Joint Exhibit-5 previously marked for identification)
 5  A.  So go to 5 in this book?
 6  Q.  In the front of the book.
 7  A.  Front of the book, okay.
 8  Q.  Tab 5.
 9  A.  Okay, I'm on 5.
10  Q.  And am I correct, this is the renewal application you
11  submitted in 2021?
12  A.  Correct.
13  Q.  And after this was submitted, did you have an
14  understanding as to whether you were recognized by the city
15  as the primary contact at that point?
16  A.  Yes.
17  Q.  And let me clarify.  Did you understand you were in fact
18  the primary contact then?
19  A.  Yes, I was the -- yes.
20  Q.  Let me ask you, please, to now turn back to city, which
21  is tab 12, and I'd like to look at pages 119 to 123.  They're
22  at the end of that page, that Exhibit-12.
23  A.  119?  You said 19, right?
24  Q.  119.  Because it's in reverse order it actually begins at
25  the back, 123, and then moves forward in time.

1   A.   Okay.

2   Q.   Let's look at page 120 specifically.  Page 120 at the

3   bottom has an email that's been previously referred to,

4   indicating Christine Foster would be the new 22nd Ward

5   Democratic Committee primary contact, but there is an email

6   here from you dated September 24th, 2021, 1:07 p.m., do you

7   see that?

8   A.   Now you're on Exhibit-12 --

9   Q.   Yeah, I'm on --

10  A.   -- page 20?

11  Q.   Page 120.

12  A.   120.

13  Q.   Let me know when you have it.

14  A.   Oh, yeah.  Okay, I'm on page 120.

15  Q.   All right, and do you see, it's a little bit below the

16  midway mark on the page, an email from you September 24th,

17  2021, at 1:07 p.m.?

18  A.   Yes.

19  Q.   And that was sent to RCO notification, would that have

20  been Jonathan Goins?

21  A.   Yes.

22  Q.   And am I correct that at that time you wrote, "I am

23  appealing this notice and would like to inform you that

24  Christine Foster is not the RCO lead for the district.  I'd

25  like a full investigation of this, since this is an outcome

1   of ongoing harassment," correct?

2   A.  Correct, yes.

3   Q.  And then the next email, which is at the top of that page

4   120, you see the language, "Good afternoon, Carla.  I

5   forwarded your email to Philadelphia City Planning Commission

6   for review so that we can resolve this issue.  Please bear

7   with us as we work this out.  I will keep you updated.  In

8   the meantime, if you have any questions, please feel free to

9   contact me any time.  Thank you."  Was that something you

10  wrote Jonathan Goins?

11  A.  Yes.

12  Q.  And then let's now turn back to page 119.  At the bottom

13  of the page there's an email from you September 26th, 2021,

14  6:59 p.m.  You said to Mr. Goins, "Thank you, as this is

15  being reviewed, I'd like to keep my RCO duties."  Correct?

16  A.  Yes.

17  Q.  And then at the top of this page 119 there's an email

18  from Mr. Goins back to you September 27th, the next day,

19  10:13 a.m., and he says, "Subject:  You are the RCO!

20  {exclamation point}.

21  A.  Uhm-hum.

22  Q.  Yes?

23  A.  Yes.

24  Q.  And then it says, "Good morning, Carla.  You will remain

25  the primary RCO for the 22nd Ward Democratic Committee.

1  Thank you so much for your patience and I apologize for the
2  confusion and inconvenience."
3  A.  Yes.
4  Q.  So that was as late as September 27th, 2021, correct?
5  A.  Yes.
6  Q.  So when did you become aware after that time that you
7  were no longer recognized for the second time as the primary
8  contact?
9  A.  It was after September, I'm trying to think.  I don't
10 recall the exact date when I was finally terminated, I guess.
11 Q.  Was it in the fall?
12 A.  It was in the fall.
13 Q.  An individual by the name of Eleanor Sharpe has been
14 mentioned in testimony.  Did you ever communicate with Ms.
15 Sharpe?
16 A.  Yes, one time.
17 Q.  And do you recall when that was?
18 A.  That was the time that they reinstated me.
19 Q.  So would that have been after your renewal application?
20 A.  That was after renewal, yes.
21 Q.  Okay.  And what was the nature of your conversation?
22 A.  Basically that I'm being reinstated because they don't
23 really have a grounds on terminating me.
24 Q.  Okay.  Now you heard councilperson Bass's testimony that
25 she has authority as the democratic ward leader to designate

1   the primary contact person for the RCO you formed, correct?

2   A.  Yes.

3   Q.  Are you aware of any bylaw or rule that has been adopted

4   either by the 22nd Ward Democratic RCO or by the city

5   democratic party or the state democratic party that vests

6   that authority in the ward leader?

7   A.  I'm not aware of any of those rules.

8   Q.  And so if you're not aware, does that also mean you're

9   not aware whether that authority would have been delegated

10  elsewhere to a committee or anything like that?  To the best

11  of your knowledge, is there any rule?

12  A.  To the best of my knowledge, I never heard of any rule

13  that exists like that, and when asked to the RCO, they

14  couldn't substantiate anything in writing that a rule like

15  that actually pertains to a RCO.

16  Q.  Okay.  Thank you.

17          MR. MARTIN:  Nothing else on direct, Your Honor.

18                      CROSS EXAMINATION

19  BY MR. D. SMITH:

20  Q.  Turn if you would to joint exhibit #2, that's tab 2 in

21  that notebook.

22  A.  The beginning of the book now.

23  Q.  Joint exhibits.  Have you found it?

24  A.  I -- yes.  2 starts with 008?

25  Q.  Yes.

1  A.  Okay, yes.

2  Q.  Joint Exhibit-2 is the application you submitted on June

3  15, 2019, is that correct?

4  A.  Yes.

5  Q.  Okay, and the organization's name that you registered at

6  that time was 22nd Ward Democratic Committee.  Have I read

7  that correctly?

8  A.  Yes, correct.

9  Q.  Did you form the 22nd Ward Democratic Committee?

10  A.  Yes.

11  Q.  You formed the democratic committee?  When was the 22nd

12  Ward Democratic Committee formed?

13  A.  Well, not -- the RCO?  The --

14  Q.  No, when was the 22nd Ward Democratic Committee formed?

15  A.  No, I didn't form the 22nd Ward Democratic Committee.

16  Q.  That's correct.

17  A.  No.

18  Q.  Now turning then to -- back to tab 12, which you were

19  reviewing with your counsel --

20  A.  Go back to 12?

21  Q.  12, please.  The page -- turn to page -- the page marked

22  City-25.

23  A.  Okay, I'm trying to get to 12 now.

24  Q.  You have that?

25  A.  I'm on page 12 -- I'm --

1   Q.  So you were made aware by the RCO staff, the city staff,

2   on August 20, 2020, of a dispute between you and ward leader

3   Bass over who would represent the 22nd ward with respect to

4   the RCO, is that right?

5   A.  Yes.

6   Q.  Okay.  And you were aware of that dispute throughout the

7   time -- throughout 2020 and 2021, is that right?

8   A.  Yes.

9   Q.  Okay.  Let's turn, if we can, to your renewal

10  application, which is joint Exhibit-5.  That's tab 5 in the

11  notebook.

12  A.  Go back to tab 5 now?

13  Q.  Five.  5, please.  Is tab 5 the renewal application that

14  you submitted on or about June 3, 2021?

15  A.  Yes.

16  Q.  Okay.  And at that time you were aware that there was a

17  dispute between you and ward leader Bass regarding who would

18  be the contact person for the 22nd ward -- democratic ward,

19  is that right?

20  A.  Yes.

21  Q.  Okay.  Now when you submitted this application, you

22  identified the organization type as ward committee, is that

23  right?

24  A.  Yes.

25  Q.  And just to be clear, when you first registered the 22nd

1    ward democratic committee through the RCO process, you did

2    not create a statement of purpose, is that right?

3    A.   No.

4    Q.   You did not create bylaws?

5    A.   No.

6    Q.   You -- and so here you have identified the organization

7    type as the ward committee, and that is the 22nd ward

8    democratic committee, is that right?

9    A.   Correct, that's the organization, yes.

10   Q.   Okay.  And if you would turn to the next page, city-

11   00002, would you read the certification at the very bottom of

12   the page that you provided with your application.

13   A.   I certify that I am an applicant and RCO staff on behalf

14   of a political ward and that the ward and the ward leader are

15   aware of the above authorization of this application for RCO

16   status.

17   Q.   Okay, you've skipped a number of words, so let me read it

18   into the record and you can tell me if I've read it

19   correctly, okay?

20   A.   Okay, I skipped -- okay.

21   Q.   You certified -- "I certify that I am applying for RCO

22   status on behalf of a political ward."  Have I read it

23   correctly so far?

24   A.   Uhm-hum.

25   Q.   Yes?

1   A.  Yes, yes.

2   Q.  Okay.  And the political ward is the 22nd Ward Democratic

3   Committee, is that right?  Is that the political ward?

4   A.  Okay, yes, that's the political ward, yes.

5   Q.  Okay, thank you.  "And that the ward committee and ward

6   leader are aware of and have authorized this application for

7   RCO status."  Have I read that correctly?

8   A.  Yes.

9   Q.  At the time you submitted that certification, you were

10  aware that ward leader of the 22nd Ward Democratic Committee

11  was Cindy Bass, correct?

12  A.  Yes.

13  Q.  And you were aware that Cindy Bass had been, at least

14  since August 20, 2020, contesting your right to serve as the

15  contact person, correct?

16  A.  Yes.

17  Q.  Then if we turn back to tab 12, page 24, on September 3

18  of 2020 Mr. Goins advised you that the RCO staff would be

19  moving forward with the changes to primary contact, right?

20  A.  Yes.

21  Q.  All right.  And then on the next page, the page before,

22  which is city-23, do you see that?  The page before.

23  A.  We're on 23 now?

24  Q.  Page 23.

25  A.  Okay.

1    Q.  And that is on September 3, so it's later the same day,

2    Mr. Goins wrote to you, "When we receive requests to change

3    RCO info from someone other than the primary contact, we

4    reach out to the primary contact to confirm."  Do you see

5    that?

6    A.  Yes.

7    Q.  Okay, and Mr. Goins had in fact reached out to you on a

8    number of occasions since the first time on August 20 of

9    2020, is that right?

10   A.  Yes.

11   Q.  So you were aware that the staff was looking into this,

12   correct?

13   A.  Yes.

14   Q.  And then it says, "If the primary contact doesn't respond

15   or contests the request for changes, we'll reach out to

16   organizational leadership, in this case the ward leader, for

17   confirmation."  Do you see that?  Have I read it correctly?

18   A.  You are still on 23?  Yes.

19   Q.  Okay.  And the ward leader here is Cindy Bass, is that

20   right?

21   A.  Yes.

22   Q.  "And we're taking the ward leader's signature on the

23   recently submitted registration as confirmation of the

24   request to change information in this case."  Do you see

25   that?

1    A.   Yes.

2    Q.   Okay.  Now is there any -- Cindy Bass has at all times

3    been the leader of the 22nd Ward Democratic Committee,

4    correct?  At all times during this --

5              MR. MARTIN:  No, just objection as to form.

6              MR. D. SMITH:  Okay.

7              MR. MARTIN:  I think it's more expansive than

8    counsel intended.

9    BY MR. D. SMITH:

10   Q.   During the period of this dispute, Cindy Bass has at all

11   times been the ward leader, correct?

12   A.   Yes.

13   Q.   And there has never been a vote of the constituents

14   within the ward to overrule Ms. Bass's decision that she

15   prefers someone other than you to be the primary contact for

16   the ward.

17   A.   I cannot answer that question because I wasn't privileged

18   to the ward meetings.

19   Q.   Okay.  So you're not aware of any such vote?

20   A.   Correct.

21   Q.   And you never asked for a vote to overrule that decision,

22   is that correct?

23   A.   No.

24   Q.   Is there anyone within the structure of the 22nd Ward

25   Democratic Committee with greater authority than Ms. Bass

1   who's the ward leader?  Is there a position above hers?  Do

2   you understand the question?

3   A.  You have -- can you explain that --

4   Q.  Sure.  As the ward leader, she's the senior executive of

5   the ward, is that right?

6   A.  Correct.

7   Q.  Okay.  There is no position above hers?

8   A.  As a ward, as a council --

9   Q.  Right, as a ward.

10  A.  No.

11  Q.  Okay.

12          MR. D. SMITH:  No further questions.

13          MR. MARTIN:  Ms. Cain, when you say --

14          MR. D. SMITH:  Wait, wait, wait --

15          MR. R. SMITH:  I have a few questions.

16          MR. MARTIN:  Oh, I apologize.

17          MR. RYAN:  No, that's all right.  If I may, Your

18  Honor, I'll try not to be redundant, but just a few.

19                    CROSS EXAMINATION

20  BY MR. R. SMITH:

21  Q.  Good morning, Ms. Cain.

22  A.  Good morning.

23  Q.  I'm Ryan Smith, I represent the city defendant in this

24  case.

25  A.  Thank you, okay.

1   Q.  You said that you spoke with Eleanor Sharpe about this

2   issue?

3   A.  Yes.

4   Q.  Do you recall when that was?

5   A.  No, I don't recall.

6   Q.  Do you recall the contents of that conversation?

7   A.  You said a contact?

8   Q.  The contents of the conversation.

9   A.  Oh, yes.

10  Q.  Do you recall what you talked about?

11  A.  Yes, yes, yes, yes.

12  Q.  You testified that Eleanor Sharpe told you that there

13  were no grounds to remove you, do I have that right?

