## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLA CAIN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| CINDY BASS, a Member of | : | No. 2:22-cv-00360-CFK |
| Philadelphia City Council, | : | |
| in her personal capacity only, | : | |
| | : | |
| and | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendants. | : | |

**Plaintiff Carla Cain's Proposed Findings of Fact and Conclusions of Law**

Plaintiff Carla Cain by undersigned counsel submits the following proposed findings of fact and conclusions of law.

**I.      Proposed Findings of Fact**

1.      By way of general background, the parties stipulated to numerous facts which are tendered in support of Cain's proposed findings of fact and which are incorporated herein by reference.  See ECF Doc. #30.

2.      By way of further general background, the parties stipulated to numerous emails and other documents which are tendered in support of Cain's proposed findings of fact and which are incorporated herein by reference.  See generally Joint Exhibits of the Parties, Nos. 1-13, admitted at the time of hearing.

**A.      Testimony of Defendant Cindy Bass**

1.      Cindy Bass is both a Philadelphia City Councilperson and Democratic Ward Leader for the 22nd Ward Democratic Committee.  N.T. 61, lns. 23-25.

2.     Bass's responsibilities related to real estate development and zoning issues are providing letters of support to registered community organizations (collectively "RCOs").  Bass testified that generally if a given community supports a development project, she will support it. N.T. 63, lns. 1-8.

3.     Bass stated that her background as it relates to participating in RCOs includes encouraging development, or discouraging development, depending on the project as well as building a strong working relationship with the community.  N.T. 63, lns. 2-9.

4.     Regarding her ward leader position, Bass testified that her responsibilities included notifying neighbors regarding pending projects, generally working with the RCOs to make sure that neighbors have a say, attend meetings and vote.  N.T. 63-64, lns. 25-3.

5.     As a councilperson, Bass stated that her staff is involved with real estate development projects.  N.T. 64, lns. 4-6.

6.     However, that role varies depending on the need.  Bass testified that depending on how controversial the project is, the role may change and that there may be instances where the zoning board follows her lead.  N.T. 64, lns. 8-20.

7.     In 2019, Christian Matozzo ("Matozzo"), Tyrone Barge ("Barge"), and Rodney Jamison ("Jamison") served on Bass's staff.  N.T. 33, lns. 20-25.  Bass's staff also included one Charles L. Richardson ("Richardson").[1]

8.

9.     In the 2011 election for City Council, Carla Cain supported Cindy Bass ("Bass"). N.T. 23, lns. 23-24.

---

[1]  *See* Joint Undisputed Facts of the Parties with Joint Exhibit List.  ECF Doc. #30, ¶ 13.

10.     Bass and Carla Cain now maintain opposing points of view on certain matters.  N.T. 24, lns. 1-6.

11.     Carla Cain has questioned the transparency and ancillary behaviors of Ms. Bass. N.T. 24, lns. 7-10.

12.     Bass was a sponsor of the section in chapter 12 of the zoning ordinance concerning RCOs.  N.T. 24, lns. 15-17.

13.     RCOs give recommendations to the Zoning Board of Adjustment.  N.T. 159, lns. 14-19.[2]

14.     An RCO primary contact can play many roles in the land development process. N.T. 144, lns. 20-21.[3]

15.     As of June 2019, Carla Cain was the first vice chair of the 22nd Ward Democratic Committee and a member of the Democratic State Committee.  N.T. 24, lns. 20-25.

16.     In 2018, Carla Cain was one of four candidates that competed against Bass in the Ward Leadership Election.  N.T. 25, lns. 1-8.

17.     Between 2013 and 2019 there was no 22nd Ward Democratic Committee RCO (referred to in the singular as "the RCO" or "RCO").  N.T. 25, lns. 9-10.

18.     When an individual within the jurisdiction of the 8th Councilman District or the 22nd Ward seeks a variance or special exception, that individual must first seek input from the relevant RCO prior to proceeding to the Zoning Hearing Board.  N.T. 26, lns. 12-15.

19.     The Planning Commission serves as the gatekeeper of the information relating to the application for relief.  N.T. 26, lns. 17-19.

---

[2] This proposed finding is taken from testimony of Eleanor Sharpe.
[3] This proposed finding is taken from testimony of Jonathan Goins.

20.     Applications for RCOs pass through a similar process, mainly the council offices, prior to approval. When there is an application for a coordinating RCO, that determination is made the city councilperson.  N.T. 26, lns. 20-25.

21.     Bass became aware of Carla Cain's registration of the RCO in 2019.  N.T. 28, lns. 10-15.

22.     Upon discovering Carla Cain's registration, Bass made a determination that she needed a "partner" to work within the RCO.  Bass then began to attempt to appoint Christine Foster ("Foster") as the individual to take on that task within the RCO.  N.T. 28, lns. 20-25.

23.     In addition to Foster, Bass also asked Dominic Mathis ("Mathis"), Carla Cain's partner in politics at the time, to serve as a secondary to Foster.  N.T. 28-29, lns. 25-3.

24.     Foster and Mathis agreed to so serve.  N.T. 29, lns. 6-9.

25.     Following Foster and Mathis' agreement to serve as primary and back-up contact respectively, for the RCO, Bass informed the Planning Commission of that change.  N.T. 29, lns. 14-16.