14  A.  Correct, yes.

15  Q.  Okay.  Do you recall having your deposition taken in this

16  case?

17  A.  No, I don't recall the deposition.

18  Q.  Do you remember when you met with -- I wasn't there,

19  actually, I was out with COVID --

20  A.  Yeah.

21  Q.  -- but you met with my colleague and Mr. Smith and they

22  asked you questions under oath?

23  A.  Yes, I do recall that.

24  Q.  Do you recall that Mr. Smith and Mr. McGrath asked you

25  about whether you had spoken with Eleanor Sharpe?

1   A.  Yes.

2   Q.  Do you remember what you said then?

3   A.  No, I do not recall.

4         MR. R. SMITH:  May I approach the witness, Your

5   Honor?

6         THE COURT:  What page number are you referring to?

7   A.  Is it big enough that I can see it?

8         MR. R. SMITH:  I'm on -- Your Honor, it's deposition

9   transcript 42, and I'm going to -- 42 and 43.  Would you like

10  a copy?

11        THE COURT:  No, thank you.

12        MR. R. SMITH:  Okay.

13  BY MR. R. SMITH:

14  Q.  Do you recognize that?  Is that the notice of your

15  deposition?

16  A.  Yes, this is the notice.

17  Q.  Okay.  I'm going to show you a page from that deposition.

18  We're looking here at 42.

19  A.  42.

20  Q.  Yep, at the very bottom, and then we're going to go over

21  to the top of 43.  The question was, "Did you have any

22  conversations with Eleanor Sharpe?"  And what was your

23  response?

24  A.  I said I don't recall.

25  Q.  Okay.

1   A.  Okay.

2   Q.  But now you recall the contents of that conversation?

3   A.  Yes, yes.

4   Q.  Okay.  Did you speak with Mr. Goins?

5   A.  I have spoken to Mr. Goins, yes.

6   Q.  When you spoke with Eleanor Sharpe and when you spoke

7   with Mr. Goins, you didn't discuss your political views, did

8   you?

9   A.  No.

10  Q.  You discussed the RCO primary contact issue.

11  A.  Correct.

12  Q.  No one from the city told you that you couldn't attend a

13  zoning board meeting, did they?

14  A.  No.

15  Q.  No one from the city told you that you couldn't attend an

16  RCO meeting, did they?

17  A.  No.

18  Q.  Did any city employee tell you that you couldn't form

19  your own organization and register it as an RCO?

20  A.  No, that wasn't discussed.

21  Q.  You allege in this case that the city retaliated against

22  you for expressing your first amendment views.  What is the

23  basis of that claim?

24  A.  Deprived me of due process.

25  Q.  Okay, but first I'm asking you about your first amendment

1  claim.

2  A.  Yes.

3  Q.  About your political activity.

4          THE COURT:  She answered your question.

5          MR. R. SMITH:  Very well.

6          THE COURT:  I mean, are you going to go through a

7  review of the law with a witness who's not a lawyer, and my

8  question is she answered, due process.  They deprived me of

9  my due process.  That's her answer.

10          MR. R. SMITH:  Understood, Your Honor.  Thank you.

11          THE COURT:  I mean, you can follow up on that if you

12  want, but --

13          MR. R. SMITH:  No, nothing further.  Thank you.

14          MR. MARTIN:  May I, Your Honor?

15          THE COURT:  Yes.

16          MR. MARTIN:  Thank you.

17                      REDIRECT EXAMINATION

18  BY MR. MARTIN:

19  Q.  Ms. Cain, these applications, your original application

20  and your renewal application, did you submit that in paper

21  form or electronically?

22  A.  Electronic form.

23  Q.  And to the best of your recollection when you were

24  submitting that, was there an option of not answering any

25  questions?

1  A.  There's no options not to answer any questions.

2  Q.  Okay, so if a question is not answered, you can't move

3  forward.

4  A.  It cannot move forward, correct.

5  Q.  Okay.  And you were asked a question by counsel for

6  councilperson Bass about the statement, and this appears at

7  the bottom of city page 2 in Exhibit-12.

8  A.  So go to Exhibit-2, go all the way back to the part --

9  Q.  No, go to Exhibit-12, at the --

10 A.  12.

11 Q.  -- back of the binder.

12 A.  12, okay.  And number 2?

13 Q.  Page 2, it's city-2.

14 A.  City-2, uhm-hum.

15 Q.  That sentence at the very bottom with the certification

16 saying I certify that I'm applying for RCO status on behalf

17 of a political ward and that the ward committee and ward

18 leader are aware of and have authorized this application for

19 RCO status, what was your understanding of that when you

20 applied for the renewal?

21 A.  Because I was a part of the -- and presently, a part of

22 the 22nd ward, and I was the first vice chair of the ward, so

23 I have been active and demonstratively active, and so it

24 pertained to me that I was answering it correctly.

25 Q.  Okay.  Now this certification actually says ward

1    committee and ward leader.

2    A.  Correct.

3    Q.  Are you aware of Ms. Bass ever getting the ward committee

4    behind her on the application submitted by Christine Foster?

5    A.  No, I have no knowledge of that.

6    Q.  So as far as you know, the ward committee never approved

7    the application made at Ms. Bass's request, correct?

8         MR. D. SMITH:  Objection.

9    A.  Correct.

10        THE COURT:  Sustained.  You can rephrase it if you

11   like.  It was leading.

12   BY MR. MARTIN:

13   Q.  I believe you testified that you were not aware, am I

14   right, of the ward committee ever voting to -- am I correct,

15   your testimony is you're not aware of the ward committee ever

16   voting with respect to approving the Christine Foster

17   application?

18        MR. D. SMITH:  Objection.

19   A.  No, I'm not, I was not aware of it.

20        THE COURT:  Sustained.  I remember the testimony.

21        MR. MARTIN:  All right.

22   BY MR. MARTIN:

23   Q.  You made a comment in your question in cross examination

24   about not being privileged, I think was the word you used, to

25   attend committee meetings.  What were you referring to when

1   you said that?

2             MR. D. SMITH:  Objection.

3             THE COURT:  Overruled.  I forget how it came out,

4   but go ahead, you can answer it.

5   A.  I was not allowed to attend any of the 22nd ward monthly

6   meetings, via Zoom or in person.

7   Q.  And during what time period were you not allowed to?

8   A.  Oooh, that was --

9             MR. D. SMITH:  Your Honor, again, this has nothing

10  to do with the RCO.

11            THE COURT:  Overruled.  But there's no foundation

12  for this.  Not allowed to attend?  Who said she couldn't

13  attend?

14            MR. MARTIN:  That's what I was getting to.

15            THE COURT:  Did you -- all right, go ahead.

16            MR. MARTIN:  Yep.

17  BY MR. MARTIN:

18  Q.  Did someone tell you you were not able to attend the

19  committee meetings?

20  A.  We were -- it was during COVID and we were denied access

21  to any of the Zoom meetings.

22  Q.  When you say we, are you referring --

23            THE COURT:  And are we relitigating something?

24  A.  Yes.

25            MR. MARTIN:  No.  Your Honor, I can let that go.

 1   And I don't have anything else, Your Honor, on redirect.

 2                THE COURT:  All right.  You can step down, thank

 3   you.  You can step down.  Thank you.

 4                MS. CAIN:  Okay.

 5                MR. CARNES:  May Mr. Goins be called as on cross-

 6   examination?

 7                THE COURT:  Who?

 8                MR. CARNES:  Mr. Goins, Jonathan.

 9                THE COURT:  And what is the -- because we've been

10   through all the -- how long are you going to be and --

11                MR. CARNES:  I don't think it's going to be very

12   long, Your Honor.  Mr. Goins prepared a memo that kind of

13   breaks down how it all went, and he provides clarity in terms

14   of what the -- you know, what the records and planning

15   commission are.

16                THE COURT:  All right, okay.

17                JONATHAN GOINS, PLAINTIFF'S WITNESS, SWORN

18                THE CLERK:  Thank you very much.  You can be seated,

19   and if you could, could you state your full name and spell

20   your last name.

21                MR. GOINS:  My full name is Jonathan Cottingham

22   Goins, last name is G-O-I-N-S.

23                THE CLERK:  Thank you very much.

24                          DIRECT EXAMINATION

25   BY MR. CARNES:

1   Q.  Mr. Goins, thank you for coming.  I just have a few

2   questions for you.  First of all, could you identify your

3   position with the city?

4   A.  Yeah, so for the last four years I've been a city planner

5   with the Division of Planning and Zoning, within the

6   department of planning and development.  I also serve in a

7   role as the RCO coordinator with the department.

8   Q.  Okay.  And you are the person who initially received the

9   June 15th, 2019 registration from Carla Cain to register the

10  22nd Ward Democratic Committee RCO, is that correct?

11  A.  Yes, that's correct.

12  Q.  And when that was received, was there any communication

13  between you and Carla Cain?

14  A.  No, not apart from the actual registration form itself.

15  Q.  Okay.  And after that was received, it was then approved

16  and put on a list that the city would maintain of registered

17  RCOs, is that correct?

18  A.  That's correct.

19  Q.  Okay.  And did you subsequently receive a comment from

20  Cindy Bass's chief of council staff member, Mr. Metozo, about

21  that?

22  A.  Yes, I did.

23  Q.  And what was -- what did he state?

24  A.  So we had a phone conversation; I do not remember the

25  exact words of that conversation, but he expressed to me that

1   he was surprised that the registration had been submitted on

2   behalf of the 22nd ward and something, you know, to the

3   effect that it hadn't been authorized or that it had been a

4   surprise to himself and to council member Bass.

5   Q.  And he was calling from councilwoman Bass's office,

6   correct?

7   A.  That is how I knew him, as a council staffer, yes.

8   Q.  Okay, now that -- if it -- would that sound like that

9   happened in -- if you would, turn to City-4, it's in Exhibit-

10  12.  I believe that's a summary that you prepared to assist

11  you in reviewing the circumstances.  Do you see that, city-4,

12  in front of you?

13      (Defendant's Exhibit-4 previously marked for

14  identification)

15  A.  I do.

16  Q.  Okay.  So when Mr. Metozo contacted you, was that

17  sometime like in September of 2019, does that sound about

18  right?

19  A.  That sounds about right, yes.  I know it was 2019.

20  Q.  Was there any action taken between September of '19 and

21  say August of 2020?

22  A.  No action regarding the status of the RCO or Ms. Cain's

23  status as the primary contact, no.

24  Q.  And so that means that if an application came before the

25  ZAB in the 22nd ward the -- which is the same as the 19119

1    zip code, that should have gone to her?

2    A.  Yeah, those notifications would go to whoever was listed

3    as the primary contact for that RCO and she was listed as

4    that primary contact.

5    Q.  Okay.  And just so I understand, when is the period for

6    approval and renewal?

7    A.  Yes, every year in June we accept RCO renewals and

8    registrations.  An RCO status is good for two years, so an

9    Rco registered, you know, in June of this year, two years

10   from now in June they would -- it would renew.

11   Q.  Okay, and what happens if somebody has applied and makes

12   an application in September or some other time?

13   A.  We wouldn't accept an application outside of that

14   registration period.

15   Q.  Okay, so then in 2020 you get an application from

16   Christine Foster for the 22nd Ward Democratic Committee RCO,

17   is that correct?

18   A.  That's correct.

19   Q.  And was there any discussion you had with anybody at

20   councilwoman Bass's staff or otherwise, prior to that

21   application being submitted on August 13th of 2020?

22   A.  I don't recall any conversation with anyone in council

23   member Bass's office regarding that application specifically

24   prior to that time.

25   Q.  Okay, and we saw as your note indicates there was a ward

1   leader cert attached which had the signature of C. Bass, is

2   that correct?

3   A.  That's correct.

4   Q.  Okay.  So according to this, you are going to treat that

5   as a change in contact information, and you follow that

6   procedure because under your regulations you have to contact

7   the primary RCO to see if that person -- primary contact to

8   see if that person agrees and so forth, correct?

9   A.  I believe the language is that we're to reach out to the

10  existing primary contact to confirm the request that has been

11  made, so we did follow that procedure.

12  Q.  And ultimately that confirmation was not received from

13  Carla Cain, correct?

14  A.  Carla Cain at that time contested the change and

15  maintained that she should remain the primary contact for the

16  RCO.

17  Q:  Was she told that she had been removed from the RCO at

18  one point in time?

19  A.  It was communicated to her at that time that we were

20  following the procedure and we were looking to confirm.  I

21  don't believe myself or anyone communicated to her that she

22  was removed because we did not remove her as the primary

23  contact at that time.

24  Q.  So she was not removed in 2020?

25  A.  Correct.

1    Q.  So even though there was a certification by the ward

2    leader attached to her application, that was not treated as

3    sufficient to change the status of the primary contact?

4    A.  That's correct.

5    Q.  And do you know that that information was ever

6    communicated to Carla Cain?

7    A.  I don't know beyond the email communication that, you

8    know, we had received this request, and do not think that it

9    was ever expressly communicated to Ms. Cain that we had not

10   changed the contact information.

11   Q.  Now we went through a variety of emails that took place

12   in September of 2021, because in September 20th, I believe,

13   of 2021, there was an application made for the property

14   identified as 244 East Springer Street in the Mount Airy

15   section of the city, do you remember that?