26.     Between Sept. 16, 2019, and Oct. 13, 2021, Ms. Bass made multiple communications to the City Planning Commission requesting that Ms. Cain be removed as primary contact of the RCO, including by communications made through Bass's council staff members, Christian Matozzo and Charles L. Richardson.[4]

27.     Sometime after Foster and Mathis agreed to serve together, an anonymous application was received by the City, with the final page of the application containing a political

---

[4]  This proposed finding is taken from the Joint Undisputed Facts of the Parties with Joint Exhibit List.  ECF Doc. #30, ¶ 13.

ward RCO registration certification by Bass.  The application was reviewed with Foster.  N.T. p. 30, ln. 19 – p. 31, ln. 2.   See also Jt. Ex. 3.

28.     Bass testified that she was unsure of whether the August 13, 2020 application was treated as a duplicate or not.  Bass could not recall whether the August 13, 2020 application was effectuated to remove Carla Cain as the primary contact from the 22nd Ward Democratic Committee RCO.  N.T. 31, lns. 16-24.

29.     On October 13, 2021, Bass wrote a letter to Eleanor Sharpe, Deputy Director, expressing that Foster should be listed as the Primary contact for the 22nd Ward Democratic RCO. N.T. 32, lns. 2-7.

30.     Bass testified that she could not recall whether the October 13, 2021 letter was effective to list Foster as primary contact.  However, as of the date of the hearing on the Preliminary Injunction, Bass testified that the primary contact for the 22nd Ward Democratic Committee RCO is Christine Foster, with Dominic Mathis serving as back-up.  N.T. 32, lns. 12-19.

31.     On September 16, 2019, Bass received an email addressed to herself, both to her official government issued email address and her personal Gmail account.  The substance of the email stated that Carla Cain was registered in the 22nd Ward as an RCO.  This email was the first Bass became aware of Carla Cain's status as an RCO.  N.T. 34, lns. 13-18.

32.     On September 5, 2020, Bass received an email from Foster which was a forwarded email from Jonathan Goins ("Goins").  N.T. 35, lns. 6-9.

33.     Goins wrote,

"Good afternoon. I am writing to follow up regarding your recent RCO registration application. As I presume, you are aware there is already an active registered 2022 Democratic Ward RCO since June of 2019. The existing 22nd Ward -- Democratic Ward RCO status does not expire until summer of 2021, as we are not able to register two RCOs under the umbrella of a single political ward, and the 22nd is not up for renewal. We would need to treat your registration as a request to change

contact information, primary and secondary, for the existing RCO -- for the existing registered RCO. 22nd would still need to renew next summer. Our typical procedure for RCO contact info request is to confirm the change with the existing primary contact, Carla Cain, in this case. If we can't get that confirmation or the change is contested, we would turn to organizational leadership, in this case, the ward leader, to confirm the change. The ward leader certification submitted with your registration should be sufficient, but I am writing to confirm that you understand what we we're proposing that renewal wouldn't be needed next summer and that you wish to proceed with the contact changes I've described to you. Please feel free to follow up with any questions or concerns, and please respond when you are able."

N.T. 35-36, lns. 17-16.

34.    Goins was the person in charge of the RCO registration process.  N.T. lns. 21-24.

35.    Foster applied in June of 2021 to renew the RCO.  N.T. 36-37, lns. 25-1.

36.    Bass then forwarded the September 5, 2020 email to Charles Richardson.  N.T. 37, lns.12-15.

37.    Bass asked Jonathan Goins to call her regarding a September 21, 2021 email to Carla Cain informing Cain of the request to change and requesting her response.  N.T. 38, lns. 6-9.

38.    Goins responded by saying he would call Bass.  N.T. 39, lns. 3-4.

39.    Bass testified that around this time, October 20, 2021, she is uncertain as to whether she definitively knew whether she had effectuated the change to the 22nd Ward RCO.  N.T. 40, lns. 5-14.

40.    Following that, Bass confirmed that Matozzo was communicating with Goins regarding the 22nd Ward RCO on September 27, 2021.  N.T. 41, lns. 1-10.

41.    Bass then confirmed that in early September 2021 a series of emails were exchanged asking Foster to confirm that she wanted to be the RCO primary contact and that Mathis would serve as backup.  N.T. 41, lns. 16-25.

42.     Bass testified that while there was an application for renewal in 2021 by Carla Cain, there was not such an application made by Foster.  N.T. 42, lns. 14-17.

43.     On September 20, 2021 an RCO notification was sent to Vern Anastasio.  N.T. 44, lns. 3-7.

44.     Additionally, on September 20, 2021 at 3:17 p.m., the same email was sent to an RCO notification address as well as the 22nd Ward Democratic Committee with Carla Cain listed as the primary RCO, primary contact, as well as the East Mount Airy RCO with its primary contact. The email was also copied to Bass's council staff.  N.T. 44, lns. 12-25.

45.     In a Friday, September 24, 2021, email from RCO.Notificaiton@phila.gov – which was officially used by the City for the business of RCOs in the City – Carla Cain was said to no longer be recognized as primary contact for the RCO.  The email identified Christine Foster as the updated contact.  N.T. 45, lns. 7-12.  Jt. Ex. 13 (Bass 000012).