16   A.  I'm familiar with the email exchange --

17   Q.  Okay.

18   A.  -- about that property, yes.

19   Q.  Now you immediately received comments from the

20   councilwoman's office about that, correct?

21   A.  Sometime after the notification communication went out

22   for that property.  I don't know the timeline, but we did

23   receive communication from the council office.

24   Q.  And Mr. Richardson believed that the certification that

25   was attached to the application that was untimely filed in

1   August of 2020 somehow corrected and changed the primary

2   contact for the 22nd ward RCO, is that correct?

3           MR. D. SMITH:  Objection as to Mr. Richardson's

4   belief.

5           THE COURT:  Pardon me?

6           MR. D. SMITH:  Objection as to the question

7   regarding Mr. Richardson's belief.

8           THE COURT:  Sustained.  It's a question as to

9   foundation.

10          MR. CARNES:  Okay.

11          THE COURT:  He's objecting to your foundation --

12          MR. CARNES:  Okay.

13          THE COURT:  -- for the belief.

14  BY MR. CARNES:

15  Q.  Was there communication between yourself and Mr.

16  Richardson, one of the staff members of Cindy Bass?

17  A.  Yes.

18  Q.  And did Mr. Richardson in one of those communications

19  express his belief that the certification attached to the

20  untimely 2020 application of Christine Foster as the primary

21  contact had been rejected?

22          MR. D. SMITH:  Objection as to, again, belief and

23  untimely.

24          THE COURT:  Overruled.

25  BY MR. CARNES:

1    Q.  You can answer.

2    A.  Yes, in my reading of his email correspondence, he did

3    seem to be under the belief that the contact information was

4    changed or should have been changed in 2020.

5    Q.  And it had not been changed?

6    A.  It had not.

7    Q.  Okay.  And is it -- it is your -- is it your position

8    that the councilperson cannot change the primary contact of

9    an RCO?

10   A.  Yes, that's my position.

11   Q.  And that's the position of the planning commission?

12   A.  I don't know that I'm authorized to speak for the

13   planning commission on a whole, but I would say there's no --

14   nothing within our -- the zoning code or the regulations of

15   the planning that, you know, provide any procedure in where a

16   councilperson could change the -- you know, the contact

17   information for an RCO.

18   Q.  Now as of 2021 when the 224 East Springer Street project

19   came up, there were objections and there's a letter that's

20   been presented on October 13th, signed by Cindy Bass in her

21   capacity as ward leader, requesting that the primary contact

22   be changed from Carla Cain to Christine Foster.  Are you

23   aware of that letter?

24   A.  Yes, I am.

25   Q.  Okay.  And am I correct in understanding that based upon

1   that communication a change took place?

2   A.   That's correct.

3   Q.   Okay.  And when that change took place, what was -- what

4   specific provision in the regulations did you utilize to

5   determine that you were authorized to take such action?

6   A.   So to my knowledge there isn't any -- a specific

7   provision in our regulations or the zoning code that

8   addresses this specific situation where there's a -- someone

9   contests a change to the primary contact.  However, we acted

10   based on our best understanding of our authority and past

11   practice that we had done in similar situations.

12   Q.   And can you tell me a situation or past practice

13   involving an RCO -- a ward leader RCO where there was a

14   change such as this made?

15   A.   Yeah.  At the same time in 2019 for that same

16   registration period when we received the 22nd ward

17   application, we received a ward application from the 13th

18   ward and very similarly the ward leader for that ward,

19   shortly after the registration was submitted, reached out to

20   express that he had not authorized -- he in this case had not

21   authorized the application, asked that he himself be named as

22   the primary contact, and in that case we had some internal

23   discussion, hadn't had that particular situation before.  We

24   decided we would, as we did here, reach out to the existing

25   primary.  They objected.  We then asked from that ward that

1  we get something in writing from the ward leader making an

2  explicit request to change that information, and when we

3  received that, we did make that change.

4  Q.  Now you just said the 13th ward, but am I -- I seem to

5  remember, and I haven't got it memorized, but you believe,

6  you've testified it was the 12th ward.

7  A.  I think I mis-stated.  It was the 12th ward.

8  Q.  Okay.

9  A.  I'm sorry --

10  Q.  It was the 12th ward.

11  A.  -- we have a lot of ward RCOs.

12  Q.  And again, that's within Cindy Bass's district, correct?

13  A.  That is within the eighth council district, yes.

14  Q.  And in that case, in 2019, you received a letter from the

15  ward leader who wanted to put himself in that position?

16  A.  That's correct.

17  Q.  Did you receive any minutes or anything else from the

18  ward leader to support his position?

19  A.  Yeah, I do not recall if we had any other documentation

20  at the time.  But my recollection -- I don't have a record of

21  it -- is that he submitted a letter as ward leader making

22  that request.

23  Q.  Was there any protest or concern about due process by the

24  party who had submitted the application and was the primary

25  contact for that RCO?

1   A.  I do not recall if we got any correspondence after that

2   change was made from the previous primary contact for the

3   ward.

4   Q.  But in 2019 you did not receive a letter from the ward

5   leader to support the change that was made in August of 2020.

6   In 2020 you did not receive a letter from the ward leader?

7           MR. D. SMITH:  Objection to form.

8   A.  Could you please restate that?  Sorry.

9   BY MR. CARNES:

10  Q.  You referred to this procedure in 2019, but I think we

11  established previously that the application for

12  reconsideration -- application for a 22nd Ward Democratic

13  Committee RCO was treated as a change of status that was

14  received in August of 2020.

15  A.  That's correct.  The application we received in 2020 was

16  not treated as a new application or renewal because their

17  eligibility period hadn't expired yet.  So in 2019, the 22nd

18  ward applied.  In 2020 they still had another year left on

19  their registration, so we didn't treat it as a new

20  application or renewal.

21  Q.  And in that situation, the ward leader of the 22nd ward

22  did not supply the letter similar to the one supplied at the

23  12th ward.

24  A.  That's correct.  We did have a signed certification form

25  authorizing the application, but not an explicit request to

1   change the contact information.

2   Q.  And let me just ask you, on that situation in the 12th

3   ward, is that how it was approached there as well?  Did the

4   new proposed primary contact submit an untimely -- I mean

5   outside of the time period -- application and suggest that

6   their name should be there and was certified by the ward

7   leader?  Is that how it was presented there, too?

8           MR. CARNES:  Objection to the characterization of

9   sometimes they are.

10          THE COURT:  Overruled.

11  A.  So no, in 2020 we did not receive an untimely renewal

12  application from the 12th ward.

13  BY MR. CARNES:

14  Q.  But in 2019 was there -- how did -- how was that

15  presented to you?  Was it a new application?

16  A.  It was just presented as per our regulations, it is

17  required they request in writing to the executive director to

18  change information -- contact information, for the RCO.

19  Q.  Now, in terms of the regulations that you're talking

20  about, can you point to which one that was relied upon?  It's

21  exhibits, we have three sets of them, but I think we're

22  working off of Exhibit-11, which is the most recent

23  promulgation of the planning commission rules effective

24  November 22nd, '21, with a change that was promulgated

25  October 22, 2021,  Can you point in that document under

1    Chapter 12 dealing with RCOs, what authorized this change of

2    primary contact for the 22nd Ward Democratic Committee RCO?

3         (Defendant's Exhibit-11 previously marked for

4    identification)

5    A.  Yes, if we look at page 41 within the regulations, 12.3.4

6    --

7    Q.  Okay.

8    A.  -- it states that updates and corrections, an RCO may

9    submit a written request of the executive director to correct

10   or update its registration information at any time.  This

11   request shall be submitted or verified by the primary contact

12   person as listed in the RCO's current registration, unless

13   the primary contact is unavailable due to death, medical

14   conditions or other exceptional circumstances.  The executive

15   director may request additional documentation to verify any

16   modification to an RCO's registration information.  So the

17   written request that was what we requested and got in both of

18   the cases I referenced, that's that -- is from this section

19   of the regulation.

20   Q.  So the executive director in this case is Eleanor Sharpe,

21   right?

22   A.  That's correct, yes.

23   Q.  So did Eleanor Sharpe write a letter to request

24   additional information in August of 2020 from the person

25   making the request to modify?

1   A.  Yeah, so my reading of the regulation doesn't require a

2   letter, but I did request a letter on her behalf and with her

3   authorization, so requested something in writing from the

4   ward leader.

5   Q.  In August of 2020?

6   A.  In -- which ward application are we referring to?

7   Q.  We're talking about the initial application, because

8   there was a challenge to that in August of 2020.

9   A.  In August of 2020 a challenge to which application?

10  Q.  To the June 20 -- the June 15th, 2019 application.

11  A.  So there's a 2019 application, and then another

12  registration submitted in 2020 listing Ms. Foster, and then

13  there was a conversation in 2020 that I had expressing that

14  request for a letter from the ward leader, explicitly

15  requesting the change in contact information.

16  Q.  Okay, and that was never supplied?

17  A.  It was not supplied in 2020.  We did ultimately receive

18  it in 2021 when we made the change.

19  Q.  And who did you have that conversation with regarding

20  that -- the requested submittal?

21  A.  I had that conversation with council member Best.

22  Q.  And let's go back to the prior exhibit, Exhibit-10.  Do

23  you see that?  That has amendments incorporated through

24  November of 2019.

25          (Defendant's Exhibit-10 previously marked for

1   identification)

2   A.  Yes.

3   Q.  Okay, let's turn to the same section, 12.3.4, and I ask

4   you to show me where the change was in these regulations.

5   Isn't this the exact same regulation that existed at that

6   point in time as well?

7   A.  Yes, it is the same.  There wasn't any change to this

8   section.

9   Q.  So any comments that were made about changing the

10  regulations to address the circumstance did not apply?

11          MR. MARTIN:  Objection, Your Honor.

12          THE COURT:  Overruled.

13  A.  Yeah, there were no changes to the regulations to

14  explicitly address the situation here where we've got a

15  contest -- someone contests the change in primary contact

16  information.  We did amend the regulations to require a ward

17  leader certification, essentially an RCO leadership

18  certification on applications when they're submitted or

19  renewed to try to avoid situations similar to this in the

20  future.

21  BY MR. CARNES:

22  Q.  And that change that you've just referenced was not made

23  until somewhere else in Exhibit-12, which is -- I mean

24  Exhibit-11, which is the regulations in effect on November

25  22nd, 2021, correct?

1  A.  Correct, that change was not made until fall of 2021.

2  Q.  And that would be after the October 13th letter from

3  councilwoman bass as ward leader, essentially removing Cindy

4  Cain -- Carla Cain, excuse me.

5  A.  After we received that letter and made the change, yes.

6  Q.  And that -- how was that done?  How was that change made?

7  It wasn't a change in a zoning ordinance, I was just a change

8  in the regulation right?

9  A.  Yeah, it's a regulation change.  Those are presented to

10  the planning -- full planning commission and if approved by

11  them, those changes take place after a public comment period.

12  I'm not sure how long that is, but once that period expires,

13  the regulations go into effect.

14  Q.  And were you aware of any --

15           MR. CARNES:  May I approach?

16           MR. D. SMITH:  May I see what it is, counsel?

17           MR. CARNES:  Yeah.  Oh, yeah, sorry.

18           MR. D. SMITH:  Thank you.

19  BY MR. CARNES:

20  Q.  I have some exhibits that were discussed at the -- at

21  Carla Cain's deposition, and I'm asking you if you -- looking

22  at Exhibit-P6, which is a series of zoning board and

23  adjustment appeals calendar from June 16th of 2021 through

24  September 14th of 2022, is that a record that could be drawn

25  down from your records?

1    A.   Yes.

2    Q.   Okay, and do you see on there reference to a 7/19/22

3    application for 225 East Springer Street?

4    A.   Yes, I do.

5    Q.   And that's a ZP2021 schedule?

6    A.   Correct.

7    Q.   Okay, and on this there are, you know, a number of

8    applications that were going before the zoning and hearing

9    board, you know, some 20 or so, do you agree?

10   A.   Correct.

11   Q.   And with respect to 225 East Springer Street, is that --

12   that was scheduled for a hearing when, can you tell?  Was

13   that July 19th, 2022?

14   A.   Yes.

15   Q.   Okay, and that's the same Springer Street property that

16   was brought up in 2021 when there was a further inquiry into

17   the status of who was the primary contact for the 22nd Ward

18   Democratic Committee RCO, is that correct?

19   A.   I would need to see the email to know the exact address.

20   I know there were a few Springer Street addresses there.

21   Q.   Okay.

22   A.   I don't recall the exact number for that email.

23   Q.   All right.  Turn to Exhibit-13, Bass page 12 and let me -

24   - can I take this away from you?  I'm going to return it to

25   you.  And I'll leave this in front of you.  Exhibit-P6 with

1   reference to the Springer Street property.  Does that

2   correspond with the RCO notice that was sent out on September

3   -- I guess the first time it was sent out was September 20th,

4   2022 -- '21.

5       (Plaintiff's Exhibit-13 previously marked for

6   identification)

7   A.  Yes, I do see they both read 244 East Springer Street --

8   Q.  And is the --

9   A.  -- and they are the same zoning permit number, yes, so

10  that would be the same permit.