46.     Following that email, later in the day on September 24 at 1:07 p.m., Carla Cain wrote back to appeal the notice of removal.  N.T. 45, lns. 15-20; see also Jt. Ex. 13 (Bass 000012).

47.     At 1:30 p.m. on September 24, Goins sent an email to Bass's staff member, Charles Richardson, referring to appeal email from Carla Cain, stating "She represents the 22nd Ward Democratic Committee.  How can this issue be resolved?"  N.T. 45, lns. 22-25; Jt. Ex .13 (Bass 000011).

48.     Eleanor Sharpe works for the Planning Commission.  N.T. 46, lns. 15-16.

49.     Goins' email stated,

"My apologies. I should have replied to you directly when this question first came up. The council office does not have the authority to change contact information for an RCO. This will need to go through a process with us, PC staff, to sort it out, and Ms. Cain will need to remain the primary contact while we do so. There is a history here that I can fill you in on. Let me know if you have time for a Teams chat later today."

N.T. 46, lns. 19-25.  Jt. Ex. 13 (Bass 000011).

50.     Bass testified that following Goins aforementioned email, Jeannie Allen-Bowens forwarded the entire email chain to Richardson, with a copy to Bass, stating, "Please see the email below and contact Jonathan Goins.  N.T. 47, lns. 2-8.

51.     Goins responded, stating that there is not a set procedure in place for when there is a disagreement among primary contacts for RCOs and that any writing from Bass representing the change in contact would be sufficient to change the primary contact RCO.  See Jt. Ex. 13 (Bass 000010-000012); N.T. 47, lns. 9-25.

52.     Goins wrote,

Councilmember Bass and Mr. Richardson,

We don't have any set procedure in place for when there's disagreement about primary contacts for RCOs, or in this case where we have separate RCO applications under the same award umbrella.  Thankfully neither happens very often.  When we spoke on this last year, I believe we requested something, in writing (a word doc is fine), from Ward Leader Bass (representing the 22nd Ward), making a specific request to change the primary contact info (name and e-mail) for the 22nd Ward RCO  I haven't spoken yet with Eleanor, but I think that would still be sufficient to make the change.

My apologies for eh confusion on this, we're just trying to be consistent in how we handle this across all RCOS.  Thank you for being responsive in trying to clear things up.

Jonathan

Jt. Ex. 13 (Bass 000010).  See also N.T. 46, lns.11-14.

53.     Richardson then emailed stating that a letter from Bass referring to Foster as Ward Leader and as Bass's designee for the 22nd Ward RCO would not be sent.  N.T. 49, lns. 1-6.

54.     In an email dated September 28, 2021, Richardson wrote to Cindy Bass, "Jonathan asked that we now supply a letter from you with your 'ward leader hat on.' on behalf of the Ward,

asking for Christine to be listed as primary contact and as committee chair.  According to him, this will finally solve the issue.  They want to avoid appearances of council choosing contacts for RCOs even though it makes sense in this  particular case."  N.T. 49, lns. 12-15; Jt. Ex. 13 (Bass 000009).

55.     Goins then sent an email at 11:29 a.m. to Mathis stating, "This message serves as notice to the 22nd Ward Democratic Ward RCO that we have received a request to change the contact information on file for the RCO.  This change would replace the currently listed contact information found  here, and there's a connection with a primary and secondary contract listed in the attached registration application, and the attached registration was supplied.  Please respond to confirm you received this message."  N.T. 50, lns. 10-16.

56.     At 8:03 p.m. Mathis responded stating, "Good evening. I did not know that this would be affecting my partner, Carla Cain. I would like to be removed from the RCO."  Then, six minutes later, at 8:09 p.m., Mathis reversed his original position, stating, "I'm sorry, that was not a valid e-mail. I gladly accept the position in the RCO.  Thank you very much, and it would be a pleasure to serve my community.  Dominic Mathis."  N.T. 50, lns. 18-25; Jr. Ex. 12 (City 96-97).

57.     Bass, when questioned about this exchange, did not recall ever speaking with Mathis.  N.T. 51, lns. 1-2.

58.     Bass testified that she was not aware that as of November 2021 that the registration identifying the primary contacts for the RCOs had been changed to reflect Foster as the primary contact, even though Bass had signed a letter dated October 13, 2021, stating that Foster was to replace Cain as the primary contact at the RCO.  N.T. 54, lns. 4-5, 13-17.

59.     Bass testified that she did not know whether Foster had done anything with the RCO since being appointed.  N.T. 55, lns. 6-10.

60.     Bass further testified that she was not aware of a procedure under the zoning ordinance or the regulations that addresses the circumstances when somebody would make an application for an RCO and is denied.  N.T. 56, lns. 11-25.

61.      Bass was then asked what she did to address Carla Cain's complaints regarding the fact that she was removed without due process. Bass stated that Cain was not authorized to set up an RCO in the first place and therefore she did not need to discuss it with Cain.  N.T. 56-57, lns. 25-4.

62.     Bass testified that she never spoke with Goins personally regarding her determination about Carla Cain's status and whether Cain should be removed as the RCO primary contact.  N.T. 58, lns. 8-19.

63.     However, Bass did testify that is was "very likely" that her staff, specifically Matozzo, did speak with Goins regarding the Carla Cain matter.  N.T. 58, lns. 22-25.