11  Q.  So ZP2021006922?

12  A.  Correct, yeah.

13  Q.  So that application that was brought forward by Vernon

14  Anastasio, that application wasn't dealt with for another

15  year, that was delayed for an entire year, is that correct?

16          MR. D. SMITH:  Objection, foundation, Your Honor.

17          THE COURT:  If that's your objection it's overruled.

18  Go ahead, you can answer the question.

19  A.  Sure.  Yes, so the initial notice was sent in September

20  of 2021, and this calendar lists a hearing in July of 2022.

21  I don't know if the case was decided in July or not --

22  Q.  Okay.

23  A.  -- but that's when it's listed on the calendar.

24  Q.  And we -- okay.  In terms of that exhibit, P-6 that

25  you're looking at, those 20 or so matters that are before the

1   zoning hearing board, would those have all been -- as a

2   planning commission executive, so to speak, would those

3   applications, all involving zoning -- the zoning board of

4   adjustment variances and so forth, all within the 19119 zip

5   code, would they all go before the RCOs including the 22nd

6   Ward Democratic Committee RCO if they're within the 19119 zip

7   code?

8   A.  So I think we discussed this at my deposition.  Not exact

9   overlap with the word boundaries and the zip code boundaries,

10  but as long as these appeals, the properties fell within the

11  22nd ward boundaries, the 22nd ward would be considered an

12  affected RCO and they would receive, you know, the

13  notification that we see in the email here.

14  Q.  Were you here, did you have any communication with Carla

15  Cain regarding -- direct, on the phone, regarding the request

16  in 2020 to have her removed or later in 2021?

17  A.  Yeah, so according to my notes, I did have a conversation

18  with her, and the email record says I would call her in 2020.

19  I do not remember, you know, any of the exact wording of that

20  conversation, but I do believe I did speak with her at that

21  time.

22  Q.  Yeah, and the first exhibit that we looked at, the -- I

23  think it was city-4.

24          MR. MARTIN:  City page 4.

25  BY MR. CARNES:

1  Q.  You have that in front of you again?

2  A.  Yes.

3  Q.  Okay.  And when did you prepare this timeline?

4  A.  It's not dated, but I believe it was typed sometime

5  earlier this year in 2022.

6  Q.  And you reviewed emails and notes and so forth to prepare

7  this?

8  A.  I did.

9  Q.  Okay.  And as you go down those notes, after the 2020

10 Foster application, you say current regs give no guidance if

11 you can't confirm change or changes contested, is that

12 correct?

13 A.  That's correct.

14 Q.  And you asked for something from Bass in writing in her

15 capacity as a ward leader and she agreed via phone with J.G.

16 Who's J.G.?

17 A.  That's myself.

18 Q.  So you spoke with her on the phone?

19 A.  I believe I did, yes, according to my notes.

20 Q.  And this memo doesn't say that had you received the

21 letter from her, you could make the change, does it?

22 A.  It does not.

23 Q.  And then 2021 in June -- I believe it was June 3rd, Carla

24 Cain applied for renewal.  That went to you, right?

25 A.  That's correct.

1   Q.  And you accepted it.

2   A.  I did.

3   Q.  Okay, and that's filled out online, is that right?

4   A.  Yes.

5   Q.  Now while Carla Cain was the primary contact for the 22nd

6   Ward Democratic Committee RCO, did you ever receive any

7   complaints regarding her behavior, or did you ever pursue any

8   concerns regarding her behavior and her management of the

9   RCO?

10  A.  Not that I recall, no.

11  Q.  Okay.  There are procedures if an RCO gets out of line

12  and doesn't do his job, are there not?

13  A.  There are, yes.

14  Q.  And those were never brought into play?

15  A.  Not to my recollection with the 22nd ward, no.

16  Q.  And then you have this September 2021, Mr. Richardson of

17  Bass's staff notices on email that Carla Cain is still listed

18  as primary, and he tells you that Christine Foster is the

19  chair.  And then Jeanine Bowers, she's at your office as

20  well, is that correct?

21  A.  She was at the time a -- on staff with the zoning board,

22  and she was the one that was sending the RCO notification

23  emails.

24  Q.  And then you got an email from Bass stating, and I could

25  read from your quote, I guess this comes from somewhere in

1    the emails, "Thank you to everyone for working to clear this

2    matter up {period}.  Just to be clear {comma}, I have been

3    working with Christina Foster regarding all RCO matters in

4    the 22nd ward.  I will continue to do so and talk to Carla

5    Cain to gauge her interest regarding working with Christina

6    to have one seamless operation and end any confusion that may

7    exist -- that currently exists.  Again {comma}, many thanks."

8    So that -- what did that mean?  What does that quote mean?

9    A.   That quote was taken from an email that I believe is in

10   the record from council member Bass.  I won't -- I don't know

11   that I can say what it means apart from what it says.

12   Q.   Now you spoke with Ms. Bass on the phone, is that

13   correct?

14   A.   Excuse me?

15   Q.   You spoke with Ms. Bass on the phone, is that correct?

16   A.   I did definitely in 2020, yes.

17   Q.   And did she identify herself as councilwoman Bass?

18   A.   I do not remember how she identified herself.

19   Q.   Did she ever identify herself as ward leader Bass?

20   A.   Not to my recollection, no.

21   Q.   And in fact, when you go down to September 24, 2021 email

22   from Charles Richardson in your memo, he's her staff member

23   and he's looping in councilwoman Bass, right?

24   A.   That's what he said in the email, yes.

25   Q.   And then you get the letter from Cindy requesting the

1   change we make late 2021.  Who's we, that's the planning
2   commission?
3   A.  Yes.
4   Q.  And Exhibit-5 right behind you is the letter, and that's
5   addressed to Eleanor Sharpe.
6   A.  Correct.
7   Q.  When did you first see that letter?
8   A.  I believe it was sent via email.  I can't say for sure,
9   but it's dated October 13th, so I assume it was at that time
10  or shortly thereafter.
11  Q.  Now you -- when you were looking at this in 2020, you had
12  some communications with Mr. Mathis and with Ms. Foster about
13  their interest, do you remember that?
14  A.  I do.
15  Q.  Okay, and you reached out to them and got information
16  from them.  Why didn't you do that again in 2021?
17  A.  To my recollection we did, and I believe the email record
18  reflects that.  But as part of our procedure, we get a -- try
19  to get a confirmation of the request from the existing
20  primary and then typically we also try to get a confirmation
21  from the proposed primary and secondary just to confirm that
22  they've accepted the role, that they understand what it
23  means, and that their email accounts are active and working.
24  Q.  Well, I know you're here on behalf of the city, but we
25  have a city exhibit here in front of us and that's city

1   Exhibit-12.  I would ask you to look through that, take your

2   time if you want and try -- show me when in 2021 you

3   contacted Mr. Mathis or Ms. Foster to confirm that they still

4   wanted to be contact people.

5   A.  I am not seeing it in the record before me, but my best

6   recollection is that we did do it in 2021.

7   Q.  Because that's your practice or that's your procedure?

8   A.  That is our typical procedure.  There are times when that

9   hasn't happened, limited situations, but in general that's

10  what we do.  It's not a regulation, it's something we like to

11  do to make sure we've got good contact information that we're

12  putting out for new applicants and committee members.

13  Q.  Now you brought up one other example of an RCO that

14  involved a ward committee.  Are there any other ward

15  committees that were involved in this sort of an inquiry?

16  A.  Not any ward committees, but there are similar situations

17  that have happened with non-ward RCOs in the past.

18  Q.  So with respect to this ward, you've mentioned the 12th

19  ward.  There were numerous communications beginning in 2019

20  from Mr. Metozo, then from Mr. Richardson, with copies to Mr.

21  Barge and other members of staff, and direct communications

22  with the councilwoman.  Did you have that sort of

23  communication on the other one, the 12th ward as well?

24  A.  The 12th ward, the timeline was much shorter, but there

25  was regular communication with that ward leader over the

1  course of the -- I believe a few months that it took to

2  resolve that situation.

3  Q.  And was there any communication from Cindy Bass who was

4  the councilwoman for that 8th ward with overarching

5  responsibilities for that ward?

6  A.  Not to my recollection.

7         MR. D. SMITH:  Objection to form.

8         THE COURT:  Overruled.

9  A.  Yeah, not that I recall when it came to the 12th ward,

10  no.

11  BY MR. CARNES:

12  Q.  Do you know whether Cindy Bass communicated directly with

13  Eleanor Sharpe regarding this matter?

14  A.  I do not know.

15  Q.  Did you advise her to put her ward leader hat on?

16  A.  I believe I used that language, yes.

17  Q.  And that's because everything was coming from the

18  commissioner's office, correct?

19         MR. D. SMITH:  Objection.

20         MR. CARNES:  Councilperson's office.

21         THE COURT:  Overruled.

22  A.  I said that because I knew that she had both roles, she

23  was obviously both a councilperson and a ward leader, and we

24  felt the request should come from the ward leader, or her in

25  that role.

1    BY MR. CARNES:

2    Q.  Now have you had any discussions with Christine Foster

3    since October of 2021?

4    A.  Not that I recall, no.

5    Q.  Have you had any discussions with Cindy Bass regarding

6    this matter since 2021?

7    A.  No.

8    Q.  There is a procedure, is there not, under the regulations

9    such that if somebody makes application for an RCO position

10   and makes application and that application is rejected, that

11   person can make an appeal and bring that before the planning

12   commission to state their case and to try to get the

13   application approved, isn't that correct?

14   A.  That's correct.

15   Q.  But there is no such procedure for what happened here

16   where Carla Cain was removed.

17   A.  Correct.

18   Q.  And again, you said that in 2020 she, Carla Cain,

19   retained her position as primary contact, but you said you

20   don't have any direct documentation or record that proves

21   that she was told that.

22   A.  That's correct.  I wouldn't say it's our typical

23   procedure and we don't change contact information to, you

24   know, explicitly tell the primary contact.  We maintain a

25   list of RCOs and the primary contacts online.  We keep as up-

1    to-date as we possibly can, and Ms. Cain would have still

2    been listed on that until the time that it was changed.

3    Q.  Now in 2021, and after October 13th, was there any

4    communication to Ms. Cain that she had been removed?

5    A.  I am not sure.  Once we made the change, again, once that

6    decision is made and information is changed, not our typical

7    procedure to inform anyone that the change is going through.

8    We kind of rely on them to check the list, check the record

9    to make sure that it's correct.

10   Q.  Well, when the 2020 -- when the 2 -- when the Springer

11   Street property was up for consideration and it was going to

12   go to the RCOs for review, Ms. Cain expressed her desire that

13   she be allowed to continue in the process pending that --

14   while that application was moving forward.  Did that happen?

15   A.  I would need to see the email that references that

16   communication from her.  I don't -- I wasn't a direct

17   recipient of that and I'm not familiar with it.

18           MR. CARNES:  No further questions.  Thank you.

19                       CROSS EXAMINATION

20   BY MR. R. SMITH:

21   Q.  Good afternoon, Mr. Goins.

22   A.  Good afternoon.

23   Q.  Can you explain the difference between an initial

24   application for an RCO versus a change request that's made

25   later?

1   A.   Sure.  So an initial application has certain requirements
2   that have to be listed as per the zoning code and our
3   regulations, contact information is one of them.  There's
4   additional documentation that we verify to see if an RCO
5   meets, or an organization meets our criteria for RCO status.
6   A change in information, I read the regulation earlier, but
7   essentially should be something in writing from the RCO
8   requesting that change to be made, and there is some
9   procedure around that but not the same as for an application.
10  Q.   Is it -- request for change time limited?
11  A.   Can you explain?
12  Q.   Is there a limited window to submit, like, an
13  application?
14  A.   No.  When it comes to request the change, I believe the
15  zoning code actually compels RCOs to update information if a
16  change happens, if there's any change in the information that
17  they submitted on their initial application, and then, you
18  know, the regulations spell out that procedure a little
19  further and say it should be written requests to the
20  executive director, but there's no limitation of when those
21  could be submitted.
22  Q.   Is the application form the only way to request a change?
23  A.   No, so there's no specific form for a request to change,
24  it just says that it should be something in writing.  There's
25  no form that we provide to make a requested change of

1   information.

2   Q.  Now you agreed when Mr. Carnes asked you if you

3   considered the ward leader certification on the 2020

4   application to be -- you agreed that it was not sufficient to

5   make a change at that time.  Why was that?

6   A.  I think -- so when we initially received it, you know, we

7   treated it as a request to change because we didn't know what

8   other category to put it in.  But at the end of the day we

9   decided that what we wanted to have for the record was that

10  they -- a specific explicit request to change the contact

11  information, rather than us receiving an application with the

12  certification and then sort of inferring from that, that that

13  was the desire.  So that is part of why the change wasn't

14  made.  I'll say also in reviewing the record, I'm not sure

15  that we ever got a confirmation from Ms. Foster.  As I said,

16  it is our typical procedure is to try to get that and I'm not

17  sure we actually did get it in that case, and that may have

18  also been part of why we didn't make the change at that time.

19  But ultimately we decided and requested that there should be

20  a letter, we should get a letter explicitly making that ask

21  from a board leader.

22  Q.  When you receive an application for an RCO, is it an

23  organization or is it a person that applies?

24  A.  From our standpoint it's an organization, ward, or

25  otherwise that applies for status as a registered community

1   organization.

2   Q.  And so Mr. Carnes asked you about the appeals process

3   when an application is rejected.  Do you remember that line

4   of questioning?