64.     Bass said the same regarding Richardson, stating that her staff spoke for her when speaking with Goins.  N.T. 59, lns. 2-3.

65.     Bass stated she spoke with Foster regarding the position and that, while she has spoken with Foster since Foster assumed the position, their conversations are very rare.  N.T. 59, lns. 6-10.

66.     Bass then testified, "There were a number of other RCOs, as I mentioned earlier, that were already operating in the community.  They were doing a great job.  There was no need to duplicate efforts."  N.T. 59, lns. 19-22.

67.     Again, Bass testified that Carla Cain submitted an application in 2019.  N.T. 65, lns. 10-12.

68.     Bass then stated that at that time (2019), as ward leader, Bass did not believe that Carla Cain had the authority to register the 22nd Ward RCO. Bass objected upon discovering Carla Cain's application.  N.T. 65, lns. 16-22.

69.     Following Bass's objection in 2019, nothing happened regarding the change in contact person through September of 2020.  N.T. 687, lns. 2-5.

70.     In September of 2020, Planning Commission staff advised that they were following their normal procedure and check in with organizational leadership.  N.T. 67, lns. 6-9.

71.     Bass testified that her objection, regarding Carla Cain's status as contact person for the 22nd Ward RCO, was that Cain's ascension to that role was done without "any sort of contact, communication" and that herself and Cain had "a little bit of history…of being contrary in a lot of matters.  N.T. 68-69, lns. 20-2.

72.     Bass, when testifying to Joint Exhibit 3 stated, her signature appeared on the political ward RCO registration certification.  N.T. 70, lns. 4-9.

73.     When asked whether the City contacted her, as ward leader, to find out what the 22nd Ward Democratic Committee wanted as its representative in the RCO process, Bass testified that the city did contact her.  N.T. 70-71, lns. 23-4.

74.     Bass testified that Exhibit-6, the letter providing Bass's response to the city investigation, was on ward leader letterhead, instead of councilperson letterhead, because she was acting at the ward leader and it was the ward RCO.  N.T. 71, lns. 13-16.

   B.     **Testimony of Carla Cain**

75.     Carla Cain ("Cain") testified that she has been involved in Democratic city politics for over 30 years.  Cain currently holds the positions of a committee person in the 22nd Ward, 25th

division.  In the past, Cain has been a committee person first vice chair and a member of a state committee. N.T. 76, lns. 12-22.

76.     Cain first became interested in forming an RCO in 2019.  N.T. 77, lns.. 1-2.

77.     Cain testified that she became interested due to development in her community. N.T. 77, lns. 4-5.

78.     Cain stated that there were other like-minded persons regarding approaching development issues.  N.T. 77, lns. 13-18.

79.     As a primary contact person for an RCO, you receive special notice regarding upcoming development projects, notice coming from both the city and the developer.  N.T. 77, lns. 23-25.

80.     Cain stated that in 2020, she became aware that there was an issue with her being recognized as the primary contact person for the RCO.  N.T, 78, lns. 1-4.

81.     Cain testified that this was in August of 2020, around the same time the application was submitted. At that time, Cain believed she was already undergoing the process of being removed.  N.T. 78, lns. 6-14.

82.     Cain testified that on August 20, 2020, Goins sent her an email stating, "I am writing to make you aware that if you are already or recently submitted an RCO registration application for the 22nd ward, the application referred to RCO meeting the first Wednesday of each month as of August the 6th meeting to discuss and create a new 22nd ward RCO. The application lists primary, secondary contact, certification authorization of the application by ward leader. As the applicant for the 22nd ward last June, the current list and primary contact of the RCO, I am reaching out to you to confirm if you are aware of the recent submission of application." N.T. 79, lns.13-22.

83.     Goins then followed up, "writing to follow up with my message of August 20th regarding the 22nd ward RCO. Because I haven't received a response from you, I am now writing to inform you that we will be moving forward with the changes to organization name and primary contacts as requested in the newly submitted registration."  N.T. 80, lns. 4-11.

84.     Cain responded on September 3, 2020 stating, "Please give me a call because I do not understand. Carla Cain."  N.T. 80, lns. 20-25.

85.     Goins responds stating he could call Cain later that day.  N.T. 81, lns. 3-5.

86.     Goins continued, "Committee members from the 22nd democratic ward submitted an RCO registration in August with two new contacts and the ward leader's signature…As the 22nd ward RCO was already active with you as primary contact, we are treating the new registration as a request to change contact information for the RCO. When we  receive requests to change RCO information from someone other than the primary contact, we reach out to the primary contact to confirm. If the primary contact doesn't respond or contests the request for changes, we'll reach out for organizational leadership, in this case the ward leader for confirmation. We're taking the ward leader's signature on the recently submitted registration as confirmation of the request to change information in this case. Happy to answer any questions as best I can by phone, Jonathan" N.T. 81, lns. 6-23.

87.     Cain then had a conversation with Goins summarizing that at the request of the ward leader, Bass, Cain was being removed from her position.  N.T. 82, lns. 1-8.

88.     Cain summarized her conversation with Goins by saying Bass was pressuring for her removal.  N.T. 82, lns. 10-11.

89.     Cain was removed from her position as primary contact in 2020.  N.T. 82, ln. 14.

90.     Cain then became aware, through emails, that she was reinstated.  N.T. 82, lns.15-18.

91.     In an email dated September 23, 2020, Cain stated that she would not accept reinstatement unless certain variables had been clarified.  N.T. 83, lns. 2-3.