5   A.  I do.

6   Q.  Who takes the appeal if the application is objected -- or

7   is rejected?

8   A.  So as stated, I believe that I -- it's not something that

9   has actually happened in my time as RCO coordinator, and so

10  I'm not intimately familiar with the process, but my

11  understanding is there's a time period for appeal, and then

12  that appeal ultimately goes to the planning commission and

13  the commissioners themselves to decide on the merits of the

14  application or the appeal.

15  Q.  And is it the organization that appeals, or is it the

16  person that submitted the application?

17  A.  I don't know exactly what the language is, but I would --

18  again, I would consider it.  The organization was, in that

19  case, rejected for RCO status and the organization is

20  appealing that decision.

21  Q.  And you testified that it's your opinion that a city

22  councilperson is not authorized to make changes to any RCO,

23  is that right?

24  A.  That's right.

25  Q.  Who is?

1    A.  So sometimes that's not entirely clear.  So clearly a

2    primary contact is, and that if we get that request to change

3    from a primary contact directly, the procedure is to make the

4    change.  Apart from that, it's not clear, as I said, in cases

5    where it's contested, who exactly within an organization has

6    that authority.  It's not explicitly stated anywhere that I

7    know of, but our position has generally been that the

8    leadership of that organization, who is, you know,

9    accountable to the organization itself and the community, has

10   the authority to make that change.

11   Q.  What about a case where the primary contact is

12   unavailable because perhaps they are deceased or no longer

13   work for the organization?  What procedure do you follow

14   then?

15   A.  Yeah, so I don't think it explicitly states, but that is

16   listed as a situation in which a confirmation of the request

17   is not required, and that is a situation that has happened.

18   We have RCO primary contacts that leave the organization,

19   have a different email address or for whatever reason not

20   available, and in those cases we would make the change,

21   meaning the planning commission would make that change.

22   Q.  Did council member Bass or any member of her staff

23   pressure you to make a change in this case?

24   A.  No, I would say the request was made and we were clear

25   the form we'd like to have that request to be made in, but I

1    would not say that I felt pressured to make a change.

2    Q.  Have you ever in your time as the RCO coordinator told

3    someone that you felt pressured by a council member to make a

4    change?

5    A.  Not that I recall, no.

6    Q.  Has a council member ever requested a change to RCO

7    contact information outside of this circumstance?

8    A.  We certainly do, and I will say on more than one

9    occasion, receive requests to change contact information from

10   a council staffer.  In most of the situations it's a

11   forwarded email that they received from an RCO

12   representative, for whatever reason reached out to them and

13   then they reached out to us and said look, this should be the

14   contact information.  That person is, you know, no longer

15   with the RCO, that sort of thing.  So I will say we have

16   gotten those sorts of requests through council staff offices,

17   and in those cases we follow essentially the same procedure

18   we said here, we'll try to get that confirmation from the

19   existing primary and kind of go through all the steps in our

20   regulation.

21   Q.  You are the one who maintains the RCO contact list in

22   your role as RCO coordinator, is that right?

23   A.  Correct.

24   Q.  So when you say change the primary contact, what does

25   that actually mean?

1   A.   Yeah, so we have a database that lists all the RCO

2   contact information and we log in, we go on there, we make

3   the change in the system, and then it prints our updates from

4   there.  So it will update the notification website where the

5   mailing list comes from for the actual notices.  Ultimately

6   that would be reflected in the list that we keep online of

7   RCOs and their contact.

8   Q.   And we've gone over several notification emails, at least

9   relating to the 244 East Springer Street property.  What do

10  those notification emails contain?

11  A.   So they are -- it's an email that is addressed to the

12  applicant, whether it's going to the zoning board or specific

13  design review, it lists the coordinating RCO I would say is

14  the most important information.  And this is laid out in, you

15  know, the regs which would be in there.  But it lists the

16  coordinating RCO, it explains the public engagement process,

17  what the applicant needs to do, what RCO responsibilities

18  are.  It also contains the refusal to the notice of refusal

19  that was issued by the zoning board as an attachment to that

20  email.

21  Q.   Is all of that material available publicly?

22  A.   Yes.

23  Q.   How would one access that material?

24  A.   So there are a few different ways to access refusals.  I

25  will say that that actual notice is available to anyone at

1    request.  So anyone can ask for that notice and receive it

2    via email if they ask to do so.  But other than that you

3    could go to a number of different city websites, search under

4    property address and the refusal document would be listed

5    there.  The only information you wouldn't have public access

6    to at this point is who is designated as the coordinating

7    RCO.  That information is available if someone asks for it,

8    but it's not considered publicly available by default.

9    Q.  And RCO meetings on these applications, are they open to

10   the public?

11   A.  So there's two rounds of meetings that are required.

12   There is a community meeting which is open to the public and

13   near neighbors receive an invitation to that, as do any

14   affected RCOs, and then the actual public hearing, whether

15   that's at the zoning board or civic design review, is open to

16   the public, opportunities for public testimony and public

17   comment.

18   Q.  And for both sorts of meetings, are notices posted

19   publicly?

20   A.  So the RCO -- the community meeting itself there is a

21   requirement to notice near neighbors with an invitation, and

22   then RCOs are expected to advertise their meetings, but there

23   is no public posting.  When it comes to the public hearing or

24   the civic design review, those are posted on the property,

25   those details.

1   Q.  Did you remove Carla Cain as the contact person for the

2   22nd Ward Democratic Committee RCO?

3   A.  I did remove Carla Cain as the primary contact and

4   replaced her with Ms. Foster.

5   Q.  And you -- why did you do that?

6   A.  I did that because we felt the request from the ward

7   leader was sufficient to make that change, and when we

8   received it then we changed it.

9   Q.  Did you consider Ms. Cain's political views when you made

10  that decision?

11  A.  No.

12  Q.  Are -- were you aware of Ms. Cain's political views when

13  you made that decision?

14  A.  I was not.

15  Q.  Nothing further.  Thank you.

16                      CROSS EXAMINATION

17  BY MR. D. SMITH:

18  Q.  Turn if you would to the regulations effective November

19  18, 2019.  I believe they're at tab 10.  Do you have them?

20  A.  I'm there, yes.

21  Q.  Okay, and if you would turn to page 30 and 31 of those

22  regulations.

23  A.  Sure.

24  Q.  Determination of eligibility and appeals is 12.3.3, is

25  that right?

1    A.   Correct.

2    Q.   And in 12.3.3.1 the eligibility determination is as to an

3    organization, is that right?

4    A.   12.3.3-1?

5    Q.   Yes.

6    A.   It refers to notifying an organization, yes.

7    Q.   Yes, not an individual, but an organization?

8    A.   Correct.

9    Q.   Okay.  And if we look at 12.3.3.2, at the top of the next

10   page, when a request has been denied it's an organization's

11   registration request that has been denied, is that right?

12   A.   Correct.

13   Q.   Not an individual's?

14   A.   Correct.

15   Q.   And it may, the organization may appeal that denial, is

16   that right?

17   A.   Yes.

18   Q.   Again, it speaks to the organization and not to an

19   individual, right?

20   A.   Yes.

21   Q.   And throughout this entire period, when there was a

22   question, if we're looking at 12.3.4, the executive director

23   may request additional documentation to verify any

24   modification to an RCO's registration information, is that

25   right?

1    A.   Yes.

2    Q.   Now here there was a dispute as to who was authorized by

3    the 22nd Ward Democratic Committee to speak for that

4    committee with respect to RCO matters, is that right?

5    A.   Yes.

6    Q.   And did you at the request of the executive director ask

7    for additional information?

8    A.   I did.

9    Q.   Of whom did you ask for that additional information?

10   A.   I asked both council member Bass directly and her staffer

11   for that additional information.

12   Q.   Okay.  And did you determine that the leader of the 22nd

13   Ward Democratic Committee wanted an update of the information

14   for the designation of a new contact person?

15   A.   We did.

16   Q.   And did you regard that as sufficient to make that change

17   under 12.3.4?

18   A.   Yes.

19   Q.   Now you were asked a question by Mr. Martin about whether

20   a councilperson has the authority to make a change, and you

21   told him no.  In this case, you weren't looking for a

22   councilperson's opinion or direction, you were looking for

23   the leader of the organization that was registered, is that

24   right?

25   A.   Correct.

1   Q.  And although you knew that a councilperson who was also a

2   ward leader had objected to the designation of Ms. Cain for

3   close to two years, you didn't jump at that councilperson's

4   preference, is that right?

5   A.  That's correct.

6   Q.  But instead you did your investigation for additional

7   information and made a considered decision, is that right?

8           MR. CARNES:  Objection.  It's a leading question.

9   The answer is yes.

10           THE COURT:  Sustained.

11           MR. D. SMITH:  Okay.

12  BY MR. D. SMITH:

13  Q.  Did you satisfy yourself by your investigation that the

14  change was warranted by the leadership of the organization

15  that had been registered?

16  A.  We did.  We felt that was reasonable and consistent with

17  our practice in the past.

18           MR. D. SMITH:  Okay, I have no further questions.

19                    REDIRECT EXAMINATION

20  BY MR. CARNES:

21  Q.  Just a few quick questions if I may, Mr. Goins.  The RCO,

22  they're going to bring the neighborhood together and get

23  community comments.  Do they not -- and you educate me.  Do

24  they not supply some sort of a recommendation themselves?

25  A.  Yeah, so there are different categories of RCOs when it

1    comes to this process.  Whoever is designated as the

2    coordinating RCO by the council office is required to supply

3    a summary or an account of the public meeting to the zoning

4    board or to civic design review board.  Most of the time that

5    meeting summary also includes some sort of recommendation,

6    vote, or otherwise position that the RCO takes on the

7    development.

8    Q.  And you say the RCOs, you're saying it plural, so the

9    coordinating and the other RCOs as well?

10   A.  I would say the RCO, if I misspoke.  So it would give

11   that -- the position of the coordinating RCO is typically

12   what is in that letter.

13   Q.  Would it reference the other RCOs' comments or positions?

14   A.  It should, if they participated in the meeting.  The

15   letter is supposed to reflect what happened in the meeting

16   and the, you know, opinions that were expressed.

17   Q.  So and I believe, you know, the practice in this area is

18   it's either the East Mount Airy or the West Mount Airy that's

19   the coordinating RCO when it's in this 22nd ward area, is

20   that correct?

21   A.  I would say both of those RCOs are regularly assigned to

22   coordinate depending on, yeah, where the property is.

23   Q.  And the council -- councilwoman Bass has the authority to

24   determine who is the coordinating RCO, correct?

25   A.  That's correct.

1   Q.  So for 244 East Springer, I think we saw it was East

2   Mount Airy that was the coordinating RCO.

3   A.  I would have to reference the email, but yes, sounds

4   reasonable.

5   Q.  So at that point in September 2021, when this notice gets

6   sent out by you to the 22nd ward RCO, democratic ward RCO, at

7   that point Carla Cain would be permitted to get all the

8   information, know of the first meeting which was to be the

9   community meeting, and also have a copy of the actual

10  application in her hands so that she could share that with

11  the community and let them know why this application was

12  rejected, what the developer wants to do, and move forward

13  accordingly, correct?

14          MR. D. SMITH:  Objection, Your Honor.  We're way

15  past the scope of the cross.

16          THE COURT:  Sustained.

17          MR. CARNES:  Okay.  Well, you were crossing his

18  comments, but I -- okay.

19  BY MR. CARNES:

20  Q.  Did -- okay.  The --

21          THE COURT:  You -- counsel, you can make your

22  position.  My understanding is, I don't see where something -

23  - other area was -- other door was opened.

24          MR. CARNES:  Yeah.

25          THE COURT:  But tell me where it was opened so you

1   can ask your question.

2   BY MR. CARNES:

3   Q.  Well, the question -- the suggestion was that the

4   coordinator is an email address that is used, and that you

5   removed the email address.  All I'm trying to bring out is

6   that that actual -- whoever is that coordinator, has certain

7   duties then to communicate, to bring this to the -- which we

8   were going over just now, right?

9   A.  Yes, they do have certain responsibilities.

10          MR. R. SMITH:  Objection, Your Honor.  The term

11  coordinator isn't -- I'm not sure whether he's referring

12  to --

13          MR. CARNES:  Primary contact.

14          MR. R. SMITH:  -- the coordinating RCO or the

15  prior --

16          MR. CARNES:  Primary contact I meant to say.

17  BY MR. CARNES:

18  Q.  The primary contact isn't just an email that gets taken

19  and removed, that primary contact goes to a person who has

20  certain responsibilities under the zoning code, right?

21  A.  I would say that the organization or the RCO itself has

22  certain responsibilities.  The primary contact could really

23  be any -- you know, in different organizations, that person

24  plays a different role that may or may not involve actually

25  facilitating the meeting.  It's --

1    Q.  Well --

2    A.  -- just the primary contact that's listed for purposes of

3    verification.

4    Q.  -- when the application is filled out, they identify a

5    schedule that they're going to have for meetings, they

6    identify a prior sample that they've provided previously for

7    that purpose, they identify where they're going to hold their

8    meetings and how they're going to communicate with the public

9    and that they under --

10              THE COURT:  He answered your question.  You asked

11   about the role of the primary person and contact person.  He

12   said that could be a number of things.

13              MR. CARNES:  All right, okay.

14              THE COURT:  Including just being a conduit for

15   information to the organization.