92.     Specifically, Cain stated, "Hi, Jonathan. I will not accept or acknowledge this change until the below is addressed. 1) What is the policy and/or legal jurisdiction that allows for the removal of the head of an RCO? Please advise and share the documentation that supports this. 2) What is the procedure to file an appeal on being removed as an RCO head?  Please respond at your earliest convenience."  N.T. 83, lns. 2-8.

93.     Goins did not explain a procedure for removal.  N.T. 83, lns. 14-16.

94.     Cain, referring to Joint Exhibit-5, testified that in 2021 she understood that she was in fact the primary contact, as recognized by the City.  N.T. 84, lns. 13-19.

95.     Cain then sent an email, marked Exhibit-12, page 120, stating that she was appealing the decision to remove her as primary contact.  N.T. 85, lns. 23-25.

96.     Cain then received an email from Goins stating the matter was referred to the Philadelphia City Planning Commission and that Cain will be kept updated by Goins as the process moves forward.  N.T. 86, lns. 3- 10.

97.     In the next email exchange, Cain informed Goins she would like to maintain her duties and stay on at RCO.  N.T. 86, lns. 14-15.

98.     Goins then responded, "You are the RCO!"  N.T. 86, ln. 19.

99.     The response went on to say, "Good morning, Carla. You will remain the primary RCO for the 22nd Ward Democratic Committee.  Thank you so much for your patience and I apologize for the confusion and inconvenience."  N.T. 86-87, lns. 24-2.

100. Cain stated that she was notified sometime that fall that she was terminated. N.T. 87, lns. 9-11.

101. Cain then testified that she communicated once with Eleanor Sharpe at the time of her reinstatement. N.T. 87. lns. 15-19.

102. Cain stated that Sharpe said that Cain was being reinstated because grounds did not exist to terminate her. N.T. 87, lns. 22-23.

103. Cain testified that she was not aware of any rule or procedure that vests termination authority in the ward leader. N.T. 88, lns. 3-5.On August 20, 2020, Cain was made aware of the dispute between herself and the ward leader over who would represent the 22nd Ward. N.T. 90, lns. 1-5.

104. Upon submitting the application, Cain identified the organization type as a ward committee. N.T. 90, lns. 21-24.

105. Again, Cain testified that Eleanor Sharpe told her that there no grounds to terminate her. N.T. 96, lns. 12-14.

106. Cain reiterated that in her conversations with Eleanor Sharpe and Goins she did not speak politically, and only discussed the RCO primary contact issue. N.T. 98, lns. 10-11.

107. Cain testified that she is pursuing this claim because of a violation of her First Amendment Rights. N.T. 99, lns. 3.

108. Cain testified that she submitted the original applications electronically. N.T. 99, lns. 19-22.

109. Cain stated that every single question on the electronic application has to be answered and that an applicant does not have the ability to continue the application unless all questions are answered. N.T. 100. lns. 2-3.

C.    **Testimony of Jonathan Goins**

110.    Goins is a city planner within the Division of Planning and Zoning for the City of Philadelphia.  He also serves as the RCO Coordinator with the department.  N.T. 104, lns. 2-7.

111.    Goins was the person who originally received Cain's 2019 registration.  N.T. 104, lns. 8-11.

112.    After the registration was received by Goins, it was then approved and placed on a list of registered RCOs.  N.T. 104, lns. 15-18.

113.    Following the approval, Goins received a comment regarding the approval from Bass's councilmanic chief of staff, Matozzo.  N.T. 104, lns. 19-22.

114.    Goins could  not remember the exact words of the conversation, but testified that Matozzo was surprised a registration had been submitted on behalf of the 22nd Ward.  Goins further testified Matozzo was calling from Bass's office.  N.T. 105, lns. 4-7.

115.    No action was taken between September 2019 and August of 2020 regarding Cain's status.  N.T. 105, lns. 20-24.

116.     Goins testified that every year in June, the office accepts RCO renewals and registrations.  An RCO status is good for two years.  No applications are accepted outside of the registration period.  N.T. 106, lns. 5-13.

117.    Goins testified that in 2020 he received an application from Foster for the RCO. N.T. 106, lns. 15-18.

118.    According to procedure, upon receipt of an application differing from the current RCO leader, Goins is required to contact the current RCO leader to confirm if that person agrees with the change.  N.T. 107, lns. 4-11.

119.   Goins reached out to Cain and ultimately, that consent was not obtained.  N.T. 107, lns. 12-16.

120.   Goins, or no one else to his knowledge, confirmed to Cain that she was being removed.  N.T. 107, lns. 18-23.

121.   Goins testified that even though there was a certification by the ward leader, that was not treated as sufficient to change the status of the primary contact and that information was never expressly communicated to Cain.  N.T. 108, lns. 1-11.

122.   Goins' testified that a councilperson cannot change an RCO contact person.  N.T. 110, lns. 7-10.

123.   While Goins testified that he was not authorized to speak on behalf of the entire Planning Commission, nothing within the zoning code or regulations stated that a councilperson could change an RCO contact person.  N.T. 110, lns. 11-17.