16              MR. CARNES:  Okay, but -- yeah, correct.

17   BY MR. CARNES:

18   Q.  So it isn't just -- it can be a broad -- that person can

19   actually have a lot of functions.

20   A.  Sure, the person who is listed as the primary contact

21   could play a lot of functions in the process, yes.

22   Q.  Okay.

23              MR. CARNES:  No, that's all.  No further questions.

24              THE COURT:  All right.  You may step down.  Thank

25   you.

1   A.   Thank you.

2        (Witness leaves stand)

3            MR. CARNES:  Can I call our next witness, Your

4   Honor.

5            THE COURT:  How many more witnesses do you have?

6            MR. CARNES:  May I confer with my co-counsel for a

7   minute on that?  We have four listed, Your Honor, I just want

8   to talk with him about how long they might be and order of

9   calling.

10            THE COURT:  All right.  And how many witnesses are

11   you going to have?

12            MR. R. SMITH:  At this point, Your Honor, I'm not

13   going to call anyone and I just want to --

14            THE COURT:  Just what --

15            MR. R. SMITH:  We're not going to call anyone.

16            THE COURT:  All right.

17            MR. R. SMITH:  We've covered it all, but I do want

18   to comment that Your Honor's order limits witnesses to those

19   who have been deposed and as I --

20            THE COURT:  Well, let's took a -- take a look at

21   that because when I looked at my old orders and they were

22   somewhat conflicting, I must say.  Why don't you all confer

23   and see what you need in in terms of telling the narrative

24   and getting the narrative out.  My big part with witnesses

25   being deposed certainly I want counsel to know from each side

1    what the -- gist of the testimony would be so you would be

2    and able to prepare and if you knew who the witnesses were

3    you would have an opportunity to depose them.  So I think the

4    objection would really if you were -- if they're calling the

5    witnesses, you need to depose them.  So are they being called

6    as of cross?

7            MR. MARTIN:  Your Honor, the four individuals are

8    Eleanor Sharpe, Jeanine Allen Bowens, both whom have been

9    referred to, and then very briefly Donald Mathis, and

10   Christine Foster.

11           THE COURT:  And who hasn't been deposed?

12           MR. MARTIN:  Mr. Mathis and Ms. Foster and that's

13   because there was a misunderstanding on our part as to

14   defense counsel accepting notices of the deposition.  But --

15           THE COURT:  All right, and they're not going to be

16   long, right?

17           MR. MARTIN:  No, not long at all.

18           THE COURT:  All right.  Confer with counsel, then

19   confer with counsel in terms of who's needed and how long

20   and for what purposes.  We will reconvene at ten after one.

21   So I'll give you a half hour break.  I don't expect the

22   afternoon to go on long and you can talk potentially about a

23   briefing schedule.  All right?  Because I don't know that we

24   need argument at this point.  It could be one joint brief for

25   the defense if you want to do that -- maybe you file an

1    initial brief both of you at the same time.  And then file

2    the reply for each at the same time as well.

3              MR. MARTIN:  That works.

4              THE COURT:  All right?

5              MR. CARNES:  Yes, thank you, Your Honor.

6              THE COURT:  And just think about this -- the timing

7    of that of course you have to get the transcript --  probably

8    that the transcripts down here don't seem to take too long to

9    get.  Okay?

10             MR. CARNES:  All right.

11             THE COURT:  See you in half an hour.

12             THE CLERK:  All rise.

13       (Recess)

14             THE CLERK:  The court is back in session.

15             THE COURT:  All right.  Are we all set?

16             MR. MARTIN:  Yes, Your Honor.

17             MR. R. SMITH:  Yes.

18             THE COURT:  Well, we're going to break at 3:00 so if

19   you have witnesses that can't come back tomorrow afternoon,

20   tat hen you should probably call them first because I'm not

21   all that optimistic that we'll finish by 3:00 so tomorrow

22   we'll pick up at 1:00 o'clock.

23             MR. MARTIN:  Your Honor, I think -- I suspect we

24   will be able to finish this afternoon.

25             THE COURT:  All right.  That will be fine, too.

1           MR. MARTIN:  Yeah.

2           THE COURT:  You may call you next witness.

3           MR MARTIN:  Yes, we call Eleanor Sharpe.

4            ELEANOR SHARPE, PLAINTIFF'S WITNESS, SWORN

5           THE CLERK:  Thank you.  You can be seated.  And if

6      you could please state your full name?

7           MS. SHARPE:  Eleanore Sharpe.

8           TEH CLERK:  And can you spell your last name?

9           MS. SHARPE:  S-H-A-R-P-E.

10          THE CLERK:  Thank you.

11              DIRECT EXAMINATION (AS ON CROSS)

12     BY MR. MARTIN:

13     Q.  Ms. Sharpe, before I begin with my questions, I didn't

14     see -- were you here this morning and able to hear the other

15     testimony given?

16     A.  I was not.

17     Q.  Okay.  That was going to change some of my questions, so

18     I'll ask you this.  First of all, would you confirm what your

19     position is with the City.

20     A.  Sure.  I'm the Executive Director of the Philadelphia

21     City Planning Commission.  I'm also the Deputy Director in

22     the Department of Planning and Development.

23     Q.  And what is your involvement with RCO's in your position?

24     A.  As Executive Director, I'm the final arbiter of any

25     questions staff might have about making decision.

1   Q.  Okay.  And -- I think that take it you're aware this case

2   involves an RCO in the 22nd Ward and a request that was made

3   in terms of changing the primary contact person.  Are you

4   familiar with that?

5   A.   Yes I am.

6   Q.  All right then.  I'm going to go right to it.  There is a

7   binder in front of you, I'd like you to please to turn to Tab

8   12 and look at Page 87.  It says, "City 87" at the bottom of

9   the page.

10       (Witness reviews document)

11  A.  Yes.

12  Q.  All right.  Now, it appears that this is a series of e-

13  mails that starts back on page 94 and comes forward.  If you

14  need to refer to any of these to answer any of the questions

15  I have for you, feel free to take your time and you can look

16  at them.

17  A.  Okay.

18  Q.  My main question for you though is on page 87.  If you

19  see there's near the center part of the page there's an e-

20  mail from Jonathan Goins to you with a couple people copied

21  of October 13th, 2021, 4:15 p.m.  Do you see that?

22  A.   I do.

23  Q.  Do you recall this e-mail?

24  A.   I do.

25  Q.  Would you read it please?

1   A.   "Eleanor, I'm going to make this change unless you
2   object. Under current regulations the process involved
3   confirm the change with the existing primary contact, Carla
4   Cain, who will most certainly object.  There is nothing that
5   says we can't make the change anyway as long as we're
6   comfortable saying the Ward leader act in writing and we
7   determine she has the authority to overrule your objection to
8   the change."
9   Q.   And then, am I right that you responded to that e-mail a
10  few minutes later and it's printed there at the top and you
11  said "Yes, I'm good with this.  Thanks."?
12  A.   Correct.
13  Q.   And the e-mail here from Mr. Goins to you as you just
14  read says, "...make this change unless you object."  Are you
15  familiar with what this is referring to?
16  A.   I'm not familiar with what you think I'm familiar with it
17  is referring to.
18  Q.   All right, I'll ask this question.
19  A.   Yes, please.
20  Q.   Does this refer to removing Carla Cain as the primary
21  contact person?
22  A.   Correct, yes.
23  Q.   All right.  Now when Mr. Goins said "There's nothing that
24  says we can't make the change anyway as long as we're
25  comfortable saying," and then there's some quoted language.

1   A.  Yes.

2   Q.  Is that grounded in the regulations or the ordinances to

3   your knowledge?

4   A.  It is now, yes.

5   Q.  It is now, you said?

6   A.  Yes.

7   Q.  As of when?

8   A.  I don't know.  I'm not sure.

9   Q.  Okay.  Oh, is it fair to say you don't know if there was

10  anything like this in effect as of October 13th, 2021?

11  A.  That is fair to say.

12  Q.  Okay.

13  A.  Then --

14  Q.  So am I right then that this situation -- what happened

15  here was not something that was really following an expressed

16  ordinance or --

17  A.  No.

18  Q.  -- a regulation?

19  A.  So it was following our practices.

20  Q.  Following your practices, but not the ordinances or the

21  regulations in effect, correct?

22  A.  There was no ordinance or regulation that specifically

23  determined how we would practice so we had a standard

24  practice of how we behaved.

25  Q.  All right, so -- just one last question to confirm it.

1  Nothing textually in the ordinance or the regulations you

2  were following and doing this.

3  A.  Not that I'm aware of.

4  Q.  All right.  Thank you.

5       MR. MARTIN:  Nothing else, Your Honor.  Thank you.

6       (Pause in proceedings)

7                    CROSS EXAMINATION

8  BY MR. R SMITH:

9  Q.  Good afternoon, Ms. Sharpe.

10 A.  Good afternoon.

11 Q.  Do you recall having a call with Carla Cain about this

12 issue?

13 A.  No.

14 Q.  Okay.  Do you having a call with council member Bass

15 about this issue?

16 A.  No.

17 Q.  Did you speak with a member of Ms. Bass's staff about

18 this issue?

19 A.  Did not.

20 Q.  Did you experience any pressure from the council member

21 or her office about this issue?

22 A.  Did not.

23 Q.  Did you make your recommendation when Jonathan asked for

24 your input based on the political views of Ms. Cain?

25 A.  Did not.  Don't even know what they are.

1  Q.  That was my next question.  So you don't know what

2  they --

3  A.  I do not.

4  Q. -- were at the time?

5  Q.  Now counsel asked you about the regulatory language and I

6  would like to specifically ask you about a request to make a

7  change to information, if I remember correctly it's 12.3.4.

8  Do I have that right?

9  A.  I don't the number.

10  Q.  Your free to refer to it at any time.

11      (Witness refers to regulation)

12  Q.  Now we have three versions there.

13  A.  Yeah, and --

14  Q.  It's a Joint Exhibit.  Any one of them is fine for the

15  next series of questions.  This portion has not changed.

16  A.  12.3.4., yes.

17  Q.  Was I correct?  Is that the making a change portion?

18  A.  (Indiscern.).  That is correct.

19  Q.  Were you employed by the City Planning Commission when

20  this regulations were adopted?

21  A.  I was.

22  Q.  Does that regulation require that you confirm a Request

23  of Change with the primary contact for an RCO?

24          MR. MARTIN:  Objection as to form, to the extent

25  it's calling for a legal conclusion.

1            THE COURT:  To the extent that what?

2            MR. MARTIN:  It's calling for a legal conclusion.

3            THE COURT:  I'll sustain it.  I mean it says what it

4    says.

5            MR. R. SMITH.  I'm going to ask the witness about

6    the promulgation of these regulations.  I believe she can

7    speak to that --

8            THE COURT:  No, we're not.

9            MR. R. SMITH:  -- without making a legal conclusion.

10           THE COURT:  We're not going to the promulgation of

11   the regulations.  The regulations are the regulations.  The

12   law is the law.  I don't want to go into the promulgation of

13   them.

14           MR. R. SMITH:  If I may proffer, Your Honor, my

15   question was going to why does it require that you check with

16   the primary contact.  That's all.

17           THE COURT:  All right.  So first of all, does the

18   regulation say check with the primary contact?

19           MR. R. SMITH.  It says confirm, Your Honor.

20           THE COURT:  Confirm.  All right.

21           MR. R. SMITH:  Confirm the change.

22           THE COURT:  All right.  And you're going to ask her

23   why?

24           MR. R. SMITH:  Yes.

25           THE COURT:  All right.

1        MR. R. SMITH:  If she knows.

2        THE COURT:  If she knows.  You have to establish a

3   foundation and then ask her.

4   BY MR. R. SMITH:

5   Q.  You testified that you were employed at the City Planning

6   Commission when these regulations were promulgated?

7   A.  Correct.

8   Q.  Were you involved in that process?

9   A.  Yes.

10  Q.  In what manner were you involved in that process?

11  A.  The review.  We review -- I review the regulations.

12       THE COURT:  Yeah, we're not going to go over the

13  promulgations and why.  There's -- when you promulgate a

14  regulation there's five or ten different people that weigh in

15  on why were doing something.  So the regulation is the

16  regulation and it's required to let the primary contact person

17  know.  So we're not going to go through why.

18       MR. R. SMITH:  Very well, Your Honor.  I -- only in

19  as much as it would help you determine the case.  That's why I

20  asked.  So if you're not interested, then there we are.

21       THE COURT:  All right.  I'm very much interested in

22  everything, but --

23       MR. R. SMITH:  Understood.

24       THE COURT:  But I got to limit it to, you know, what

25  the legal issues are and relevancy and fairness to the

1   parties.  I can't have one person come in that was there and

2   say "Well this is why,"  I'm not going to do that.  I -- you

3   know -- so it requires the primary person be contacted and

4   we'll leave it at that.  Go ahead, Counsel.

5              MR. R. SMITH:   Thank you.

6   BY MR. R. SMITH:

7   Q.  Does that regulation contain circumstances under which the

8   primary contact does not need to verify the change?

9   A.  Yes, if they're unavailable.

10  Q.  Can you please read that sentence of the regulation so we

11  have it context?

12  A.  "...unless the primary contact is unavailable due to

13  death, medical condition, or other exceptional circumstances."

14  Q.  Would you considerable a dispute over who the primary

15  contact should be other exceptional circumstances?