124.   Goins acknowledges that he is aware of the October 13 letter from Bass.  N.T. 110, lns. 18-24.

125.   Goins testified that based upon that letter, a change within the RCO took place. N.T. 111, lns. 1-2.

126.   Goins acknowledge that no specific guideline or regulation was followed when making the change.  N.T. 111, lns. 3-12.

127.   Goins testified that, per the regulations, it is required than an RCO change be requested in writing to the executive director.  N.T. 114, lns. 16-19.

128.   Goins testified about Defendant's Exhibit-11, is a copy of regulation 12.3.4, which states, "…updates and corrections, an RCO may submit a written request of the executive director to correct or update its registration information at any time.  This request shall be submitted or

verified by the primary contact person as listed in the RCO's current registration, unless the primary contact is unavailable due to death, medical conditions or other exceptional circumstances. The executive director may request additional documentation to verify any modification to an RCO's registration information." N.T. 115, lns. 7-19.

129.    Goins confirmed that the executive director referred to is Eleanor Sharpe.  N.T. 115, lns. 20-22.

130.    Goins confirmed that no change was made to regulation 12.3.4.  N.T. 117, ln. 7.

131.    However, an amendment did occur on November 22, 2021 which required a ward leader certification to avoid situations like the present from recurring in the future, according to Goins.  N.T. 117, lns. 10-25.

132.    Goins confirmed that change was not made until fall of 2021 and well after Cain was removed from her post.[5]  Additionally, Goins confirmed only a regulation changed and that it was not an ordinance change. A regulation change is required to be put forward before the entire Planning Commission and undergo a public comment period.  N.T. 118, lns. 1-13.

133.    Goins, when asked about speaking with Cain directly, testified that he had spoken with her sometime in 2020.  N.T. 121, lns. 14-20.

134.    Then in June 2021, Goins received Cain's application for renewal.  N.T. 122, lns. 23-25.

135.    Goins accepted the application.  N.T. 123, lns. 1-2.

136.    Goins never received a complaint about Cain during her time as the primary contact with the RCO.  N.T. 123, lns. 5-10.

---

[5] *See also* Bass 000012 (email dated September 24, 2021 from RCO.Notification@phil.gov stating that Carla Cain was no longer contact of 22nd Ward Democratic Committee).

137.    Procedures exist should a primary contact need to be disciplined, although such procedures were never applied to Cain at any time.  N.T. 123, lns. 11-14.

138.    In September 2021, Richardson of Bass's staff, notices that Cain is still listed as the primary contact and informed Goins that Foster is the chair.  N.T. 123, lns. 16-19.

139.    Such communications occurred while Jeanine Allen-Bowens was at Goins office on staff with the Zoning Board of Adjustment.  N.T. 123, lns. 19-20.

140.    Goins testified that Bass had emailed Goins stating, "Thank you to everyone for working to clear this matter up. Just to be clear, I have been working with Christina Foster regarding all RCO matters in the 22nd ward. I will continue to do so and talk to Carla Cain to gauge her interest regarding working with Christina to have one seamless operation and end any confusion that may exist -- that currently exists.  Again, many thanks." N.T. 124, lns. 1-10.

141.    Goins confirmed he spoke with Bass, but Bass never confirmed her role.  N.T. 124, lns. 15-20.

142.    Richardson emailed Goins and then Bass sent a letter to Goins, requesting the change to the primary contact of the RCO be made in late 2021.  N.T. 124, ln. 21 - 125, ln. 1.

143.    Following additional exchanges, Goins testified that he advised Bass to "put her ward leader hat on."  N.T. 127, lns.15-17.

144.    Goins testified that he felt the request for the change should come from the ward leader.  N.T. 127, lns. 22-25.

145.    Goins testified that there is a procedure in place such that if someone applies for an RCO position and would be rejected, such person can appeal directly to the Planning Commission to state his or her case. N.T. 128, lns. 8-14.

146.    However, no such procedure applied to the Cain matter. N.T. 128, lns. 15-16.

147.    While Goins testified that Cain retained her position in 2020, he does not have any direct documentation or record to prove that she was told that.  N.T. 128, lns. 18-25.

148.    Goins testified that after October 13, 2021, he is not certain whether there was any communication to Cain that she had been removed.  N.T. 129, lns. 3-4.

149.    Goins testified to the difference between an initial application for an RCO and a change application, stating, "So an initial application has certain requirements that have to be listed as per the zoning code and our regulations, contact information is one of them.  There's additional documentation that we verify to see if an RCO meets, or an organization meets our criteria for RCO status.  A change in information, I read the regulation earlier, but essentially should be something in writing from the RCO requesting that change to be made, and there is some procedure around that but not the same as for an application."  N.T. 130, lns. 1-9.

150.    Goins stated that the application is not the only way to make a change, just that the request should be in writing.  N.T. 130. lns. 22-25.

151.    Goins testified that the ward leader certification on the 2020 application was insufficient. The application was insufficient, Goins testified, because the Planning Commission wanted an explicit request to change the contact information and the 2020 application did not provide that. Goins also stated that due to never receiving written confirmation from Foster, the change was not made.  N.T. 131, lns. 2-21.

152.    Goins then testified to the appeals process stating that while he does not have firsthand experience, his understanding is that there is an automatic time for appeal and that such an appeal goes to the Planning Commission.  N.T. 132, lns. 2-14.