16             MR. MARTIN:  Objection, Your Honor.

17             THE COURT:  Sustained and I'll rule on that right

18  now.  That -- the dispute would be a reason.  I'll tell you

19  that right now.  Dispute would not be a reason they're

20  unavailable. Unless that person says "I'm in dispute and I'm

21  unavailable."  So we'll shut that door right now.

22  BY MR. R. SMITH:

23  Q.  We heard testimony and I'm going to ask about the role of

24  RCO's in the zoning process.  An RCO gives a report or a

25  summary of their public meeting to the zoning board.  Is that

1    right?

2    A.  Correct.

3    Q.  After an applicant contacts the RCO?

4    A.  I coordinate the RCO.  Yes.

5    Q.  Could you describe that process please?

6    A.  Sure.  The notification process is where RCO's get

7    involved and the notification is to inform near neighbors who

8    live in a community about development activity in their

9    community, giving them an opportunity to attend a public

10   meeting to meet with developers and weigh in on their thoughts

11   and opinions on any proposed development in their

12   neighborhood.  The City sees the RCO's as a conduit for that

13   information so we inform -- coordinate the RCO's assigned by

14   city council about applications in their neighborhood and copy

15   -- I forgot how we label it -- RCO's within that boundary area

16   of that potential application as well and the feedback is them

17   summarized hopefully and presented at the Zoning Board of

18   Adjustment or Civic Design Review.

19   Q.  And in your experience is that feedback credited more than

20   any other source of feedback?

21           THE COURT:  Can we go to sidebar for one minute

22   everybody?

23       (Sidebar on the record)

24           THE COURT:  So, I got an understanding that you guys

25   weren't going to be calling any witnesses, all right.  That's

1    what I thought.  So we have a witness who talked all of two

2    seconds, right.  And now we're way beyond what that witness

3    testified to and I'm just wondering, in all due respect, what

4    you're laying your foundation for with this witness.

5              MR. R. SMITH:  This last series of questions, Your

6    Honor, I think addresses the irreparable harm prong that --

7    the point I'm trying to make is that Ms. Cain can still weigh

8    in on applications --

9              THE COURT:  Yeah

10             MR. R. SMITH:  -- in a manner she sees fit.

11             THE COURT:  And I think we have that.

12             MR. R. SMITH:  Very well.

13             THE COURT:  But you can get right to that and ask

14   her.

15             MR. R. SMITH:  Very well.  I was trying to give it

16   some context --

17             THE COURT:  All right --

18             MR. R. SMITH:  But I apologize.

19             THE COURT:  No, you don't have to apologize.  I just

20   want to find out where we are and where we're going.

21             MR. R. SMITH:  Understood.

22             THE COURT:  All right.

23             MR. R. SMITH:  Thank you, Your Honor.

24         (Sidebar ends)

25   BY MR. R. SMITH:

1  Q.  Ms. Sharpe, is the feedback that an RCO provides in your

2  experience given any more credence or consideration than

3  feedback from any source --

4  A.  No.

5  Q.  -- on a zoning application.

6  A.  No, it's not.

7  Q.  Thank you.

8          MR. R. SMITH:  That's all I have.

9          MR. D. SMITH:  I have no questions of this witness.

10         THE COURT:  Any follow-up just on this question?

11         MR. MARTIN:  Yea, one question please.

12                     REDIRECT EXAMINATION

13 BY MR. MARTIN:

14 Q.  Ms. Sharpe, did you say the RCO's give advice to the

15 Planning Commission -- I'm sorry, give a recommendation to the

16 Planning Commission?

17 A.  No.

18 Q.  Give it to the Zoning Board of Adjustments?

19 A.  To the Zoning Board of Adjustments.

20 Q.  All right.  Thank you.

21         MR. MARTIN:  Nothing else.

22         THE COURT:  You can step down,  Thank you.

23    (Witness leaves stand)

24         MR. CARNES:  Your Honor, we have a last witness,

25 Christine Foster who's here.  Ms. Foster.

1           CHRISTINE FOSTER, PLAINTIFF'S WITNESS, SWORN

2           THE CLERK:  You can be seated.  And can you state

3   your full name please?

4           MS. FOSTER:  Christine Foster.

5           THE CLERK:  And can you spell your last name.

6           MS. FOSTER:  F as in Frank, O-S-T-E-R.

7           THE CLERK:  Thank you.

8                      DIRECT EXAMINATION

9   BY MR. CARNES:

10  Q.  Good afternoon, Ms. Foster.

11  A.  Good afternoon.

12  Q.  May ask you a few questions?  You've got a folder in front

13  of you there.

14  A.  Which one, this one or this one {witness indicates}?

15  Q.  The big one.

16  A.  Okay.

17  Q.  Yep.  Go to Exhibit 3 and you put a third tab in there if

18  you could.

19  A.  Okay.

20  Q.  And that's a -- application that has a submittal date of

21  August 13th, 2020.  Do you recognize that?

22  A.  Yes, I do.

23  Q.  And is that something that has an your -- an organization

24  address, a meeting location, and so forth?  And a primary

25  contact person is listed on the second page and the name is

1  Christine Foster.  That's your name right?

2  A.  Yes.

3  Q.  Okay.  Now, did -- we heard the testimony previously and I

4  don't know if you -- I think you were here for the whole

5  proceeding.

6  A.  Yes, I was.

7  Q.  So you heard Ms. Bass testify that -- you know she wanted

8  to put somebody else in this position, right?

9  A.  That is correct.

10 Q.  So she contacted you, right?

11 A.  Yes.

12 Q.  Okay.  And she asked you if you would be the primary

13 contact.

14 A.  Yes.

15 Q.  Okay.  And when did she bring this to your attention of --

16 keeping in mind that this application was submitted on August

17 13th, 2020?

18 A.  It was, I can't give you the exact month and date but it

19 was in the year 2020.

20 Q.  Okay.  And did you ever find out what this -- what the --

21 what happened here whether you became the primary contact in

22 2020?

23 A.  Can you --

24 Q.  Did you ever find out in 2020 whether or not you became

25 the primary contact of the 22nd Ward Democratic Committee RCO?

1    A.  Yes.

2    Q.  And when did you find out?

3    A.  I can't tell you the exact date, but I was notified, yes.

4    Q.  Okay.  So in 2020 did you receive notices regarding ZHB

5    hearings and things of that nature.

6    A.  What hearings?

7    Q.  Zoning Hearing Board.

8    A.  No.

9    Q.  Okay.  Now were you contacted by Mr. Goins who you heard

10   testify previously?

11   A.  Through e-mails, yes,

12   Q.  In 2020?

13   A.  I believe so, yes.

14   Q.  Okay.  And you and Mr. Mathis are friends?

15   A.  No.

16   Q.  Do you know him at all?

17   A.  I know of him.  He's the committee person --

18   Q.  -- and

19   A.  -- but we're not -- I don't have andy contact with him,

20   no.

21   Q.  Have you ever met with him?

22   A.  No.

23   Q.  Right.  Did you have any -- after 2020 we go to 2021.  Did

24   you -- let me back up a second.  When you filled this out this

25   2021 there's a bunch of things that you certify to, like

1    reading the Planning Commission regulations, things of that
2    nature.  Did you read the Planning Commission regulations?
3    A.  Let me -- where are they so I can take a look at them?
4    Q.  Okay,  It's on Page -- if we go to the same exhibit that
5    we were on before --
6    A.  -- in Section 3?
7    Q.  Yes.  So go back in the page -- four pages back, you'll
8    see there's certifications.  And the first one is "I have read
9    the Planning Commission regulations."  Do you see that?
10   A.  Well, I remember that, yes, because in order to accept
11   something, you have to certify that you read everything.
12   That's just common sense.
13   Q.  Right.  Did you read those regulations?
14   A.  Yes.  I read them.
15   Q.  Okay.  And did you become aware of what the process was to
16   renew that application in 2021?
17   A.  To renew?
18   Q.  Yes.
19   A.  I don't recall.  No.
20   Q.  Did you -- were you aware that application forms are
21   perceived on June of every year, but it would be every two
22   years that renewals would take place?
23   A.  No.
24   Q.  Did you ever review the city website governing RCOs and
25   their functions?

1  A.  No.

2  Q.  Okay.  Now, let's turn to 2021, did you have any

3  communication in 2021 as an RCO for the 22nd ward Democratic

4  committee?

5  A.  With regards to what?

6  Q.  Procedures in front of the zoning hearing board, things of

7  that nature.

8  A.  No, because you have to understand, the pandemic and

9  everything was shut down.  No.

10  Q.  Okay.  How about now in 2022?  Have you received any

11  notification of any hearings?

12  A.  The only thing I received, because my name is registered

13  as the RCO person, and my email is registered as well, I get

14  emails.  I have gotten emails in regards to people requesting

15  zoning hearings in regards to certain properties.

16  Q.  Have you done anything in response --

17  A.  No.

18  Q.  -- to those emails?

19  A.  No.  I just read them.  No.

20  Q.  Did you discuss this with Cindy Bass in terms of what your

21  response was going to be to emails that you would receive as

22  the contact person for the -- I mean, excuse me, the primary

23  contact person for the --

24  A.  We talked about it.

25  Q.  And what did she tell you to do?

1   A.  Well, at the time we talked about it because of the

2   pandemic and everything, just hold off on everything because I

3   needed to know what the procedures were and how to move

4   forward.  Was there any training or anything?  Any classes to

5   go to or anything.  So that's something she said that we will

6   discuss.

7   Q.  Well, now the pandemic is over.  It's been over for a

8   little while.  What did you discuss about it afterwards?

9   A.  I haven't.

10  Q.  You haven't spoken with her?

11  A.  Everything's still on hold.

12  Q.  What --

13  A.  I haven't gotten anything in email as far as any kind of -

14  - I did -- there was an email that came out, probably

15  circulated to all the RCOs from Jonathan Goins (phonetic)

16  about some kind of training -- some kind of notification of

17  training.  I think I responded back and he said that I wanted

18  to accept that.

19  Q.  What about -- like, for instance, if you got an -- did you

20  ever get an email regarding a zoning application of 244 East

21  Springer Street?

22  A.  No.  I can't recall.  No.

23  Q.  Did -- the zoning applications that you received, you just

24  never responded to them at all.

25  A.  Like I said, I get a lot of emails in regards to a lot of

1    properties where people are requesting certain things for

2    zoning or whatever.  Okay?  I don't open up every single one

3    of them and read, read, read, read.  Okay?

4    Q.  Okay.

5    A.  No.

6    Q.  Now, in terms of the process that took place in August of

7    2020 when you filled out that application that we reviewed a

8    little while ago?

9    A.  Well, let's back up a little bit.  I didn't fill out any

10   application.  What you see here, and I'm going to make it very

11   clear.

12   Q.  Okay.

13   A.  What you see here, all this here, and this last page where

14   you certify, I remember that.  Okay?  As far as any

15   information, I remember, you know, emailing Jonathan's office

16   if they're asking me for certain information, like my email,

17   phone contact numbers.  Those are the things I submitted to

18   them.  If I had filled out an application, I would have

19   remembers because I'm a very detail-organized person, and I

20   would have printed it out, and I would have made a copy of it,

21   and filed it.

22   Q.  So then you're telling me that this exhibit that's Exhibit

23   3, you did not fill this out?

24   A.  No.  The information I gave to them, okay, I gave them my

25   information that they asked me for.  Whatever information I

1   gave to them.  Did I physically fill out the application?  No.

2   Q.  Okay.  Back up a little bit and tell me who them is.  Is

3   that Mr. Richardson?

4   A.  No.

5   Q.  The staff members for Cindy Bass?

6   A.  No.

7   Q.  Is it Mr. Goins?

8   A.  His office requested certain information from me, Jonathan

9   Goins office sent -- asking me if I wanted to, you know, be

10  the RCO, if I would agree to it, which I did.  Okay.  Then I

11  had to submit him certain information, which I did, like I

12  said, my information, my address, my phone numbers, my emails.

13  Q.  Okay.  And you -- and this certification that's on the

14  back page here that says Cindy Bass, ward leader, did you ever

15  see that before?

16  A.  Yeah, because she had to sign off on it.  Yes.

17  Q.  Okay.  But the rest of it, you never signed -- you never

18  filled out?

19  A.  Everything was done electronically, I'm assuming.  Okay?

20  It wasn't like an application where I sat there and filled it

21  out, and mailed it in, or scanned it back.

22  Q.  But when -- I mean, you're saying you assumed it was

23  electronic.  Did you -- do you remember --

24  A.  Well, this looks like an electronic application.

25  Q.  I know.  But I'm just asking you about your recollection.

1    Do you remember sitting down in front of a computer --

2    A.   No.

3    Q.   -- and filling it out?

4    A.   No.

5    Q.   Okay.  So you wouldn't have gone through these -- filled

6    out these sequentially on a computer?

7    A.   No.

8    Q.   Thank you.

9    A.   Like I said, they asked me for certain information once I

10   accepted the position, and I replied back to the office.

11   Q.   Okay.  Now, going back to before that August 13th, when

12   you spoke with Ms. Bass, you're a committee person in the 22nd

13   ward; is that right?

14   A.   Yes, I am.  Division 29.

15   Q.   Okay.  And Carla is in the 25th division; is that right?

16   A.   I guess.

17   Q.   Okay.  Did you have a meeting -- a ward meeting where this

18   was brought up or discussed?