153.    It is Goins' opinion that a councilwoman is not authorized to make changes to any RCO.  N.T. 132, lns. 21-24.

154.    When asked if Bass or any member of her staff pressured him or his office to make the requested change, Goins testified, "No, I would say the request was made and we were clear the form we'd like to have that request to be made in, but I would not say that I felt pressured to make a change." N.T. 133, 134, lns. 22-1.

155.    Goins testified that he is the one who maintains the primary contact information for the RCOs. He also testified to the process of changing a primary contact, which essentially boils down to changing the information in their internal system. N.T. 134-135, lns. 21-7.

156.    Goins testified to removing Cain and replacing her with Foster as the primary contact because he then felt at that time the request from the ward leader was sufficient. N.T. 137, lns. 1-8.

157.    There was a dispute as to who was authorized to speak on behalf of the 22nd Ward Democratic Committee as it related to the RCO. Goins requested clarification from Bass and her staff as to the proper contact. Goins' office, acting under 12.3.4., felt that the ward leader expressing a desire to update the primary contact person was sufficient. N.T. 139, lns. 2-19.

**D.    Testimony of Eleanor Sharpe**

158.    Eleanor Sharpe is the Executive Director of the Philadelphia Planning Commission and Deputy Director of Planning and Development. N.T. 148, lns. 20-23.

159.    Sharpe described herself as the final arbiter of any dispute regarding RCOs. N.T. 148, lns. 24-25.

160.    In an email from Goins to Eleanor Sharpe, Goins stated, "Eleanor, I'm going to make this change unless you object. Under current regulations the process involves confirming the change with the existing primary contact (Carla Cain) who will most certainly object. There is nothing that says we can't make the change anyway as long as we're comfortable saying 'the

Ward leader act in writing and we determine she has the authority to overrule your objection to the change.'"  Sharpe responded, "Yes, I'm good with this."  N.T. 150, lns. 1-11; Jt. Ex. 12 (City 000087).

161.    Sharpe testified that such email referred to the removal of Cain as primary contact. N.T. 150, lns. 20-22.

162.    However, Sharpe confirmed that there was "no ordinance or regulation that specifically determined" how and when a change should be made upon such a request.  N.T. 151, lns. 22-24.

163.    In certain circumstances, such as death, medical condition, or other exceptional circumstance, the primary contact does not need to verify a change in RCO information.  A dispute regarding who the primary contact is, does not constitute an exceptional circumstance.  N.T. 156, lns. 10-21.[6]

### E.    Testimony of Christine Foster

164.    Foster testified that she had been contacted by Bass to be the primary contact for the RCO.  N.T. 161, lns. 10-14.

165.    Foster testified that she did not know Dominic Mathis (although knew "of" him) and was not friends with him.  N.T. 162, lns. 14-22.

166.    When asked if she ever reviewed the city website governing RCOs, Foster testified that she had not.  N.T. 163, lns. 24-25.

167.    When Foster was asked whether she had discussed with Bass what the primary contact job entailed, Foster confirmed that she had spoken with Bass about it, stating, "Well, at the time we talked about it because of the pandemic and everything, just hold off on everything

---

[6]  The Court made this ruling from the bench at the time of hearing.

because I needed to know what the procedures were and how to move forward." N.T. 165, lns. 1-6.

168.    Foster testified that she has not spoken to Bass since and that everything is still "on hold." N.T. 165, lns. 11.

169.    Foster then testified that she did not fill out and complete the application to become primary contact for the RCO.  N.T., 166, lns. 9-10.

170.    Foster provided whatever information Goins' office requested but did not personally fill out the application.  N.T. 166-167, lns. 22-1.

171.    Foster testified to the extent that she did not know whether everything was done electronically, but simply assumed that such was the case.  N.T. 167, ln. 19.

172.     Foster never filled out the application on a computer, or otherwise.  N.T. 168, lns. 5-10.

173.    When asked what she has done so far as primary contact for the RCO, Foster responded, "For right now, I explained to you, everything was a standstill. I haven't done anything as of yet. I haven't been to any RCO meetings. We haven't conducted any RCO meetings."  N.T. 173, lns. 9-14.

174.    When asked whether the same process was repeated in 2021, Foster testified that she could not recall.  N.T. 177, lns. 5-12.

## II.    Conclusions of Law

1.    At the time of Cain's removal, nothing in the City Ordinances or Regulations required a political ward leader's approval to establish an RCO and nothing vested authority in a ward leader over any given RCO, including those in a ward leader's ward.

2.      Accordingly, Bass was without authority to remove Cain from her position within the 22nd Ward Democratic RCO.

3.      State action permitting suit under 42 U.S.C.§ 1983 was present however in spite of the lack of statutory authority permitting Bass's actions because the scope of actionable conduct under § 1983 includes conduct broadly including "statute, ordinance, regulation, custom or usage."  42 U.S.C. § 1983.

4.      Bass's actions were taken "with the help of or in concert with [City] officials" and the City "has so far insinuated itself into a position of interdependence with the acting party [Bass] that it must be recognized as a joint participant" in the retaliatory conduct.  *Kach v. Hose,* 589 F.3d 626, 646 (3d Cir. 2009).