19   A.   The what was discussed?

20   Q.   You being the primary contact for the 22nd ward Democratic

21   party RCO?

22   A.   No.  Huh-uh.

23   Q.   No?

24   A.   No.  You mean, in other words, did we all have a meeting

25   in a room with everybody?

1   Q.  Yeah.

2   A.  No.

3   Q.  The meeting was just between you and Cindy Bass, right?

4   A.  Well, she called me and asked me, yes.

5   Q.  Okay.  Now, in 2021, there was kind of a deadline to

6   reapply in June, and you said you weren't aware of that.

7   A.  That is correct.

8   Q.  So you didn't apply?

9   A.  No, I did not.

10  Q.  Now, in September of 2021, turning to, if you would

11  please, Ms. Foster, to Exhibit -- I guess it's 13.  It's

12  really in the back there.  It's called the Bass Exhibits.

13  And --

14  A.  Okay.

15  Q.  -- if you go to -- go pretty much to the end there.  Do

16  you see where it says Bass 13?

17  A.  Okay.

18  Q.  And it's sort of -- in the middle of the page there, it

19  says RCO notification.  And it says --

20          THE COURT:  What page are you looking at?  I'm sorry.

21          MR. CARNES:  Bass 13.  Page --

22  A.  I've got Bass 13.

23  BY MR. CARNES:

24  Q.  Yeah.  It says, "From RCO notification.  Sent Monday,

25  September 20, 2013, to Vern at A Law Phlly," and so forth, do

1    you see that?  2021, excuse me.

2    A.  On Bass 13?

3    Q.  Yeah.

4    A.  No.

5    Q.  Well, it's an email.

6    A.  I'm looking at the same page.

7    Q.  All right.  Do see where it says, "Dear Applicant, you

8    have filed an appeal to the Zoning Board of Adjustment for 244

9    East Springer Street, Permit #ZP --"

10   A.  Well, I see that part, yes.

11   Q.  Okay.  Now, that came from RCO Notification up top.  See

12   above that?

13   A.  Attention registered community organization?

14   Q.  No, below that.  The next paragraph down.  It says, "From:

15   RCO Notification."

16   A.  Yes.

17   Q.  Okay.  So September 20, '21 at 3:17, this RCO notification

18   went out, and at that time, it went to in the cc's a Carla

19   Cain, or C. Cain225 -- 2225@gmail, and info@eastmountairy, and

20   people like Charles Richardson --

21   A.  Yes.

22   Q.  -- and Tyrone Barge.

23   A.  I see it.  Uh-huh.

24   Q.  See that?  Do you know who Charles Richardson is?

25   A.  Yes.

Foster - Direct                    171

1    Q.   Who is he?

2    A.   He works in Cindy's office.

3    Q.   How about Tyrone Barge?

4    A.   He works in Cindy's office.

5    Q.   Okay.  You know them.

6    A.   I don't know them personally, but I know who they are.

7    Q.   Okay.  Now, that was referenced at 244 East Springer

8    Street down below, and turning to page 12, it says in the

9    middle, see the big word "no" in bold print?

10   A.   Bass 12?

11   Q.   Yeah.  Yes.

12   A.   Contact.  Okay.

13   Q.   Okay.  So do you see the word no?

14   A.   Yes.

15   Q.   Okay.  So that's tied to an email that says the contact

16   for the 22nd Ward Democratic Committee is no longer C. Cain.

17   And it then refers to you, FosterChristine01@yahoo.com.

18   That's you, right?

19   A.   Yes.

20   Q.   Okay.  Do you -- did you ever receive that documentation

21   regarding 244 East Springer Street?

22   A.   No.  And there's a mistake on here too.

23   Q.   Okay.

24   A.   If I might ask.  First of all, that's not the email

25   address I use.  I told them do not use that email address.

Foster - Direct                        172

1    And that is not the phone number I asked them to use.  I had

2    changed that, and sent back an email telling them what email

3    to use, as well as what phone number to use.

4    Q.  And I assume they corrected that later.  This was early

5    on.

6    A.  Yes, they did.

7    Q.  Okay.  So also in front of you is an exhibit -- a small

8    exhibit book.  If you could just turn to Exhibit P-6 in that.

9    A.  I'm sorry, what?

10   Q.  P-6.

11   A.  P-6?

12   Q.  Yeah.  Yes, please.

13   A.  Okay.

14   Q.  And this is a -- this purports to be the Zoning Board of

15   Adjustment Appeals calendar and there's reference in there on

16   the second page.  It's kind of circled.  At 7/20/22, 244 East

17   Springer Street, Zoning Board of Adjustment.

18   A.  Okay.

19   Q.  ZP2021006922.  Now, that never has come before you at any

20   point in time, not in 2021 or 2022; is that correct?

21   A.  Okay.  Let me back up a little bit.  Like I said to you, I

22   don't know anything about these Springer Streets.  Like I said

23   to you, because I'm part of the -- because I'm on the list for

24   the RCOs, I get emails for people inquiring about certain

25   property.  Okay?  A lot of addresses coming above my email for

1    certain properties and certain areas.  A Springer Street came

2    up.  I don't know whether it's the same address.  Okay?  But

3    I've seen -- in regards to Springer Street.  I've seen in

4    regards to other property.  I can't sit up here and say that

5    225 was one of the addresses I saw on Springer Street.

6    Springer Street, the street came up, yes.  I wasn't paying

7    attention as to what exactly the address it was, because I get

8    -- because I got a lot of them.

9    Q.  Okay.  So what have you been doing as the primary contact

10   for the 22nd ward Democratic committee RCO?

11   A.  For right now, I explained to you, everything was a

12   standstill.  I haven't done anything as of yet.  I haven't

13   been to any RCO meetings.  We haven't conducted any RCO

14   meetings.  There was a notation that was mentioned by Ms.

15   Carla Cain that there was an RCO meeting at the Truelight

16   Church, which is not true.

17   Q.  Excuse me.  What?  Truelife Church?

18   A.  Truelight Church.  The church.  It was mentioned by her

19   that there was a meeting held at Truelight Church in regards

20   to an RCO meeting.  We have never had an RCO meeting at

21   Truelight Church.  What we have at Truelight Church is

22   Cliveden Hill  Associates meeting.  That's a neighborhood

23   association meeting that we have every month once a month.

24   Okay?  Cliveden Hill Association is a registered RCO and it

25   has been for over 25-something years.  Okay?  We have monthly

1    meetings every month.  We discuss a lot of things that's going

2    on in the neighborhood, crime, violence, just all sorts of

3    things.  There was an incident if I must -- if I may --

4    Q.  No, you're not answering my question.

5    A.  Okay.

6    Q.  There's no question in front of you right now.

7    A.  Okay.  Okay.

8    Q.  I appreciate your exposition, but no.  So the -- are you -

9    - let me -- but it does lead to a question.  Are you a member

10   of the Cliveden Hill --

11   A.  Absolutely.  I'm vice president.  Yes.

12   Q.  So you're the vice president of another, and do you

13   participate in that as an RCO?

14   A.  Excuse me?

15   Q.  Do you participate in that as a primary contact for an

16   RCO?

17   A.  What?  Cliveden Hill?

18   Q.  Yeah.

19   A.  No.  Like I said.  Back up a little bit.  Let me explain

20   something to you.  Cliveden Hill, huh-uh, please.  You asked

21   me a question.  I'm going to answer it, okay?

22   Q.  That's fine.

23   A.  Cliveden Hill Association is an organization of the

24   neighborhood, of all the neighbors.  Okay?  We have a meeting

25   there every month.  It's not an RCO meeting.  We never had any

1   RCO meetings.

2   Q.  Okay.

3   A.  Never at Cliveden Hill meetings.

4            THE COURT:  All right.  So can we get back on track?

5   Because part of this is this is not a review of performance.

6   We're not reviewing performance.  So I understand what you're

7   saying.  I don't see the weight of it in terms of the issues

8   involved.

9            MR. CARNES:  Okay.

10           THE COURT:  I mean, the person appointed is

11  appointed, whether they do something or nothing is not in

12  front of me.

13           MR. CARNES:  Okay.

14           THE COURT:  Unless you have a reason to tell me why

15  it is.

16           MR. CARNES:  Well, Your Honor, I think -- I don't

17  want to -- yeah.  I think -- there's a little bit of an

18  argument, Your Honor, that, you know, you have to -- sometimes

19  you need a little motivation or understanding.  I know my

20  colleague disagrees with me a little bit about this, but I

21  won't pursue it if the Court doesn't feel it's important.

22           THE COURT:  I agree with your colleague.

23           MR. CARNES:  Okay.  So we'll -- let me just --

24  BY MR. CARNES:

25  Q.  In 2021, as we just looked at, there was a dispute over

1   this 244 East Springer Street.  And at one point, the planning

2   commission was saying that you were the RCO, the primary

3   contact for the RCO.

4   A.  Because I'm on the list.

5   Q.  Then they said --

6          THE COURT:  Wait for a question.

7   BY MR. CARNES:

8   Q.  Then they said it -- no, it's still Carla Cain.  And then

9   it came back to you.  The final determination was made on --

10  if you've listened to the testimony, on October 13th, the

11  councilwoman wrote a letter in her capacity as ward leader and

12  stated that she wanted you to be the primary contact.  You

13  heard that in the back --

14  A.  Right.

15  Q.  -- of the courtroom.  So from then on, you were the

16  primary contact.

17  A.  Yes.

18  Q.  Prior to being reestablished or established as the primary

19  contact in 2021, not 2020, did you have any communication with

20  Jonathan Goins to determine or confirm that you were still

21  interested?

22  A.  I just explained to you a few minutes ago that I sent him

23  an email.  He asked me if I agreed to it.  Yes.  To confirm, I

24  said yes.

25  Q.  But my understanding, that was in 2020 when you filled out

1    that --

2    A.  I can't -- listen, it all started in 2020.  Okay?

3    Q.  Yes.

4    A.  Everything started in 2020.

5    Q.  Did it get repeated in 2021?  Did you have further

6    conversations in 2021?

7    A.  I can't remember the exact date.  All I remember is the

8    fact that I accepted the position when it was first offered to

9    me in 2020.  There was a discussion about me sending in my

10   information.  He asked me do I agree to it.  I said yes.  I

11   can't remember if that's 2021, in the middle of 2021 or what,

12   but yes.

13   Q.  Okay.

14   A.  Between '20 and '21.  Probably in '21, because things had

15   to go through a process.

16            MR. CARNES:  All right.  I have no further questions.

17   Thank you very much.

18   A.  All right.  Thank you.

19            MR. D. SMITH:  I have no questions.

20            MR. R. SMITH:  Nothing from me, Your Honor.

21            THE COURT:  All right.  Thank you.  You may step

22   down.

23       (Laughter)

24   A.  I'm sorry.  Thank you.  It's just so cold in here.  It's

25   freezing.  Thank you.

1                THE COURT:  That's why I wear a robe.

2        (Laughter)

3        (Witness leaves stand)

4                MR. CARNES:  Your Honor, that concludes all the

5        witnesses that we have.

6                THE COURT:  All right.

7                MR. CARNES:  If I could just say, we do have an

8        agreement as to exhibits.

9                THE COURT:  No other witnesses?

10               MR. D. SMITH:  No other witnesses, Your Honor.

11               MR. R. SMITH:  None from the City.

12               THE COURT:  All right.  And what's the briefing look

13       like then?

14               MR. D. SMITH:  Three weeks and three weeks, Your

15       Honor, from the receipt of the transcript.

16               THE COURT:  So three weeks to -- three weeks to brief

17       from both sides from the receipt of the transcript, and then

18       three weeks to respond.

19               MR. D. SMITH:  Correct.

20               THE COURT:  From receipt of the briefs.  Is that

21       right?

22               MR. D. SMITH:  Yes.

23               THE COURT:  All right.

24               MR. CARNES:  Your Honor, the understanding or

25       agreement between parties is that the exhibit list would all

1    be introduced into evidence, as well as Exhibit P-6 in the

2    smaller binder.

3              THE COURT:  All right.  So admitted.

4         (Plaintiff's Exhibits admitted into evidence)

5              MR. CARNES:  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you all.  Don't forget

7    to order the transcript.  Okay?

8              MR. D. SMITH:  Yes.

9              MR. CARNES:  Do you want me to take back the -- is

10   that the -- how do you want that?

11             THE COURT:  As long as we have one copy, you can take

12   back everything else, okay?

13             MR. CARNES:  Yeah.

14             THE COURT:  As long as we have one copy.

15             MR. CARNES:  There are extra exhibits in there that,

16   you know, have not been introduced.  Maybe we should take them

17   back just so that they're not --

18             MR. D. SMITH:  Yes.

19             MR. CARNES:  -- hanging out there for you.

20             THE COURT:  Which --

21             MR. CARNES:  In that smaller version.  All of P-6

22   could stay.

23             THE COURT:  All right.  All right, counsel.  Thank

24   you.

25             THE CLERK:  All rise, please.

180

1                    ALL:  Thank you, Your Honor.

2               (Court adjourned)

3
4                         CERTIFICATION
5    I, Lewis Parham, certify that the foregoing is a correct
6    transcript from the electronic sound recording of the
7    proceedings in the above-entitled matter.
8
9
10   *Lewis Parham*                    9/16/22
11
12   _____        _____
13   Signature of Transcriber               Date