5.      The City's actions went beyond mere approval or acquiescence in Bass's actions when it undertook actions to carry out Bass's removal.  *Leshko v. Servis,* 423 F.3d 337, 341 (3d Cir. 2009).

6.      The City's policy or practice of recognizing and complying with a councilperson's directive served as the impetus for City Planning to facilitate Cain's removal.

7.      In order for Cain to show that she was removed for a retaliatory purpose, Cain must show that (1) she engaged in constitutionally protected conduct; (2) the retaliatory action taken against her was "sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  *Thomas v. Independence Twp.,* 463 F.3d 285, 296 (3d Cir. 2006).

8.      Political speech is the core of the First Amendment.  See *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943); see also *Buckley v. Valeo,* 424 U.S. 1 (1976) (per

curiam); *Texas v. Johnson*, 491 U.S. 397 (1989); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

9.      Cain engaged in protected First Amendment conduct both by her political speech and activism opposing Bass in various political campaigns.  See *Montiero v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006) ("It is clearly established that when a public official excludes a[n] elected representative or a citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment."); see also *Bond v. Floyd*, 385 U.S. 116 (1996) (elected official's speech is protected under the First Amendment).

10.     Bass, with the City's assistance and approval, wholly prevented Cain, through Cain's removal, from performing the duties for which Cain was instituted to perform by the 22nd Ward Democratic RCO.  *Werkheiser v. Pocono Twp*., 780 F.3d 172, 181(3d Cir. 2015) ("the First Amendment may well prohibit retaliation against elected officials for speech pursuant to their elected duties only when the retaliation interferes with their ability to adequately perform their duties.").

11.     Cain was denied access to information and prevented from performing her duties for the 22nd Ward Democratic RCO, which impeding activity rises to the standard required under the "sufficient to deter a person of ordinary firmness element."  *Croft v. Donegal Twp*., 2021 WL 1146285 at *3 (W.D. Pa. March 25, 2021).

12.     The antagonism and retaliatory animus by Bass toward Cain is apparent and establishes the causal connection between the Cain's exercise of constitutionally protected rights and Bass's retaliatory removal.  *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir. 2000); see also ECF Doc. #30 (Joint Stipulation of the Parties) ¶¶ 4, 5 and 13.

13.     A party seeking a preliminary injunction ordinarily "must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (quoting *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987)).

14.     If a party seeking a preliminary injunction makes a satisfactory showing on these two "gateway factors," the district court is permitted to balance "the possibility of harm to other interested persons from the grant or denial of the injunction, and… the public interest," if these additional factors are relevant to the facts of the case at hand. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179, *as amended* (June 26, 2017) (3d Cir. 2017)4 (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

15.     The foregoing conclusions establish that Cain has a reasonable probability of success on the merits of this matter which is prerequisite to the Court issuing a preliminary injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) *as amended* (June 26, 2017).

16.     "[T]he violation of a fundamental right, such as one's First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir.2002) (internal quotations omitted).

17.     Injunctive relief is "clearly appropriate" where "First Amendment interests [are] either threatened or are in fact being impaired at the time relief [i]s sought." *Stilp v. Contino*, 613 F.3d 405, 409, n.4 (3d Cir. 2010) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

18.     No remedy at law is available to cure Cain's First Amendment injury or to give her the prospective relief she seeks. *Ne. Pa. Freethought Society v. County of Lackawanna Transit System*, 938 F.3d 424, 443 (3d Cir. 2019).

19.     No harm will be imposed on other interested parties.

20.     The public interest favors a preliminary injunction where, as here, Cain has demonstrated a likelihood of success on the merits, irreparable harm, and the injury complained of derives from the Constitution. *Pennsylvania Prof'l Liab. Joint Underwriting Ass'n. v. Wolf*, 328 F. Supp. 3d 400, 411 (M.D. Pa. 2018).

21.     In light of no monetary consideration at stake in this case, nominal security is appropriate.  See Rule 65(c).

22.     Plaintiff suggests nominal bond of one hundred dollars ($100).  See *Schrader v. Sunday*, --- F.Supp.3d ---, 2022 WL 1542154 (M.D. Pa. May 16, 2022) (preliminarily enjoining provision of Child Protective Services Law upon posting $100 with court); *Stilp v. Contino*, 629 F.Supp.2d 449 (M.D. Pa. 2009), *aff'd* 613 F.3d 405 (3d Cir. 2010) (preliminarily enjoining provision of Public Official and Employee Ethics Act upon posting $250 with court).

23.     A preliminary injunction restoring Carla Cain to the position of primary contact of the RCO and to restrain the City and Councilperson Bass from further attempts to remove Ms. Cain from such position is appropriate relief.

Respectfully submitted,

**METTE, EVANS & WOODSIDE**

By: _____

Aaron D. Martin
Pa. Atty. I.D. 76441
3401 North Front Street
Harrisburg, PA 17110
Phone: 717-232-5000
admartin@mette.com

**Law Offices of John S. Carnes, Jr.**

By: /s/ John S. Carnes, Jr.
John S. Carnes, Jr.
Pa. Atty. I.D. 47338
101 Main Street
Parkesburg, PA 19365
Phone: (610) 857-5500
jscarnes@jcatty.com

*Attorneys for Plaintiff,*
*Carla Cain*

Dated: October 17, 2022.

28